**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00261-STV

MICHAEL LEVINE, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.,

      Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Defendant's Motion to Dismiss and Compel Individual Arbitration as to Certain Opt-In Plaintiffs (the "Motion").  [#70]  The Motion is before the Court on the Parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment. [#15, 16]  The Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion.  For the following reasons, the Motion is **GRANTED in part and DENIED in part.**

**I.    BACKGROUND**

      Defendant Natural Grocers owns and operates more than 150 grocery stores throughout the Central and Western United States.  [#17 at ¶ 15]  Defendant employs Assistant Store Managers ("ASMs") in its stores and classifies them as exempt from overtime.  [*Id*. at ¶¶ 2, 4]  Plaintiff Michael Levine was employed by Defendant as an

ASM in Highlands Ranch, Colorado from March 2018 to April 2019.  [*Id*. at ¶ 10]

Plaintiff filed the instant action on January 31, 2020, on behalf of himself and others

employed by Defendant as ASMs.  [*Id*. at ¶¶ 6-7]  Plaintiff alleges that:

> Plaintiff and all other similarly situated were required to work more than 40
> hours in a workweek and/or 12 hours in a day while employed by
> Defendant in order to complete their job duties. However, in accordance
> with Defendant's policy, pattern, and/or practice, they were misclassified
> as exempt from overtime compensation and were not paid at the
> mandated rate of time-and-one-half for all hours worked in excess of 40 in
> a workweek and/or 12 hours in a day.

[*Id*. at ¶ 5]  Following the filing of this action, 158 current or former ASMs filed notice of

consent to join the action as opt-in as plaintiffs.  [*See* #104]  Defendant argues that 57

of those opt-in plaintiffs signed electronic arbitration agreements.[1]  [*See generally* ##70,

70-1, 107, 107-1]

### A. Evidence of Arbitration Agreements

Defendant has submitted two categories of documents in support of its argument

that certain opt-in plaintiffs signed arbitration agreements.  [##70-1, 107-1]  The first

category consists of two-page documents titled "Arbitration Agreement and Class Action

Waiver"; these documents contain employee digital signatures—created by checking a

box—and timestamps on the second page.  [*See, e.g.,* #70-1 at 1-2]  The second

category consists of three-page documents taken from Defendant's human resources

portal.  [*See Id.* at 3-5; #70-2]  The first page of these documents is titled "Arbitration

Agreement and Class Action Waiver," and: (1) identifies a specific employee by name

and employee ID number, (2) contains an acknowledgement message, and (3)

---

[1] Defendant also argues that 13 individuals who have not opted-in to the collective
action, but who could potentially qualify as class members under Federal Rule of Civil
Procedure 23, are subject arbitration.  [#107 at 2 n.2]  Because those individuals are not
yet parties to this action, the Court will not address at this time whether they are subject
to arbitration.

indicates the date on which the employee accepted the arbitration agreement.  [*Id*. at 3]

The acknowledgement message reads as follows:

> I acknowledge that:
> I have read the Agreement in full.
> By accepting the Agreement, I agree to and am bound by all of its terms, including the arbitration/class action waiver provisions on page 1.
> I have had sufficient time to review the Agreement.
> I understand that I may access my executed or electronically accepted copy at any time by accessing the Document Acknowledgement Tab in my HRIS record, clicking on the Arbitration Agreement link and then clicking on the Arbitration Agreement and Class Action Waiver Document link.

Pages two and three consist of the actual arbitration agreement, which is titled "ARBITRATION AGREEMENT AND CLASS ACTION WAIVER."  [*Id*. at 4-5]

Defendant also submitted a declaration by Heidi Hayward, Defendant's Vice President of Human Resources.  [#70-2]  The declaration details the following pertinent information:  Defendant has included an arbitration agreement in all new-hire onboarding paperwork in its applicant tracking system, iCIMS, since September 10, 2018 [*id*. at ¶¶ 3-4]; Defendant has included the arbitration agreement as required paperwork in iCIMS for all recipients of company job offers, including promotions, since December 10, 2019 [*id*. at ¶ 5]; Defendant has included the arbitration agreement as required paperwork for all Store Managers and ASMs in the company's online human resources information system, UltiPro HRIS, since January 10, 2020 [*id*. at ¶ 6]; as of January 10, 2020, Defendant expressly conditioned continued employment and an annual merit pay increase for Store Managers and ASMs upon acceptance of the terms of the Arbitration Agreement [*id*.]; and after January 10, 2020, UltiPro HRIS sent automatic reminders to Store Managers and ASMs who had accepted continued employment and the merit increase but had failed to sign the agreement [*id*. at ¶ 7].

Ms. Hayward's declaration also includes an exhibit detailing the process by which employees signed the agreement in UltiPro HRIS.  [*Id*. at 4-6]  First, an employee was required to log into their UltiPro HRIS account, which informed the employee of required employment documents they had not yet signed.  [*Id*. at 4]  The employee then would click on the title of the document they had not yet signed—in this case, the Arbitration Agreement.  [*Id*.]  They would next be shown a screen containing: (1) the name of the agreement, (2) a link to view the actual agreement, (3) the acknowledgement message, and (4) an empty check box stating "Accept?"  [*Id*. at 5]  The employee could then click the "Accept" box to indicate that they accepted the agreement.  [*Id*.]  Importantly, the system did not permit an employee to click the "Accept" box unless they had opened the actual agreement by clicking the document link.  [*Id*.]  After accepting, the employee was shown a pop-up box again containing the acknowledgment message and prompting the employee to confirm "yes" or "no" to "acknowledge" the message contained therein.  [*Id*. at 6]  Once an employee had clicked the "Accept" box and then re-confirmed acknowledgement by clicking "yes," the UltiPro HRIS system showed the document as "Accepted" for that employee and indicated the date and time of acceptance.  [*Id*.]

## B.  Content of Arbitration Agreements

There are two versions of the Arbitration Agreement.  [*See generally* ##70, 70-1, 107, 107-1]  The  first version states that the Agreement is in consideration of the signatory's employment with Defendant.  [*See* #70-1 at 1]  The second states that the Agreement is in consideration of: (1) the signatory's employment with Defendant, (2) a "new position . . . and associated pay increase," (3) a "relocation bonus," and/or (4) a

"merit increase."  [*See e.g.,* #107-1 at 1]  The Agreements thereafter contain either five or seven terms and conditions.  [##70-1 at 1; 107-1 at 1]  All the Agreements contain a term stating: "Any dispute, controversy or claim arising out of or relating to my employment with the Company or the termination thereof will, to the fullest extent permitted by applicable law, be settled exclusively by binding arbitration."  [*Id.*]

Agreements containing a check box and electronic signature on the agreement itself contain the following statements:  "I have executed this Arbitration Agreement and Class Action Waiver as of the date set forth below" and "Checking the checkbox above is equivalent to a handwritten signature."  [See #70-1 at 2]  Agreements completed through the UltiPro HRIS process detailed above contain the following statement:  "I have agreed to this Agreement as of the date of my execution or electronic acceptance thereof."  [*Id.* at 5]

### C.  Plaintiff's Evidence

Plaintiff has submitted nearly identical declarations from 23 opt-in plaintiffs.[2] [##126-1 to 126-24]  Each of these opt-in plaintiffs completed the acknowledgement process in UltiPro HRIS.  [*Id.*]  The declarations describe the employees' experience working for Defendant, their receipt of several emails regarding the arbitration agreements, and assert that Defendant misrepresented the agreement.  [*Id.*]  Some declarations also contain information specific to the individual employees, which the Court will address in the analysis.  [*Id.*]

---

[2] Plaintiff has also submitted a declaration from an individual who worked for Defendant, but did not opt in to this litigation.  [#126-2]

### D.  Procedural History

Defendant filed its Motion to Compel on February 4, 2021.  [#70]  Through the Motion, Defendant argues that 32 opt-in plaintiffs signed an arbitration agreement and should be compelled to arbitrate.  [*Id.*]  On February 23, 2021, Plaintiff filed a motion seeking an extension of time to respond to the Motion in order to conduct discovery into the alleged agreements.  [#79]  The Court thereafter granted Plaintiff a 60 day extension to conduct discovery.  [#92]  Plaintiff filed his response to the Motion on May 24, 2021, in which he informed the Court that despite the extension of time, he did not conduct any discovery into the arbitration agreements.  [#103 at 14 n. 4]  Defendant filed a reply to the Motion on June 7, 2021, and identified additional opt-in plaintiffs it argues are subject to arbitration, thus bringing the total to 57.  [#107 at 2 n.2]

On June 29, 2021, Plaintiff filed a motion seeking additional time to investigate the alleged agreements of the opt-in plaintiffs identified by Defendant in its reply.  [#112]  The Court granted Plaintiff two weeks to conduct additional investigation and later permitted Plaintiff to file a surreply to the Motion.  [##113, 122]  Plaintiff then filed his surreply and Defendant filed a response.  [##126, 128]

## II.   LEGAL STANDARDS

Arbitration agreements are governed by the Federal Arbitration Act ("FAA").  *See* 9 U.S.C. § 1 *et seq.*; *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (finding that employment contracts fall within the FAA, except "contracts of employment of transportation workers").   But "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked."  *Avedone Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997).   "[U]nlike the general

presumption that a particular issue is arbitrable when the existence of an arbitration agreement is not in dispute, when the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1370 (D. Colo. 2014) ("*Nesbitt I*") (quoting *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998)), *aff'd*, 811 F.3d 371 (10th Cir. 2016) ("*Nesbitt II*"); *see also Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002) (stating that "presumption [of arbitrability] disappears when the parties dispute the existence of a valid arbitration agreement"). "A federal court must apply state contract law principles when determining whether an arbitration agreement is valid and enforceable." *Nesbitt I*, 74 F. Supp. 3d at 1371 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

If the court determines the existence of a valid and enforceable arbitration agreement, the FAA then applies. Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *see also Nesbitt I*, 74 F. Supp. 3d at 1370 (same). Accordingly, the FAA requires the Court to "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds*, 470 U.S. at 221, unless the agreement to arbitrate is invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," *Nesbitt II*, 811 F.3d at 376 (quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339

(2011)); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018).   But an arbitration agreement will not be nullified by "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."  *Id.*

In considering a motion to compel arbitration under the FAA, the court applies "a standard similar to that governing motions for summary judgment."  *Stein v. Burt-Kuni One, LLC*, 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005); *see also Ragab v. Howard*, 841 F.3d 1134, 1139 (10th Cir. 2016) ("When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate," applying a "standard [that] is similar to the summary judgment standard").  Accordingly, first Defendant "must present evidence sufficient to demonstrate an enforceable arbitration agreement."  *Stein*, 396 F. Supp. 2d at 1213.  Then, the burden shifts to Plaintiffs "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56."  *Id.*

III.   **ANALYSIS**

In its Motion, Defendant argues that that the arbitration agreements signed by the opt-in plaintiffs require them to submit their claims to binding arbitration.  [*See generally* ##70, 107]  Plaintiffs respond that: (1) Defendant has not presented sufficient evidence to demonstrate the existence of the arbitration agreements, and (2) if the Court finds any valid agreement, the agreements should be invalidated by generally applicable contract defenses.  [*See generally* #103]  The Court addresses these arguments in turn.

## A. Existence of Enforceable Arbitration Agreements

As a threshold matter, the Court must determine whether any agreements to arbitrate exist. *Avedone Eng'g*, 126 F.3d at 1287. Here, because the parties dispute whether there is a valid and enforceable arbitration agreement, the presumption of arbitrability falls away. *Nesbitt I*, 74 F. Supp. 3d at 1370; *Dumais*, 299 F.3d at 1220.

To support its argument that enforceable arbitration agreements exist, Defendant has provided signed arbitration agreements for each opt-in plaintiff it seeks to compel to arbitration, as well as declarations from Defendant's employees regarding the process of signing the agreements and internal documents evidencing pay raises. [##70-1, 70-2, 107-1, 107-3, 128-1, 128-2] In response, Plaintiff argues that Defendant has not: (1) sufficiently authenticated the agreements, (2) demonstrated that the individuals read and signed the agreements, thereby agreeing to the terms of the agreements, and (3) shown that there was consideration for the agreements. [#103 at 9-11] The Court will first consider what law it should apply to determine whether any agreement to arbitrate exists. It will then examine Defendant's evidence of agreements and Plaintiff's rebuttal evidence.

### i.    Choice of Law

In determining whether there was an agreement to arbitrate, this Court must apply state contract law principles. *Nesbitt I*, 74 F. Supp. 3d at 1371. A federal court sitting in diversity applies the conflict of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941). Though the Court's jurisdiction in this case is not one of diversity, courts have applied *Klaxon* when analyzing state contract law in the context of determining whether there was a valid arbitration agreement in the

context of federal employment claims. *See Perez v. Qwest Corp.*, 883 F. Supp. 2d 1095, 1116 n.3 (D.N.M. 2012); *Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 253 (D. Md. 2011); *see also Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (applying same choice of law principles in federal question arbitration cases as would govern in diversity cases); *United Gov't Sec. Officers of Am. v. Special Operations Grp., Inc.*, 436 F. Supp. 2d 790, 792 (E.D. Va. 2006) (finding that "federal courts should apply the *Klaxon* rule in federal question cases where, as here, federal law dictates some reference to, or borrowing from, state law").

Applying *Klaxon*, the Court looks to Colorado's choice of law jurisprudence. Colorado has adopted the choice of law principles set forth in the Restatement (Second) of Conflict of Laws and thereby applies the law of the state having the "most significant relationship" to the particular issue in dispute. *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979); *see also Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014). "Thus, the court considers (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of the business of the parties." *Wells Fargo Ins. Serv. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1103 (D. Colo. 2016).

Defendant argues that Colorado has the most significant relationship to the agreements because "Defendant is headquartered in, operates primarily from, and sets its employment policies and practices from Colorado." [#107 at 8] By contrast, Plaintiff argues that this Court should apply the law of the state where each opt-in plaintiff lived

and worked when the agreements were purportedly signed.  [#103 at 9-10]  The Court agrees with Plaintiff that the opt-ins' state of residence and work has the most significant relationship to the arbitration agreement:  Plaintiffs signed the agreements, performed their work for Defendant, and lived in those jurisdictions.  Moreover, the agreements state that any arbitration would take place in the state in which the employee resides.  [*See* #70-1 at 1]  *See e.g., Born v. Progrexion Teleservices, Inc.*, No. 2:20-cv-00107, 2020 WL 4674236, at *10 (D. Utah Aug. 11, 2020) (applying Restatement and finding that state where employees worked had most significant relationship to employment agreement); *Krohn v. Spectrum Gulf Coast, LLC*, NO. 3:18-CV-2722-S, 2019 WL 4572833, at *2 (N.D. Tex. Sept. 19, 2019) (applying most significant relationship test and determining that Texas law governed because "Plaintiff and [Defendant] entered into the Agreement in Texas, [Defendant] employed Plaintiff in Texas, and Plaintiff resided in Texas"); *Bruster v. Uber Tech. Inc.*, 188 F. Supp. 3d 658, 664 (N.D. Ohio 2016) (applying most significant relationship test to arbitration agreement and finding that Ohio law applied because Plaintiff worked and resided in Ohio and signed the agreement in that state).

Nonetheless, the Court agrees with Defendant's assessment that, with limited exception, each of the jurisdictions in which opt-in plaintiffs work and reside follow the "basic hornbook contract law on offer, acceptance, and consideration."[3]  [#107 at 8]

---

[3] Opt-in Plaintiffs worked in the following states:  Arizona, Colorado, Idaho, Iowa, Kansas, Louisiana, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Texas, Utah, and Wyoming.  [#140]  With one exception, in each of those states a valid contract requires consideration and mutual assent through offer and acceptance.  *See Goodman v. Physical Res. Eng'g, Inc.*, 270 P.3d 852, 855 (Ariz. App. 2011*); Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012); *P.O. Ventures Inc. v. Loucks Family Irrevocable Trust*, 159 P.3d 870, 874-75

The Court will therefore proceed with its analysis using basic contract principles, citing to differences among the states' laws where necessary to further the analysis of specific opt-in plaintiffs.

## ii.   Authentication and Signatures

Plaintiff contends that Defendant has failed to authenticate the arbitration agreements, arguing that there is no evidence that any of the opt-in plaintiffs received or signed the agreement.   [#103 at 3-5]   This argument is unavailing.   Defendant has provided actual agreements that contain dated digital signatures.   [##70-1; 107-1] *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (to sustain its prima facie burden, the party seeking to compel arbitration must simply show that an arbitration agreement existed, not that the agreement would be enforceable); *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1148 (D. Colo. 2012) (same).   Defendant further provided declarations from Heidi Hayward—Defendant's Vice President of Human Resources—describing the process by which the agreements were obtained. [##70-2; 107-3; 128-1]

---

(Idaho 2007); *Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009); *O'Neill v. Herrington*, 317 P.3d 139, 144 (Kan. Ct. App. 2014); *Chipman v. Northwest Healthcare Corp., Applied Health Serv., Inc.*, 317 P.3d 182, 185 (Mont. 2014); *Overmier v. Parks*, 495 N.W.2d 620, 623 (Neb. 1992); *Piano v. Premier Distrib. Co.*, 107 P.3d 11, 14 (N.M. Ct. App. 2004); *Ehlen v. Melvin*, 823 N.W.2d 780, 783 (N.D. 2012); *Redwine Resources, Inc. v. Predator Tech., L.L.C.*, 171 P.3d 330, 334 (Okla. App. 2007); *Homestyle Direct, LLC v. Dep't of Human Serv.*, 311 P.3d 487, 492-93 (Or. 2013); *Karns v. Jalepno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 692 (Tex. App 2015); *Cea v. Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App. 2012); *Matter of Estate of McCormick*, 926 P.2d 360, 362 (Wyo. 1996).   The elements in Louisiana are slightly different, requiring: (1) capacity, (2) consent, (3) certain object, and (4) lawful cause.   *Bayou Rapides Corp. v. Dole*, 165 So.3d 373, 378 (La. Ct. App. 2015).   These slightly different elements do not impact the Court's analysis.

### a.  Opt-in Plaintiffs Submitting No Evidence

Plaintiff submitted no declarations, nor other competent evidence, for 34 of the 57 contested opt-in plaintiffs.  *Vernon*, 857 F. Supp. 2d at 1148 (stating that once a defendant provides evidence of an agreement to arbitrate the burden shifts to Plaintiff "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." (quotation omitted)). Instead, as to these opt-in plaintiffs, Plaintiff only *generally* argues that the agreements are not authenticated and that Defendant has not shown that the individuals read, understood, and signed the agreements.  [#103 at 3-12]

Courts routinely uphold digital agreements, provided the signatory had "reasonable notice, either actual or constructive, of the terms of the putative agreement and . . . manifest[ed] assent to those terms."  *Vernon*, 857 F.Supp.2d at 1149.  Here, the terms of the agreements appear either as part of the same document where the individual opt-in plaintiffs manifested an electronic signature [*see e.g.*, #70-1 at 1-2] or through a link that individuals were required to click on and review before manifesting agreement by clicking "Accept" [*see id*. at 3-5; #70-2 at 5].    Plaintiff has provided no competent evidence that, under such circumstances, these opt-in plaintiffs did not have notice of the terms of the agreement. *Vernon*, 857 F.Supp.2d at 1149-50 (noting that courts regularly recognize hybrid agreements where the terms appear on a separate page from the manifestation of assent).

 Moreover, signatures on written agreements—including digital signatures—are widely accepted as evidence of mutual assent.  *See e.g.*, *id*.; *Aerotek, Inc. v. Boyd*, 624 S.W. 3d 199, 208 (Tex. 2021) (recognizing digital signatures as valid); *Haywood Sec.,*

*Inc. v. Ehrlich*, 149 P.3d 738, 741 n.2 (Ariz. 2007) (recognizing electronic signature and noting that Arizona's Electronic Transactions Act recognizes electronic signatures); *Walker v. Dillard's, Inc.*, No. 17-657 MV/KK, 2019 WL 1283001, at *3 (D.N.M. Mar. 20, 2019) (recognizing, under New Mexico law, electronic signature on an arbitration agreement).  And Courts regularly accept evidence of a company's regular practices as evidence that an employee signed an agreement as part of employment onboarding or other standard procedure.  *See Beattie v. TTEC Healthcare Sol.*, No. 1:18-cv-01574-RM-SKC, 2019 WL 2189481, at *2 (D. Colo. May 21, 2019) ("Defendants' contention that Plaintiffs . . . manifested their assent to the arbitration agreement by clicking the 'Accept' button is supported by employee data they routinely collect and maintain."); *Petrie v. GoSmith, Inc.*, 360 F. Supp.3d 1159, 1162 (D. Colo. 2019) ("Defendant's position is supported by data it routinely collects."); *Vernon*, 857 F.Supp.2d at 1151 ("Defendants have offered evidence describing their routine practice [which is] . . . sufficient to establish a *prima facie* showing." (emphasis in original).

*Beattie v. TTEC Healthcare Solutions* describes analogous circumstances to those presented here.  In that case, the magistrate judge issued a recommendation to deny the defendant's motion to compel arbitration because defendant did not provide authentication information regarding the security procedures for its training system. 2019 WL 1594254, at *5 (D. Colo. Apr. 15, 2019).  The district court declined to adopt the recommendation.  2019 WL 2189481.  Instead, it reviewed the spreadsheet provided by the defendant, which indicated the date on which plaintiffs had "completed" the arbitration agreement, and determined that defendant had met its initial burden to show an agreement.  *Id*. at *2.  The court then found that Plaintiffs "d[id] not actually

deny that they executed the arbitration agreement" but even if they did, "general denials" are insufficient to raise a genuine issue of fact.[4]  *Id*.

Like in *Beattie*, Plaintiff has provided no evidence that 34 of the opt-in plaintiffs deny executing the agreements.  [*See generally* ##103, 126]  Where the Court has no evidence to suggest that any of these individuals contest the authenticity of the agreements, no issue of material fact is apparent.  *Beattie*, 2019 WL 2189481, at *2 ("Plaintiffs offer only speculative arguments. . . . This is not enough to raise a genuine dispute about the existence of the arbitration agreement."); *Umbenhower v. Copart, Inc.*, No. 03–2476–JWL, 2004 WL 2660649, at *2 (D. Kan. 2004) ("[T]he court concludes that defendants were not required to authenticate the arbitration agreement in the absence of any evidence disputing the authenticity of the agreement."); *Aerotek*, 624 S.W. 3d 199, 208 ("The Employees were free to seek discovery to discredit Aerotek's evidence. They chose not to. Rather than attacking the reliability of the hiring application's security procedures with evidence of their own, they chose to rely on mere argument. Because arguments are not evidence, no evidence supports the Employees' contentions.").

---

[4] Plaintiff cites two cases for the proposition that "there can be no presumption of validity of the Defendant's purported record of the digital signatures of the Affected Individuals without a detailed explanation of how that digital signature or consent was obtained.  [#103 at 8]  In *Mullinax v. United Mktg. Grp., LLC*, the court found a genuine issue of material fact with regard to the creation of an arbitration agreement.  No.10-CV-03585-JEC, 2011 WL 4085933, at *9 (N.D. Ga. Sept. 13, 2011).  There, however, the defendant supported its claims merely with screenshots of its website showing where an electronic signature would be placed and the plaintiff unequivocally denied any memory of seeing or signing any document.  *Id.*  In contrast here, these 34 opt-in plaintiffs did not submit any evidence challenging their digital signatures.  In the other case, the court found no genuine issue of material fact and concluded that the opt-in plaintiffs had signed the arbitration agreements.  *Hose v. Wash. Inventory Servs., Inc.*, No. 14CV2869-WQHWVG, 2016 WL 6427810, at *5 (S.D. Cal. Aug. 30, 2016).

Accordingly, as to these 34 opt-in plaintiffs, the Court finds that Defendant has met its initial burden of demonstrating the existence of an enforceable arbitration agreement, which Plaintiff has failed to overcome by identifying a material dispute of fact. *Martinez v. Capstone Rest. Grp.*, LLC, No. 20-cv-1017-WJM-MEH, 2021 WL 1723776, at *3 (D. Colo. Mar. 31, 2021) (finding evidence of digital agreements not rebutted); *Frazier v. W. Union Co.*, 377 F. Supp. 3d 1248, 1258 (D. Colo. 2019) (finding evidence of signed agreement sufficient to meet initial burden of demonstrating enforceable arbitration agreement).

### b. Opt-in Plaintiffs Submitting Declarations

The Court next turns to the 23 opt-in plaintiffs[5] who submitted declarations regarding the arbitration agreements.  [#126]  With two exceptions, each declaration stated the following:

> In fact, I did not sign the arbitration agreement and did not agree to its terms.  Rather, and as demonstrated by the acknowledgement . . . I simply acknowledged that "I have read the Agreement in full."  I did not "accept[] the Agreement["] nor "agree to and am bound by all of its terms, including the arbitration/class waiver provisions . . ."

[*See, e.g.*, #126-1 at ¶ 8][6]  The declarations also state: "all I did was click on a box which indicated that I had read the agreement in full. I never intended to—nor did I

---

[5] The opt-in plaintiffs who submitted declarations are: Brandon Lee Becker [#126-1], Tiffany Eden [#126-3], Cecelia Fernandez [#126-4], Robert George [#126-5], Timothy Grove [#126-6], Angela Helms [#126-7], William Hunter [#126-8], Emily Milano King [#126-9], Tatiana Kopytova [#126-10], Lauren Lee [#126-11], Kathy Parker [#126-12], Dora Poitevint [#126-13], Lorenzo Rubio [#126-14], Kathy Samaniego [#126-15], Hunter Severn [#126-16], Laurana Snyder [#126-17], Robby Stout [#126-18], Josh Syrop [#126-19], Amy Vaclav [#126-20], Kenny Walker [#126-21], Eric Wilson [#126-23], Clairissa Wood [#126-24].

[6] Opt-in plaintiff Cecelia Fernandez's declaration did not contain this statement.  [#126-4]  However, Ms. Fernandez admits in other portions of her statement that she signed the agreement, although she argues it was under duress.  [*Id.* at ¶ 8]  The Court will address her duress argument in Section III.B.ii.b.6, below.  Opt-in plaintiff Jacob

indicate—that I would be bound by the arbitration agreement" [#126-8 at ¶ 10], and "I opened [the agreement], quickly skimmed through it, and clicked on the acknowledgement,"  [#126-9 at ¶ 5].  Based on these statements, the Court finds that these opt-in Plaintiffs have admitted that they "acknowledged" the agreement. Accordingly, it is unnecessary for the Court to consider Plaintiff's authentication arguments as to these opt-ins, who do not dispute that they personally engaged with Defendant's UltiPro HRIS system and the arbitration agreement.

The Court thus turns to Plaintiff's argument that these opt-in plaintiffs did not actually *accept* the agreement, and instead merely acknowledged reading it.  [*See* #126-9 at ¶¶ 5, 8]  According to Ms. Hayward's declaration, in order to get to the acknowledgement page, opt-in plaintiffs first had to: (1) open the arbitration agreement text, which included the statement "I have agreed to this Agreement as of the date of my execution or **electronic acceptance** thereof," and (2) click "Accept."  [##70-1 at 5 (emphasis added); 70-2 at 4-6]  It was only then, after "accepting" the agreement, that opt-in plaintiffs were prompted with the acknowledgement text and asked to click "yes" or "no" to acknowledge the statements in that message—including to acknowledge that they had "read the agreement in full" and understood that "[b]y accepting the Agreement, I agree to and am bound by all of its terms."  [##70-1 at 3; 70-2 at 4-6] Thus, opt-in plaintiffs could not have "clicked on the box"  to "acknowledge" the agreement until they had already clicked "accept."  And they were twice warned that "accepting" would bind them to the agreement.

---

Watson's declaration also did not contain this statement.  [#126-22]  The Court will address Mr. Watson's argument that he did not sign the agreement separately, in Section III.A.ii.c below.

The declarations do not provide evidence suggesting that opt-in plaintiffs completed the acknowledgement through a system other than UltiPro HRIS, nor do they contest Defendant's description of the "accepting" and "acknowledging" process for completing the agreements.[7]   By contrast, the declarations state that opt-in plaintiffs completed the agreements in response to an email from Ms. Hayward, instructing them to "log into HRIS to review and acknowledge the document."  [*See* #126-10 at ¶¶ 9-10] And the declarations state that opt-ins "quickly skimmed" the document and clicked on the acknowledgment.  [#126-9 at ¶ 5]

Accordingly, the Court finds that Plaintiff has not provided evidence sufficient to create a dispute of material fact regarding whether these 22 opt-in plaintiffs accepted the terms of the arbitration agreement.   *Beattie*, 2019 WL 2189481, at *2 (finding agreement where employees agreed to arbitration by clicking "accept" button); *Hayford v. Santander Consumer USA Inc.*, No. CV-20-01808-PHX-JJT, 2021 WL 3934328, at *3-4 (D. Ariz. Aug. 11, 2021) (finding valid agreement under similar "acknowledgement" system); *Born*, 2020 WL 4674236, at *1, *11 (describing onboarding process for signing

---

[7] Plaintiff does assert, without any evidence whatsoever, that the UltiPro HRIS process detailed by Ms. Hayward in her declaration "relates to the company's distribution of ethics, insider trading, and payroll deduction authorization forms to employees and not, as Defendant seeks to infer, its arbitration agreement."  [#103 at 6]  The Court assumes that Plaintiff makes this argument on the sole basis of the fact that the document describing the process contains examples of ethics, insider trading, and payroll documents and does not contain an example of the arbitration agreement.  [*See* #70-2 at 4-6]  But Ms. Hayward's declaration attests that this is the process used to complete all company-required paperwork [#70-2 at ¶ 6] and Plaintiff provides no evidence to contradict her declaration.  The Court sees no reason to discount Ms. Hayward's declaration based on Plaintiff's pure speculation, especially given the fact that the Court allotted Plaintiff sixty days to conduct discovery into the arbitration agreements and Plaintiff chose not to conduct any discovery during that period.

arbitration agreement similar to that here and finding employees bound by completing the process).

### c.  Jacob Watson

Finally, the Court turns to opt-in plaintiff Jacob Watson.  Defendant submitted a signed arbitration agreement containing Mr. Watson's checkbox electronic signature and a timestamp stating "1/24/2020 5:06 PM."  [#107-1 at 71-72]  The same document also shows that Mr. Watson accepted the terms of an offer of employment by checkbox electronic signature at the same date and time.  [*Id.*]

For his part, Plaintiff submits a declaration by Mr. Watson stating that the signed arbitration agreement is a "sham" and that he did not sign it.  [#126-22 at ¶ 9].  Mr. Watson attests that he has some familiarity with arbitration, recalls receiving the arbitration agreement, and made the affirmative decision not to accept the arbitration agreement because he "believes in worker's rights."  [*Id.* at ¶ 6] Moreover, Mr. Watson submits screen shots from his UltiPro HRIS login purporting to show that he has not completed the UltiPro HRIS process for accepting and acknowledging the arbitration agreement  [*Id.* at ¶¶ 3-4]

Where a defendant produces an electronically signed version of an arbitration agreement, courts have found that an individual's general denial that he signed the agreement insufficient to create a genuine issue of material fact.  Indeed, a court in this district recently held:

> Plaintiff's failure to recall executing the arbitration agreement does not raise a genuine dispute of material fact as to the existence of the agreement. . . . Plaintiff does not dispute that she completed the online pre-employment documentation, nor that completing this documentation was required prior to beginning her employment.  Plaintiff offers no alternative explanation for the notation stating that she signed the

> arbitration agreement, and she cites no binding authority where an arbitration agreement was held unenforceable under similar circumstances. . . . To the extent that Plaintiff suggests that any electronically signed agreement may be held invalid by a general denial of signing, such argument is unpersuasive.

*Martinez*, 2021 WL 1723776, at *3 (citing *Hancock v. AT&T Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012) ("Clickwrap agreements are increasingly common and 'have routinely been upheld.'")).

Thus, had Plaintiff simply submitted a declaration from Mr. Watson including a general denial of signing the arbitration agreement, the Court would agree with Defendant that there is no genuine dispute of fact concerning Mr. Watson's acceptance of the arbitration agreement. *Id.* at *2 (finding no genuine issue of fact despite the fact that the plaintiff "categorically denie[d] the existence of the agreement and contend[ed] that she did not assent to its terms") (quotation omitted). But here there is more. Not only does Mr. Watson give a precise recollection of his affirmative refusal to sign the agreement and his statement of reasons for refusing to sign the agreement, but he also presents screen shot evidence of his UltiPro HRIS login that supports his denial. Defendant specifically addresses Mr. Watson's declaration in its second reply brief, but offers no explanation for the contradictory UltiPro HRIS information. [#128 at 5 n.8] There may be a simple explanation for this contradictory information—perhaps there were two separate arbitration agreements, one Mr. Watson signed and one he refused to sign—but Defendant neither makes this argument nor offers evidence in support of the argument, and it is not this Court's responsibility to make arguments for the parties. Accordingly, the Motion is DENIED as to Mr. Watson. At the October 14, 2021 discovery hearing, the parties shall be prepared to discuss Mr. Watson's opt-in status.

### iii.    Consideration

Plaintiff next argues that there is no evidence of consideration for the agreements.  [#103 at 10-12] The agreements provided by Defendant state that they are in consideration for employment, a merit increase, a promotion, or a bonus.  [##70-1; 107-1]  As with the first issue, Plaintiff does not provide evidence or arguments disputing consideration as to 33 of the opt-in plaintiffs.  Accordingly, the Court finds that, as to those opt-in plaintiffs, the arbitration agreements exist.

For 19 of the remaining 24 opt-in plaintiffs, Defendant provides records evidencing increased compensation in the form of a merit increase. [*See* #128-1 at 10-47]  It also provides a declaration from Ms. Hayward stating that this increase was in exchange for signing the arbitration agreement  [*id.* at ¶ 6], and the emails sent to opt-in plaintiffs indicating that the agreement was part of the merit increase program [#70-2 at 7].   Moreover, the agreements themselves list the merit increase as one of the categories of consideration offered by the company in exchange for the agreement to arbitrate.  [*See* #70-1 at 4]  For 15 of these opt-ins, the merit increase was effective as of December 30, 2019, and the employee signed the agreement within the first three weeks of January 2020.[8]   Thus, although the various declarations state that opt-in

---

[8] Brandon Becker signed the agreement on January 16, 2020.  [#70-1 at 9]  Tiffany Eden signed on January 18, 2020.  [*Id.* at 19]  Timothy Grove signed on January 11, 2020.  [#107-1 at 18]  Robert George signed on January 19, 2020.  [#107-1 at 15]  Courtney Helms signed on January 8, 2020.  [#70-1 at 27]  Emily King signed on January 14, 2020.  [#107-1 at 38]  Tatiana Kopytova signed on January 15, 2020.  [*Id.* at 41]  Lauren Lee signed on January 12, 2020.  [#70-1 at 42]  Dora Poitevint signed on January 9, 2020.  [*Id.* at 56]  Kathy Samaniego signed on January 12, 2020.  [*Id.* at 67]  Hunter Severn signed on January 14, 2020.  [#107-1 at 56]  Robby Stout signed on January 9, 2020.  [#70-1 at 77]  Josh Syrop signed on January 10, 2020.  [#107-1 at 61]  Eric Wilson signed on January 11, 2020.  [#70-1 at 85]  Clairissa Wood signed on January 8, 2020.  [*Id.* at 88]

plaintiffs did not receive a raise *after* signing the agreements, they do not dispute their merit increases in the days and weeks immediately before signing, as apparently contemplated by both the internal email and the agreements themselves.

The Court thus turns to the six remaining opt-in plaintiffs who dispute consideration and the three opt-in plaintiffs whose merit increases occurred several months removed from them signing the agreement. Cecelia Fernandez, Amy Vaclav, and Jacob Watson were employed in Colorado when they signed the arbitration agreement. [#140] Under Colorado law, continued employment constitutes sufficient consideration for entering into an arbitration agreement. *Grady v. DirecTV Customer Servs., Inc.*, No. 14-cv-03474-CMA-NYW, 2015 WL 3619337, at *4 (D. Colo. Jun. 10, 2015); *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1062-63 (Colo. 2011) (finding an at-will employee who is offered a new condition of employment accepts that offer through continuing the employment relationship, and receives consideration in the continued employment relationship). Thus, consideration exists for these Colorado opt-ins.

Ralph Parisi and William Hunter were employed in Arizona. [#140] "[U]nder clearly established Arizona law, in an at-will employment relationship, the employer could discharge an employee who refused to sign the [arbitration] agreement. Whether the consideration is viewed as forbearance to discharge or continued employment, as a practical matter, the consideration is the same." *Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 943 (D. Ariz. 2011) (quotation omitted); *see also Mattison v. Johnston*, 730 P.2d 286, 288-290 (Az. Ct. App. 1986) (finding that the implied promise of employment and continued employment were sufficient consideration for the

employee's agreement to a restrictive covenant); *Penn v. Fidel*, No. CV–11–339–PHX–DG, 2011 WL 1559224, *2 (D. Ariz. April 25, 2011) (although plaintiff was hired two weeks prior to signing an arbitration agreement, the arbitration agreement was valid and enforceable).  Thus, consideration exists for these Arizona opt-ins.

Laurana Snyder was employed in Iowa.  [#140] In Iowa, continued employment also constitutes sufficient consideration.  *Owens v. MBPXL Corp.*, 173 F.Supp.2d 905, 914 (N.D. Iowa 2001) (citing *French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989); and *McBride v. City of Sioux City*, 444 N.W.2d 85, 91 (Iowa 1989)).  Thus, consideration exists for Ms. Snyder.

Kenny Walker was employed in Kansas.  [#140]  "[I]n Kansas continued employment can be consideration in certain circumstances, and the question of consideration is a question of fact."  *Herr v. Heiman*, 75 F.3d 1509, 1515 (10th Cir. 1996) (citing *Puritan–Bennett Corp. v. Richter*, 657 P.2d 589, 592 (1983) (finding continued employment was sufficient consideration to support a restrictive covenant executed after the initial employment contract began)).  Continued employment can create a binding agreement to arbitration where:  "(1) the language of the arbitration policy purported to create a contractual duty; (2) plaintiff had actual notice of the policy; and (3) the obligation to arbitrate was mutual."  *Rangel v. Hallmark Cards, Inc.*, No. 10–4003–SAC, 2010 WL 781722, at *6 (D. Kan. Mar. 4, 2010) (citing *Durkin v. Cigna Prop. & Cas. Corp.*, 942 F. Supp. 481, 488 (D. Kan. 1996)).  Those factors are all present here, where the agreement language creates a contractual duty, Mr. Walker was provided notice, and the agreement created mutual obligation by stating:  "Any dispute,

controversy or claim arising out of or relating to my employment with the Company or the termination thereof will, to the fullest extent permitted by applicable law, be settled exclusively by binding arbitration."   [#107-1 at 71] Thus, consideration exists for Mr. Walker.

Finally, Kathy Parker[9] was employed in New Mexico.  [#140]  Under New Mexico law, continued employment is not sufficient consideration for an arbitration agreement. *Piano v. Premier Distrib. Co.*, 107 P.3d 11, 14-15 (N.M. Ct. App. 2004) (concluding that because the "implied promise of continued at-will employment placed no constraints on [the d]efendant's future conduct; its decision to continue [the p]laintiff's at-will employment was entirely discretionary," the promise was illusory and did not constitute sufficient consideration).  However, parties' mutual promises to arbitrate does constitute sufficient consideration for the agreement.  *Jolley v. Rush Truck Leasing, Inc.*, No. A-1-CA-38855, 2021 WL 3144925, at *2 (N.M. Ct. App. July 26, 2021); *Sisneros v. Citadel Broad. Co.*, 142 P.3d 34, 42 (N.M. Ct. App. 2006) ("Consideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do." (internal quotation marks and citation omitted)). Here, the agreement creates a mutual obligation to arbitrate:  "Any dispute, controversy or claim arising out of or relating to my employment with the Company or the termination thereof will, to the fullest extent permitted by applicable law, be settled exclusively by binding arbitration."   [#107-1 at 49]   This language created a mutual obligation to arbitrate any disputes arising from Ms. Parker's employment with

---

[9] Defendant did submit an internal record that purportedly shows that Ms. Parker received a merit increase on December 30, 2019.  [#128-1 at 28]  However, that record shows that Ms. Parker's salary did not change at that time.  [*Id.*]

Defendant, and therefore constitutes sufficient consideration.   *Jolley*, 2021 WL 3144925, at *2; *Sisneros*, 142 P.3d at 42-43.

Accordingly, there is evidence of consideration for each of the opt-in plaintiffs. Thus, with the exception of Mr. Watson discussed above, this Court finds that Defendant has met its burden of demonstrating agreements to arbitrate, which Plaintiff has not overcome.

### B. Contract Defenses: Fraud and Unconscionability

Finding that the agreements exist, the Court must next determine whether they are enforceable.   Plaintiff argues that the arbitration agreements are invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." [#103 at 13 (quoting *Nesbitt II*, 811 F.3d at 376 (in turn quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)))].   Plaintiff argues that the agreements should be invalidated for the following reasons:  (1) Defendant committed fraud by representing the agreement as a "policy" and asking employees to "acknowledge" the policy without informing them that they were agreeing to arbitration, (2) the nature of the agreements are unconscionable, (3) Defendant engaged in coercion, and (4) Defendant engaged in an "arbitration scheme" in order to interfere with this litigation.  [##103 at 13-18, 126 at 2-6]

### i. Fraud

Plaintiff argues that the agreements were obtained by fraud because Defendant described the agreements as a "policy" and did not inform opt-in plaintiffs of the consequences of signing the agreement.  [#103 at 14-15]

First, Plaintiff appears to only make a fraud argument as to the agreements signed after Defendant's human resources department sent an email instructing employees to sign the arbitration agreements, in January 2020.[10]   [*See id*.]   Because Plaintiff does not provide evidence or arguments as to agreements signed before January 2020, the Court finds that those agreements were not procured by fraud.[11]

Next, the Court finds disingenuous Plaintiffs' assertion that Defendant fraudulently represented the arbitration agreement as merely a "policy" and did not explain that employees would be "waiving" legal rights.   [*Id*.]   Both versions of the arbitration agreement clearly state that the document is an "Arbitration Agreement and Class Action Waiver."   [##70-1 at 1-5]   Moreover, although the email sent to employees in January 2020 did indeed refer to a "new policy," it stated in full:

> We have distributed a document for your review and acknowledgement in the HRIS system.
>
> This document contains a new policy that is being implemented as part of the merit increase process for all Store Managers and Assistant Store Managers.
>
> The **agreement** requires any employment-related dispute to be handled through arbitration rather than a court proceeding. The **agreement** also requires any employment-related dispute to be brought in the employee's individual capacity rather than through a class action proceeding.
>
> Attached is a QRG (Quick Reference Guide) providing the steps to follow in HRIS to complete the acknowledgement of this document.

---

[10] Plaintiff repeatedly refers to Defendant's fraudulent "scheme," describes the scheme as Defendant purporting to adopt a new "policy" in connection with its merit increase process, and argues that the scheme was "ramped up" in January 2020.   [*Id*.]

[11] The following opt-in plaintiffs signed agreements before January 2020:   Bobby Alcozer signed his agreement on July 8, 2019 [#70-1 at 1-2]; Amanda Collazo signed on July 17, 2019 [*id*. at 18]; Michael Crumb signed on December 1, 2018 [#107-1 at 7]; Robyn Enders signed on January 30, 2019 [*id*. at 11]; Elisa McGinley signed on April 19, 2019 [#70-1 at 46-47]; and Alex Rojas signed on January 29, 2019 [*id*. at 63].

Please log into HRIS to review and acknowledge the document by Tuesday, January 13th.

[#70-2 at 11 (emphasis added)]   Although the email could certainly be *clearer*, it indicates that the document is an agreement—not merely a policy being acknowledged—and that it affects employees' ability to bring lawsuits and class action proceedings.  Plaintiffs are not excused from reading the entirety of the email and the agreement itself by the presence of the words "policy" and "acknowledge."  *Vernon v. Qwest Commc'ns Int'l, Inc.*, 925 F. Supp. 2d 1185, 1191 ("[I]f one chooses to 'sign' a contract and to accept its benefits without reading and understanding its terms, he generally must accept the consequences of his decision."); *see also Krohn*, 2019 WL 4572833, at *3 (finding sufficient notice of content and effect of arbitration agreement in email that: (1) stated that the company's new program required "binding arbitration," (2) explained that arbitration waived right to court litigation, and (3) described how to access agreement).

Other than the use of the terms "policy" and "acknowledge," Plaintiff does not identify any fraudulent representations by Defendant in obtaining the arbitration agreements from the various opt-in plaintiffs.[12]  Accordingly, the Court does not find that the agreements are invalidated on this ground.

### ii.   Unconscionability

Plaintiff also argues that the agreements are unconscionable.  [#103 at 16-18] "[A] finding of unconscionability requires 'evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the

---

[12] The Court addresses Plaintiff's argument with respect to the timing of the "scheme" in Section III.B.ii.d below.

part of one of the parties, together with contract terms which are unreasonably favorable to that party.'" *Internet Archive v. Shell*, 505 F.Supp.2d 755, 767 (D. Colo. 2007) (quoting *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986)).   Under Colorado law, a court determines whether a contract is unconscionable by examining the following factors:   (1) the use of a standardized agreement executed by parties of unequal bargaining power; (2) the lack of opportunity for the customer to read or become familiar with the document before signing it; (3) the use of fine print in the portion of the contract containing the provision in question; (4) the absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; (5) the terms of the contract, including substantive fairness; (6) the relationship of the parties, including factors of assent, unfair surprise, and notice; and (7) the circumstances surrounding the formation of the contract, including setting, purpose, and effect.   *Davis*, 712 P.2d at 991.[13]

### a.  Nature of the Agreement

First, Plaintiff argues that the agreement is unconscionable because it "disproportionately favors Defendant and Defendant had disproportionate bargaining power in the drafting and execution of the agreement."   [*Id.* at 16-17]   A contract of adhesion, on its own, however, is not sufficient for a finding of unconscionability, and Plaintiff does not elaborate on how the agreement "disproportionally favors" Defendant. *Nesbitt*, 74 F. Supp. 3d at 1371 (unequal bargaining power alone does not create unconscionability); *Laurich v. Red Lobster Rest., LLC*, 295 F. Supp. 3d 1186, 1218 (D.

---

[13] Plaintiff applies Colorado law to his unconscionability arguments and does not point to any deficiencies under any other state's law regarding the circumstances of the making of the agreements.   [#103 at 16]   Accordingly, the Court addresses only those objections raised by Plaintiff.

N.M. 2017) ("[W]hile it may have been in an adhesion contract in the sense that it was a take-it-or-leave-it offer, the terms are not so patently unfair that the agreement is unconscionable.").

Plaintiff additionally argues that the opt-in plaintiffs were unable to print the agreement and consult with an attorney.   [#103 at 17] Various opt-in plaintiffs' declarations state that Defendant did not provide them with a paper copy of the agreement and that:

> I opened [the agreement], quickly skimmed through it, and clicked on the acknowledgement.   Because [Defendant's] stores are busy and understaffed, I had very little time to read the arbitration agreement.   I was at work and needed to complete my assigned job duties.

[*See e.g.*, #126-13 at ¶¶ 5-6]   But a large portion of opt-in plaintiffs signed the agreement a day or more after being notified by email that the agreement was available in their UltiPro HRIS accounts, suggesting potential opportunity to print, review, and consult an attorney.   [*See* ## 70-1, 70-2, 107-1]   And based on the email notifying opt-ins of the agreement, they had at least three days to review and sign—and many took much longer to complete the agreement, without any evidence of penalty for the delay.   [#70-2 at 10; 70-1; 107-1]

Indeed, beyond the above vague statements, Plaintiff provides no facts or evidence to suggest that any opt-in Plaintiff requested additional time to review the document, requested that the document be printed, could not access the document outside of work hours, or asked to consult with an attorney—much less evidence that Defendant outright refused such requests.   The fact that many opt-ins chose to merely

"skim" the agreement before signing does not make it unconscionable.[14]   *See Axis Venture Grp., LLC v. 1111 Tower, LLC*, No. 09–cv–01636–PAB–KMT, 2010 WL 1278306, at *4-5 (D. Colo. Mar. 20, 2010) (finding that plaintiff attempted to imply that he was "affirmatively instructed to sign the documents without reading them," but that the record showed that he was provided access to the agreement, was not prevented from reading the agreement, was not compelled or defrauded, did not ask for additional time to read, and he "did not concern himself" with the specific terms of the agreement); *Dumais v. Am. Golf Corp*, 150 F. Supp. 2d 1182, 1191 (D.N.M. 2001) (granting motion to compel arbitration despite Plaintiff's arguments that she was not a native English speaker, not given an explanation of the agreement, and not given time to review the agreement, because "a party who executes a written contract with another is presumed to know the terms of the agreement").

### b.  Coercion and Duress

Second, Plaintiff argues that Defendant did not affirmatively inform opt-in plaintiffs that they could choose to not sign the agreement.  [#103 at 14-15]  Plaintiff further argues that Defendant "coerced" or "forced" opt-in plaintiffs to sign the agreements.  [#126 at 3]

First, where Plaintiff has not provided declarations or other evidence of coercion or duress specific to an individual opt-in plaintiff, those agreements cannot be

---

[14] Plaintiff further argues that the agreement is a contract of adhesion and that Defendant "surprised" the opt-in plaintiffs by referring to the agreement as a "policy." [#103 at 16-17]  As stated above, the single reference to the agreement as part of a "new policy"—in the face of several other references to the nature and content of the agreement—does not create fraud or surprise.

invalidated based on Plaintiff's evidence of coercion as to other opt-ins.  The Court thus

turns to the evidence Plaintiff does provide.

The 25 opt-in plaintiffs who submitted declarations each made statements

regarding feeling pressure to sign the agreements.  For example, the declarations make

the following statements:

> (1) "I did not create the policies or directives—rather, I had to follow them.
> They were mandatory and I had no say as to whether I agreed with
> them or not.  To reinforce my belief, [Defendant] would follow-up with
> me to make sure I had received the policy or directive and
> acknowledge that I had read it."  [#126-13 at ¶ 3]

> (2) "During my employment . . . it was clear to me that I had little to no say
> over the terms of my employment.  The company required me to
> perform the tasks they set for me each day, which included checking
> my work e-mail and signing-off on new policies and directives.  I had
> no choice but to follow them.  If not, I believe I would have been
> disciplined."  [*Id*. at ¶ 4]

> (3) "When I was sent the e-mails attached as Exhibit A, I recall that I had
> no choice but to read and acknowledge the company's new policy."
> [*Id*. at ¶ 5]

> (4) "The cover e-mails did not indicate that I had a choice whether or not
> to sign and, based on the directives from the company's senior
> employees, I knew I had no choice."  [*Id*. at ¶ 10]

Notably, these statements do not describe specific actions by Defendant or its agents.

Instead, and without any supporting facts, plaintiffs vaguely state that they had "no

choice" but to sign agreements and follow company directives.  This is not sufficient

evidence to show that Defendant coerced opt-in plaintiffs into signing the agreements.

*Richardson v. Citigroup, Inc.*, 2012 WL 3590899, at *4 (D. Colo. Jul. 25, 2012) (finding

no unconscionability where there was no evidence that Plaintiff was subject to

significant external pressure to sign the arbitration agreement without taking time to

review or have someone else review); *Chen-Oster v. Goldman, Sachs & Co.*, 449 F.

Supp. 3d 216, 265 (S.D.N.Y. 2020) (explaining that the employment relationship alone is not sufficient to demonstrate coercion); *Laurich*, 295 F. Supp. 3d at 1218 (finding that although employee may have felt pressure to sign arbitration agreement due to busy work schedule and statements by employer, "these circumstances do not rise to the level of unconscionability, because they did not deprive her of a meaningful choice, and the terms were not patently unfair").

The Court therefore turns to the declarations Plaintiff identifies as providing specific evidence of coercion.[15]  [*See generally* #126]

## 1.  Robert George

Robert George was employed in Utah when he signed the agreement.  [#140] His declaration states as follows:

(1) "I was directed by my regional manager, Jason Haldread . . ., and my Store Manager, Willon Bonds, to acknowledge the arbitration agreement.  I had no choice—they were my supervisors and had responsibility over the store where I worked.  I feared retaliation if I did not agree, and so I did."  [#126-5 at ¶ 5]

(2) "I asked Mr. Haldread if the arbitration agreement had anything to do on my ability to join this lawsuit and he said 'No.'"  [*Id*. at ¶ 6]

(3) "[B]ecause I feared retaliation from my Regional Manager and Store Manager if I did not acknowledge the arbitration agreement, I was coerced into something that I did not understand nor agree."  [*Id*. at ¶ 9]

As an initial matter, this lawsuit had not yet been filed on January 19, 2020, when Mr. George signed his agreement.  [##1, 107-1 at 15]  Moreover, this declaration does

---

[15] In addition to the declarations noted above, Plaintiff also submits as evidence of coercion a declaration by Lola Blake, a former employee of Defendant who did not join this case.  [#126-2 at ¶ 1]  Because Ms. Blake is not a plaintiff before this Court, the Court will not pass on the validity of her arbitration agreement.  Her declaration contains no facts regarding the circumstances under which any opt-in plaintiff signed the arbitration agreements at issue.  [*See generally Id*.]

not provide facts through which this Court can make a finding of coercion.  The fact that Mr. George's supervisors "directed" him to complete paperwork does not, on its own, indicate that they forced or threatened him to do so.  And Mr. George provides no facts to suggest that they did threaten him or why he might have "feared retaliation."  Even if the supervisors had indeed threatened retaliation, Mr. George "simply could have refused to sign" the arbitration agreement and pursued employment elsewhere.  *Miller v. Corinthian Colleges, Inc.*, 769 F. Supp.2d 1336, 1347 (D. Utah 2011) (applying Utah unconscionability law).

### 2.  Timothy Grove

Timothy Grove was employed in Louisiana when he signed the agreement. [#140]  His declaration states as follows:

> I did what [Defendant] expected me to do with all other policies and directives they sent – I opened it, quickly skimmed through it, and clicked on the acknowledgment. . . .  In fact, during conference calls with our Regional Manager, Wayne Ford, he routinely indicated that the company had rolled out a new "policy" which we were required to acknowledge.  As I always followed Mr. Ford's directives, including with respect to acknowledging new policies, I did as he said.  I did not believe I had a choice.

[#126-6 at ¶ 5]  The declaration otherwise states, in general terms, that Mr. Grove had "no choice" but to follow Ms. Hayward's and Mr. Ford's directives.  [*See Id*. at ¶¶ 9, 10]

These statements, and the declaration as a whole, are devoid of specific facts. Mr. Grove does not state he was threatened, harmed, or that he did not have a meaningful choice—at a bare minimum, between continuing employment with Defendant and signing the agreement.  These statements thus do not provide evidence of coercion.

### 3.  Kathy Samaniego

Kathy Samaniego was employed in Texas when she signed the agreement.

[#140]  Her declaration contains a nearly identical statement to Mr. Grove's, above, as

well as the following:

> In approximately mid-2020, [Defendant] held a conference call with Assistant Store Managers and Store Managers to discuss this lawsuit. Ms. Hayward and several other corporate-level employees were on the call.  I recall Ms. Hayward stated that the lawsuit had no merit and that the person bringing it—Michael Levine—was a disgruntled employee (or words to those effect).  I remember she was bad-mouthing Mr. Levine a lot.  It shocked me. . . . It was clear to me that [Defendant] did not want anyone on the call to join the case.  The call was also unusual because it was not recorded—the company usually records calls such as this so others can listen to it later.

[#126-15 at ¶ 11]

As with Mr. Grove, the general statements about Mr. Ford's "directives" do not

provide evidence of coercion.   Moreover, Ms. Samaniego signed her agreement in

January 2020, so any action taken by Defendant in "mid-2020" could not have had a

coercive effect upon her decision to sign.  [#70-1 at 67]

### 4.  Tiffany Eden

Tiffany Eden was employed in Colorado when she signed the agreement.  [#140]

Her declaration states as follows:

> When I was sent the e-mails . . . I recall I had no choice but to read and acknowledge the company's new policy.  In fact, I had just returned to work after being out for 8 weeks because of knee surgery.  Upon my return it was an extremely busy time, and I was overwhelmed with all of the work and tasks that I was required to complete.  I recall there was a flurry of policies and other documents which I was required to acknowledge.  However, I did not have time to read them, nor was I given an opportunity to take them home to review.

[#126-3 at ¶ 5]  As stated elsewhere in this Order, the fact that Ms. Eden felt internal

pressure to quickly catch up on her work does not amount to coercion or procedural

unconsciability.   *See Axis Venture Grp.,* 2010 WL 1278306, at *4 (finding no unconsciability where plaintiff did not ask for additional time and did not face external pressure from defendant); *Laurich*, 295 F. Supp. 3d at 1218 (finding that although employee may have felt pressure to sign arbitration agreement due to busy work schedule, "these circumstances do not rise to the level of unconsciability, because they did not deprive her of a meaningful choice, and the terms were not patently unfair").

### 5.  Lorenzo Rubio

Lorenzo Rubio, who was hired in Oklahoma in January 2020 [##126-14; 140], submitted a declaration which states:

> I was directed by my regional manager, David Granado . . . to acknowledge the arbitration agreement as part of my on-boarding in approximately January 2020.  I had no choice—he was one of my supervisors and had responsibility over the store where I worked.  I was also contacted by a member of the company's human resources department [(Ms. Lara)] . . . who told me to sign the arbitration agreement or otherwise I could be subject to disciplinary action up to and including termination.  Ms. Lara worked in the company's corporate office and had responsibility for human resources over the store where I worked. I did not voluntarily agree to the terms of the arbitration agreement.

[#126-14 ¶ 5]  As previously stated, a managers' directions to sign the agreement as part of the onboarding process is not sufficient to demonstrate coercion, and Mr. Rubio alleges no wrongful acts by any of Defendant's agents.  *Strickland Tower Maint., Inc. v. AT & T*, 128 F.3d 1422, 1426 (10th Cir. 1997) ("In Oklahoma, economic duress allows a party to avoid a contract that it has entered if a wrongful act [of the other party was] sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure. . . . A litigant cannot, therefore, make out a claim of economic duress by alleging merely that the opposing party took

advantage of her weak negotiating position or because of business necessities." (quotation omitted)).    Mr. Rubio had a choice—he could have refused to sign the agreement and, perhaps, not been offered employment with Defendant.  *Been v. O.K. Industries, Inc.*, 495 F.3d 1217, 1236 (10th Cir. 2007) (Under Oklahoma law, "[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other party" (internal citations and quotations omitted)); *see also Kepas v. eBay*, 412 F. App'x 40, 46 (10th Cir. 2010) (under California law, even though arbitration agreement was an adhesion contract whose express language conditioned employee's future employment on acceptance of its terms, it was not necessarily unconscionable); *Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 F. App'x 812, 818-19 (10th Cir. 2008) (same applying New Mexico law).

### 6.  Cecelia Fernandez

Cecelia Fernandez was employed in Colorado at the time she signed the agreement.  [#140]  Her declaration states:

> [M]y regional manager, Matt Anderson . . . specifically came to the store where I worked and had a private one-on-one meeting with me in the manager's office to discuss the arbitration agreement. During this meeting, Mr. Anderson said that I needed to sign the acknowledgment or that I would "get into trouble" (or words to those effect). Mr. Anderson's threat left me with the very clear impression that I would be disciplined— probably fired—if I did not acknowledge the company's arbitration agreement.

[#126-4 at ¶ 5][16]

Assuming the truth of Ms. Fernandez's declaration, Mr. Anderson's conduct does not lead to a finding of unconscionability.  First, Ms. Fernandez does not actually allege

---

[16] Mr. Anderson submitted a declaration denying this allegation and stating that he never spoke with Ms. Fernandez about the agreement.  [#128-2]

that Mr. Anderson threatened to fire her, but merely states that she feared being fired. [#126-4 at ¶ 5] But even assuming Mr. Anderson was implicitly threatening to fire Ms. Fernandez, that does not necessarily render the arbitration agreement unconscionable. In Colorado, a contract may be voidable for economic duress if assent is induced by an improper threat that leaves no reasonable alternative. *Vail/Arrowhead, Inc. v. Dist. Court for the Fifth Judicial Dist.*, 954 P.2d 608, 612 (Colo.1998). Here, Ms. Fernandez was given an alternative to signing the agreement, however undesirable—she could have refused to sign and faced the consequences, including possible termination. *Grady v. DIRECTV Customer Servs. Inc.*, No. 14-cv-03474-CMA-NYW, 2015 WL 3619337, at *4 (D. Colo. June 10, 2015) (under Colorado law, even though employee's employment was conditioned upon employee's acceptance of an arbitration agreement, the arbitration agreement was not necessarily unconscionable); *Richardson v. Citigroup, Inc.*, No. 12-cv-0485-WJM-KMT, 2012 WL 3590899, at *3-4 (D. Colo. July 25, 2012) (same), *report and recommendation adopted*, 2012 WL 3590897 (D. Colo. Aug. 21, 2012); *see also Kepas*, 412 F. App'x at 46 (10th Cir. 2010) (same under California law); *Pennington*, 269 F. App'x at 818-19 (10th Cir. 2008) (same under New Mexico law).

### c. Fee- and Cost- Shifting

Plaintiff next argues that the agreement is unconscionable because it allows Defendant to recover attorney's fees, expert witness fees, and costs if it is the prevailing party at arbitration. [#103 at 17] Plaintiff argues that this thwarts opt-in plaintiffs' FLSA rights. [*Id.*] The costs and fees provision of the arbitration agreements in this matter read as follows:

> The Company will bear the costs and fees of any arbitration (including any filing fees, the hearing fees and the arbitrator's fees), and each party will

pay its own attorneys' fees and expenses in connection with any arbitration; provided that the arbitrator may award, in addition to any other relief, the prevailing party its, his or her reasonable attorneys' fees, expert witness fees and costs (provided that if a party asserts a claim pursuant to a federal, state or local statute or law which provides for a specific allocation or handling of attorneys' fees and/or costs, then the recovery of attorneys' fees and/or costs shall be handled in accordance with the federal, state or local statute or law governing such party's claim).

[#70-1 at 1, 4]

Although arbitration is presumptively adequate to vindicate statutory claims, that presumption "falls apart . . . if the terms of an arbitration agreement actually prevent an individual from effectively vindicating his or her statutory rights." *Shankle v. B–G Maint. Mgmt. of Colo., Inc.*, 163 F.3d 1230, 1234 (10th Cir. 1999).  Courts regularly find that effective vindication of federal statutory rights is thwarted by provisions that: (1) shift fees and costs to a plaintiff and (2) impose prohibitive costs.  *See, e.g.*, *Pollard v. ETS PC, Inc.*, 186 F. Supp. 3d 1166, 1176-77 (D. Colo. 2016); *Nesbitt II*, 811 F.3d at 379-81; *Shankle*, 163 F.3d at 1234-35; *Brownlee v. Lithia Motors, Inc.*, 49 F.Supp.3d 875, 880-81 (D. Colo. 2014).

"In a typical FLSA case, only a plaintiff may recover prevailing party attorneys' fees and costs." *Pollard*, 186 F. Supp. 3d at 1176; 29 U.S.C. § 216(b).  However, "the FLSA entitles a prevailing defendant to attorney[ ] fees . . . where the district court finds that the plaintiff litigated in bad faith." *Sanchez v. Nitro-Lift Techs., LLC*, 762 F.3d 1139, 1148 (10th Cir. 2014).  Plaintiff is therefore correct that courts have found that provisions stating that the arbitrator may award the prevailing party fees and costs, on their own, can be "a barrier to effective vindication of FLSA rights, and therefore unenforceable as to Plaintiff's FLSA claims." *Pollard*, 186 F. Supp. 3d at 1176. However, the instant agreements qualify the arbitrator's power by stating that claims

brought under a federal statute *shall* be handled in accordance with the fee and costs handling provisions of that statute. [#70-1 at 1, 4]

Accordingly, the plain text of the agreement requires attorney's fees to be awarded in accordance with the FLSA, and the fees provision does not impair opt-in plaintiffs' ability to "effectively vindicate" their rights. *See Pollard*, 186 F. Supp. 3d at 1176 (noting distinction between prohibited fee-shifting language and identical language in the agreement as found in this case); *Turner v. Chipotle Mexican Grill, Inc.*, No. 14-cv-02612-JLK, 2018 WL 11314701, at *5 (D. Colo. Aug. 3, 2018) (finding a fees provision did not prevent effective vindication of FLSA rights because "[t]he Agreement makes clear that the arbitrator's authority to award reasonable attorney fees is subject to applicable law").

### d. "Arbitration Scheme"

The Court thus turns to Plaintiff's primary argument: that Defendant engaged in a "ramped up" "arbitration scheme" in the weeks before this action was filed and as a result of being notified that Plaintiff was pursuing this action. [#103 at 15] Plaintiff also argues that, as part of the "scheme," Defendant sent out a mass email reminder on July 10, 2020—after Plaintiff's FLSA Motion had been filed—"instructing" ASMs to sign the arbitration agreement. [*Id*. at 15] Plaintiff argues that this conduct was designed to ensure that ASMs could not join this case, thus making the agreements unconscionable. [*Id*. at 15, 18]

### 1. Agreements Signed Before Complaint Filed

First, the Court notes that six of the opt-ins plaintiffs signed their arbitration agreements prior to November 2019, when Plaintiff alleges it informed Defendant it was

pursuing legal action.[17] [#103 at 1] Thus, these agreements were clearly not impacted by the alleged "scheme."

The Court thus turns to the remaining 51 agreements.[18] Defendant procured 35 of the arbitration agreements in January 2020, before this case was filed and while Defendant was purportedly engaged in "potential pre-suit settlement discussions" with Plaintiff. [##103 at 15; 70-1; 107-1] Plaintiff alleges that this timing was improper. [#103 at 15, 18] The facts of this case are similar to those in *Ellis v. Love's Travel Stops & Country Stores*, a Western District of Oklahoma case in which the Defendant rolled out a new arbitration policy the same day the complaint was filed. No. CIV-21-308-F, 2021 WL 4229068, at *3 (W.D. Okla. Sept. 16, 2021). In that case, Defendant had been obtaining arbitration agreements from newly hired employees since October 2020, rolled out the agreements for "team members" hired prior to October 2020 during March 2021, and rolled out the agreements to managerial employees on April 7, 2021—the same date the complaint was filed. *Id*. at *3.

---

[17] Bobby Alcozer signed his agreement on July 8, 2019. [#70-1 at 1-2] Amanda Collazo signed on July 17, 2019. [*Id*. at 18] Michael Crumb signed on December 1, 2018. [#107-1 at 7] Robyn Enders signed on January 30, 2019. [*Id*. at 11] Elisa McGinley signed on April 19, 2019. [#70-1 at 46-47] Alex Rojas signed on January 29, 2019. [*Id*. at 63]

[18] Courts often examine the propriety of Defendant communications with potential class or FLSA collective action members in relation to case law regarding the court's inherent power to facilitate notice and restrict communications to those potential plaintiffs. *See Hoffman–La Rouche, Inc. v. Sperling*, 493 U.S. 165, 169-71 (1989) (finding the court has the discretion to "facilitat[e] notice to potential plaintiffs" and "broad authority . . . to enter appropriate orders governing the conduct of counsel and the parties" as it pertains to communications to potential plaintiffs.); *In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litigation*, 835 F.3d 1195, 1204 n.3 (10th Cir. 2016) (Courts also can "use Rule 23(d) to restrict inappropriate communications from counsel to putative class members.").

The *Ellis* plaintiff argued that because the agreements did not mention the lawsuit, they were unconscionable.  *Id*.  The court, however, concluded that "it was not unconscionable for defendant to omit any information about this lawsuit in the [] documents when it had not yet been served with the complaint and summons."  *Id*. at *4.  The court further concluded that although plaintiff asserted that it notified defendant of the potential for the suit, plaintiff "d[id] not proffer any evidence of these communications" and there was no evidence in the record to suggest that Defendant received notice of the complaint itself until service, nor that defense counsel were involved in the roll out of the agreements.  *Id*.  The *Ellis* court therefore concluded that the agreements were not misleading for failure to advise employees of the lawsuit and that "[t]he facts in this case do not demonstrate that the manner in which defendant distributed the [agreement] was 'clearly designed to thwart unfairly the right of [employees] to make an informed choice as to whether to participate in this FLSA collective action.'"  *Id*. at *5 (quoting *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 922 (11th Cir. 2014))

Although not binding precedent, this Court is persuaded by the *Ellis* Court's reasoning.  Here, Plaintiff only provides a general statement in his brief indicating that he was in "potential pre-suit settlement discussions" with Defendant; Plaintiff fails to present any evidence of these discussions.  [#103 at 15]  Plaintiff also provides no evidence regarding Defendant's awareness of the bounds of the potential suit and no evidence—other than timing—that the agreements were orchestrated specifically to interfere with this litigation.  Moreover, the record *does* reflect that Defendant had been implementing arbitration agreements as a requirement of employment during the two

years prior to the filing of this action by rolling the agreements out in stages similar to those in *Ellis*.   [*See* #70-2 at ¶¶ 3, 5-6 (describing how Defendant instituted the agreements for new employees in 2018, employees accepting promotions in 2019, and all remaining employees in 2020)]   Considering these facts, the Court simply does not have evidence before it to suggest the nefarious "scheme" described by Plaintiff.

And the Court is not persuaded otherwise by the cases cited by Plaintiff.   For example, in *Balasanyan v. Nordstrom, Inc.*, the arbitration agreement was introduced to putative class members four months after the complaint was filed, and the plaintiffs argued that the communication was "unacceptably confusing because it led employees to believe that they were not entering into an agreement."   Nos. 11-cv-2609-JM-WMC, 10-cv-2671-JM-WMC, 2012 WL 760566, at *2-3 (S.D. Cali. Mar. 8, 2012).   And in *Williams v. Securitas Security Services*, the court found that an arbitration agreement— introduced to employees during pending litigation but before the FLSA class was certified—referenced the litigation in a misleading manner and contained a confusing "opt-out" system for binding employees to arbitration.   No. 10-7181, 2011 WL 2713741, at *2-3 (E.D. Pa. July 13, 2011).

Both of these cases dealt with arbitration agreements introduced to employees after the action was filed.   Indeed, this Court has found no cases invalidating arbitration agreements which were introduced before the filing of a complaint, and Plaintiff has pointed to none.   *Cf. Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 918 (11th Cir. 2014) (company devised and implemented a new alternative dispute resolution policy in the late spring 2012, after it was served with the complaint in February 2012, and then rolled out its policy after the court's May 31, 2012 scheduling order); *Degidio v. Crazy*

*Horse Saloon and Rest., Inc.*, 880 F.3d 135, 138, 142 (4th Cir. 2018) (company began entering into arbitration agreements more than a year after action began and the agreements presented a false picture of potential plaintiffs' legal posture).  Indeed, the Tenth Circuit has noted that when a party introduces an arbitration agreement at a time when there is no pending litigation:

> [W]e question whether there was any impropriety. . . . [T]o require [Defendant] either to refrain from submitting the arbitration agreement or to alert Plaintiffs that there may be subsequent class actions in which they could become parties, would be breaking new ground. Plaintiffs have not presented any authority . . . that a person proposing an arbitration agreement must alert the other contracting person about litigation that might be filed in the future that could come under the agreement.

*In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litigation*, 835 F.3d 1195, 1204 n.3 (10th Cir. 2016).  Accordingly, and on the evidence before it, the Court perceives no impropriety as to the 35 agreements signed in January 2020, before this litigation was filed.

## 2.  Agreements Signed After Complaint Filed

The remaining 16 agreements were signed between February 2020 and February 2021.[19]  [##70-1, 107-1]  It is clear from the record that at least three of these agreements—for opt-in plaintiffs Shannie Keller, Ralph Parisi, and Zane Sampson— were signed as part of offers of employment.  [##107-1 at 28; 70-1 at 55, 73]  Defendant has provided declaration testimony that it has required arbitration agreements since 2018 for all new offers of employment.  [#70-2 at ¶ 3]  Plaintiff has not provided evidence to contradict that assertion.  Thus, those opt-ins who were new employees

---

[19]  Those individuals include Daryl Byrum, Sara Chess, Patricia Dunn, Cecilia Fernandez, Kelly Hansen, Shannie Keller, Julia Kickhaefer, Michael Lien, Ralph Parisi, Kathy Parker, Zane Sampson, Laura Snyder, Amy Vaclav, Kenny Walker, April Wayman, and Tracy Zattiero.  [See ## 70-1, 107-1]

after the beginning of this litigation clearly signed the document as part of an ongoing practice of the company and not as part of some scheme.  *See Cohn v. Ritz Transp., Inc.*, 2014 WL 1577295, at \*3 (D. Nev. Apr. 17, 2014) (declining to invalidate arbitration agreements signed by new employees because "[n]one of the new employees had opted into this lawsuit at the time defendants required them to sign the arbitration agreement . . . [and] defendants' policy requiring that new employees sign the agreement was in place long before this action began"); *Gauzza v. Prospect Med. Holdings, Inc.*, No. 17-3599, 2018 WL 4853294, at \*2 (E.D. Pa. Oct. 4, 2018) ("continu[ing] [a] preexisting policy of requiring new hires to sign arbitration agreements as a condition for employment" is "not inherently abusive" under Rule 23(d)); *In re SunTrust Banks, Inc. 401(k) Plan Affiliated Funds ERISA Litigation*, No. 1:11-CV-784, 2017 WL 9884901, at \*2 (N.D. Ga. Feb. 27, 2017) (finding that Plaintiffs failed to meet Rule 23(d) standard for improper communication "in light of the fact that the Severance Plan is longstanding, predating the litigation in this case, and because the Severance Plan releases are widespread rather than being targeted at putative class members").

Moreover, based on the declarations from both Plaintiff and Defendant, it appears that the agreements were provided to the remaining employees during the rollout in January 2020, before this action was filed.  [*See* ##70-2 at ¶ 6; 126-12 at ¶ 9] After the initial informative emails sent in January, the only other communication between Defendant and the remaining opt-in plaintiffs regarding the agreements was on

July 10, 2020,[20]  when a mass email was sent to employees who had been notified of the agreement before litigation began.  [#70-2 at ¶ 8]  The email reads as follows:

> Hello!
>
> You may have one or more unacknowledged documents waiting to be acknowledged in HRIS.
>
> To acknowledge these documents please log in to HRIS to complete. If you need assistance please contact HR.
>
> Thank you!

[#70-2 at 13]   Other than this email, Plaintiff does not allege that any of the opt-in plaintiffs at issue had communication with Defendant regarding the agreement after it was rolled out. [21]  And the July email itself does not even directly mention the arbitration agreement.

Plaintiff has pointed the Court to no authority requiring a Defendant to affirmatively reach out as soon as new litigation is filed to employees who had been provided, but not yet returned, their arbitration agreements.  Moreover, it is unclear how Defendant's failure to reach out to these 13 employees would render an otherwise enforceable arbitration agreement unenforceable—the agreements themselves clearly state that signatories were precluded from participating in class actions and in litigating claims in court.  *See Stevenson v. Great American Dream, Inc.*, No. 1:12–CV–3359–

---

[20] The only potential exception is a communication between opt-in plaintiff Cecilia Fernandez and her manager, Matt Anderson, which this Court detailed previously. [#126-4 at ¶ 5]  But Ms. Fernandez's declaration does not state when that interaction took place and, in any event, the Court does not find the alleged interaction to be so egregious as to entirely invalidate a contract that the Court otherwise cannot find to be unconscionable.

[21] A phone call between Defendant's agents and some ASMs took place either on December 15, 2020, or sometime in "mid-2020" regarding this lawsuit.  [##126-15 at ¶11; 128-1 at ¶ 4]  There is no evidence before the Court that any of the opt-in plaintiffs who signed the agreements after January 2020 participated in, or were even aware of, this call.

TWT, 2014 WL 3519184, at *3 (N.D. Ga. Jul. 15, 2014) (finding that arbitration agreement signed after litigation began was not unconscionable because "[e]ven if [plaintiff] was unaware of this litigation when she signed the arbitration agreement, she does not deny that the text of the arbitration agreement made it clear to her that she could not participate in an FLSA collective action suit, pre-existing or not"); *Cohn*, 2014 WL 1577295, at *4, 16-17 (adopting magistrate recommendation finding that arbitration agreements signed after filing of the lawsuit were not void).

Thus, the Court cannot say that, on balance, that either the July 2020 communication or the signing of the arbitration agreements after the January rollout was unconscionable such that the agreements are invalidated.[22]

### e. Unconscionability Conclusion

In summary, after reviewing the unconscionability arguments presented by Plaintiff as they relate to the individual agreements, this Court finds that Plaintiff has not shown that the content and terms of the agreements were substantively unconscionable. And, although there is some evidence that, for certain opt-in plaintiffs, the timing and communication gave Defendant an unfair boost, these facts are not so egregious that they require the Court to invalidate the agreement as a whole. *Internet Archive*, 505 F.Supp.2d at 767 (stating that a finding of unconscionability requires *both* an absence of meaningful choice and unreasonable contract terms).

---

[22] Because Plaintiff has not presented sufficient evidence demonstrating that Defendant has—either in the past or the present—engaged in improper communications with potential plaintiffs, this Court declines to order a corrective notice be sent. [#103 at 18 n. 7 (stating, without providing evidence, that "Plaintiff *presumes* Defendant is continuing to obtain arbitration agreements from current ASMs" (emphasis added)]

### C.  Scope of Arbitration Agreements

Finally, having found that that the agreements are valid and enforceable, their scope is determined as a matter of federal law, and questions "concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Encore Prod., Inc. v. Promise Keepers*, 53 F.Supp.2d 1101, 1109 (D. Colo. 1999) (citation omitted).  All the agreements contain a term stating: "Any dispute, controversy or claim arising out of or relating to my employment with the Company or the termination thereof will, to the fullest extent permitted by applicable law, be settled exclusively by binding arbitration." [##70-1 at 1; 107-1 at 1] This action was brought for the purpose of vindicating wage claims under federal and state law, an aim that clearly relates to opt-in plaintiffs' employment with Defendant.   [#17]   This Court accordingly finds that the claims fall within the scope of the arbitration agreements.

## IV.   CONCLUSION

The Court concludes that a genuine issue of fact exists as to whether Mr. Watson signed the arbitration agreement and Defendant's Motion [#70] is **DENIED** as to opt-in Plaintiff Watson.[23]  This Court has further determined: (1) a valid agreement to arbitrate exists between Defendant and each of the remaining 56 opt-in plaintiffs, (2) Plaintiff has not demonstrated that the agreements are unconscionable or induced by fraud, and (3) these opt-in plaintiffs' claims fall within the scope of the arbitration agreements.  As a result, the remaining 56 opt-in plaintiffs' claims must be resolved through arbitration

---

[23] As previously indicated, at the October 14, 2021 discovery hearing, the parties shall be prepared to discuss Mr. Watson's opt-in status.

proceedings.[24]  Thus the Motion [#70] is **GRANTED** to the extent that it seeks to compel arbitration with the other 56 opt-in plaintiffs.

Nonetheless, the Motion [#70] is **DENIED** to the extent that it seeks to dismiss these 56 opt-in plaintiffs' claims.  Under Section 3 of the FAA, upon determining that an issue should be referred to arbitration, a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . ."  9 U.S.C. § 3; *see also Hickerson v. Pool Corp.*, No. 19-cv-02229-CMA-STV, 2021 WL 119346, at *1 (D. Colo. Jan. 13, 2021).  Here, although Defendant has requested that the claims be dismissed, Plaintiff has requested that they be stayed pending the outcome of the arbitration.  [#103 at 18 n. 8]  Accordingly, and by the terms of the statute, the 56 opt-in plaintiffs' claims for whom the Court has ordered arbitration are **STAYED** pending resolution of the arbitration proceedings.

SO ORDERED,

DATED:  September 27, 2021                    BY THE COURT:

                                              s/Scott T. Varholak
                                              United States Magistrate Judge

---

[24] In general, a district court lacks authority to compel arbitration in other districts, as is required by the terms of the various arbitration agreements in this matter.  *Ansari v. Qwest Commc'n Corp.*, 414 F.3d 1214, 1220-21 (10th Cir. 2005).  However, that rule is not jurisdictional but "one of venue" which parties waive "by not raising the issue before the district court."  *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1051-52 (10th Cir. 2006).  The parties have not raised venue before this Court, thus the issue is waived.