**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00261-STV

MICHAEL LEVINE, individually and on behalf of all others similarly situated,

     Plaintiff,

v.

VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.,

     Defendant.

_____

**ORDER OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

     This matter comes before the Court on Defendant Natural Grocers' Motion to Decertify (the "Motion to Decertify") [#223] and Plaintiff's Motion for Class Certification (the "Motion to Certify") [#261] (collectively, the "Motions"). The Motions are before the Court on the Parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment. [##15; 16] This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the instant Motions. For the following reasons, the Motion to Decertify is **GRANTED** and the Motion to Certify is **DENIED.**

**I.    BACKGROUND**

     Defendant is a Colorado corporation that owns and operates more than 150 grocery stores in nineteen states. [#17 at ¶¶ 14-15] Defendant employs more than 3,000 people across the United States, including dozens of Assistant Store Managers ("ASMs")

at its retail stores. [*Id.* at ¶ 16]  Defendant classifies all ASMs as exempt both from federal and state overtime requirements.  [*Id.* at ¶¶ 1, 4]

Plaintiff Michael Levine was employed as an ASM in a store located in Highlands Ranch, Colorado, from approximately March 2018 to April 2019.  [*Id.* at ¶ 10]  Mr. Levine, on behalf of himself and others similarly situation, filed the instant suit on January 31, 2020. [#1]  The operative Complaint alleges that Natural Grocers violated the Fair Labor Standards Act ("FLSA") and the Colorado Wage Claim Act ("CWCA") by improperly classifying Levine and other ASMs as exempt employees and denying them overtime.[1] [*See generally* #17]

On November 6, 2020, the Court granted Mr. Levine's Motion for Conditional Certification [#41], and conditionally certified the following collective for the purposes of Mr. Levine's FLSA claims:

> All current and former "Assistant Store Managers" who worked for Natural Grocers in the United States at any time on or after January 31, 2017 to the present, and who were classified as exempt from overtime compensation.

[*Id.* at 11]  On November 20, 2020, the Court approved the parties' proposed Notice and Consent to Join forms.  [#45]  At the close of the notice period, 158 individuals had filed Consent to Join forms.[2]  [*See* #104]  On September 27, 2021, this Court ordered that 56 of the opt-in plaintiffs' claims must be resolved through arbitration proceedings and stayed those opt-in plaintiffs' claims.[3]  [#142]

---

[1]  The Complaint also asserts a claim under the Colorado Minimum Wage Act (the "CMWA").  [#17 at ¶¶ 87-94]  The Court dismissed Plaintiff's CMWA claim on September 19, 2022, holding that Plaintiff failed to plausibly allege a violation of the CMWA for which relief is available.  [#209]

[2] Consistent with the parties' briefing, the Court refers to these individuals as "opt-ins."

[3] Two opt-ins have withdrawn their Consent to Join form and discontinued participation in this action.  [##194; 278]

On December 7, 2023, after the close of discovery, Defendant filed the Motion to Decertify [#223], arguing that discovery established that the opt-ins and the named Plaintiff are not similarly situated.  Plaintiff has responded to the Motion to Decertify [#243] and Defendant has replied [#255].   On February 22, 2023, Plaintiff filed the Motion to Certify, which seeks to certify a class of ASMs under Federal Rule of Civil Procedure 23 for the purposes of Plaintiff's state-law claims.  [#261]  Defendant has responded to the Motion to Certify [#266][4] and Plaintiff has replied [#269].

## II.    THE MOTION TO DECERTIFY

### A.    STANDARD OF REVIEW

#### i.    Similarly Situated

Section 216(b) of the FLSA authorizes private individuals to recover damages for violations of FLSA's minimum wage and overtime provisions.  *See* 29 U.S.C. § 216(b); *Brayman v. KeyPoint Gov't Sols., Inc.*, 595 F. Supp. 3d 983, 992 (D. Colo. 2022); *Norwood v. WBS, Inc.*, No. 15-cv-00622-MSK-KMT, 2016 WL 7666525, at *1 (D. Colo. Sept. 29, 2016).  Section 216(b) states that:  "An action to recover the liability [for unpaid overtime compensation, retaliation and liquidated damages] may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or

---

[4] Defendant's response contains declarations from putative class members.  [##266-19; 266-20; 266-21; 266-22; 266-23; 266-24; 266-25; 266-26; 266-27]  In Plaintiff's reply, Plaintiff asserts that these declarations were obtained in violation of Colorado Rule of Professional Conduct 4.3, and requests that they be stricken and Defendant's counsel be admonished.  [#269 at 10]  On April 10, 2023, the Court informed the parties that this request to the Court, made in Plaintiff's reply brief and not by separate motion, would not be considered absent a proper motion.  [#274 (citing Federal Rule of Civil Procedure 7(b)(1) and D.C.COLO.LCivR. 7.1)]  To date, no such motion has been filed.  Accordingly, the Court considers the declarations attached to Defendant's response where appropriate.

more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).   "The FLSA thus provides plaintiffs the opportunity to proceed collectively, which allows 'plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.'"   *Brayman*, 595 F. Supp. 3d at 992 (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).   Contrary to the procedures governing a class action under Rule 23, plaintiffs who wish to participate in a FLSA collective action must opt in to the action.   *See Norwood*, 2016 WL 7666525, at *1.

A FLSA collective action may only be maintained by and among "similarly situated" employees.   *See id.*   While neither the FLSA nor controlling caselaw has defined the phrase "similarly situated," the Tenth Circuit has approved a two-step "ad hoc" analysis governing that determination.[5]   *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102-05 (10th Cir. 2001); *Brayman*, 595 F. Supp. 3d at 992.   "At the initial 'notice stage,' the trial court must determine whether plaintiffs have made 'substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'"   *Norwood*, 2016 WL 7666525, at *1 (quoting *Thiessen*, 267 F.3d at 1102).   The court makes this initial determination relying upon the allegations in the complaint and any supporting affidavits filed by the plaintiffs.   *Id.*   "[T]he court does not weigh evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims" during the notice stage.

---

[5] The Court notes that this "ad hoc" analysis has recently been criticized in other Circuits. *See Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 517 (2d Cir. 2020) ("We question whether the ad hoc approach is consistent with the notion that party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims."); *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1114-16 (9th Cir. 2018) (explaining "two major flaws" of the "ad hoc test"). However, the ad hoc approach as described by *Thiessen* remains in wide use within the Tenth Circuit, and neither party advocates for the use of a different analysis.

*Koehler v. Freightquote.com, Inc.*, 93 F. Supp. 3d 1257, 1263 (D. Kan. 2015) (quotation omitted).  Certification at step one is conditional, "and the standard of proof 'is a lenient one that typically results in class certification,' allowing notice to be sent to the putative class members and discovery to be undertaken."  *Norwood*, 2016 WL 7666525, at *1 (quoting *Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 679 (D. Kan. 2004)); *see also Young v. Dollar Tree Stores, Inc.*, No. 11-cv-01840-REB-MJW, 2012 WL 3705005, at *2 (D. Colo. Aug. 24, 2012) (describing the conditional certification burden as "minimal").

After the completion of discovery, the second, or "decertification," stage occurs—often prompted by a motion to decertify.  *See Norwood*, 2016 WL 7666525, at *1; *Coldwell v. RiteCorp Env't Prop. Sols.*, No. 16-CV-01998-NYW, 2017 WL 4856861, at *3 (D. Colo. July 20, 2017).  During the decertification stage, the court applies a much stricter standard to determine whether class members are similarly situated.  *See Norwood*, 2016 WL 7666525, at *1.  The court reviews several factors at the decertification stage, including: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.  *Thiessen*, 267 F.3d at 1102-03.  Plaintiffs bear the burden of establishing that they are similarly situated.  *Brayman*, 595 F. Supp. 3d at 992 (citing *Coldwell*, 2017 WL 4856861, at *3).

### ii.   FLSA Executive and Administrative Exemptions

Plaintiff's FLSA claim alleges that ASMs are misclassified as exempt and improperly denied overtime pay.  [#17 at ¶¶ 47-53]  "In order to determine whether members of the class are similarly situated [in the context of a misclassification case], the Court must consider the salient factors in an exemption analysis."  *Green v. Harbor*

*Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1094 (D. Kan. 2012).  Two specific exemptions are at issue in this case.

### a.    Executive Exemption

First, under the Executive Exemption, the FLSA exempts a person employed "in a bona fide executive . . . capacity."  29 U.S.C. § 213(a)(1).  Under the Department of Labor regulations, an employee qualifies for the executive exemption if the employee:  (1) meets a specific weekly salary threshold; (2) has a primary duty of management; (3) customarily and regularly directs two or more employees; and (4) has authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a)(1)-(4).  Here, the second, third, and fourth criteria are in dispute.  [*See*, *e.g.*, ##223 at 44-49; 244 at 3-10]

Regarding the second criterion—that the employee have the "primary duty of management"—a Department of Labor regulation provides the following illustrative list of management activities:

> [I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  Another regulation clarifies that the "term 'primary duty' means the principal, main, major or most important duty that the employee performs," to be

determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). While "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee . . . [t]ime alone . . . is not the sole test." *Id.* § 541.700(b). The regulation provides the following example:

> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

*Id.* § 541.700(c).

With respect to the third criterion—that the employee customarily and regularly directs two or more employees—the frequency of direction "must be greater than occasional," but "of course, may be less than constant." *Id.* § 541.701. "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement." *Id.* § 541.104(c).

Finally, with respect to the fourth criterion—regarding the employee's hiring, firing, and promotion authority—a Department of Labor regulation provides the following illustrative list of factors to consider in determining whether an employee's suggestions and recommendations regarding the status of another employee are given "particular weight":

> [W]hether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and

recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

*Id.* § 541.105.  "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status."  *Id.*

### b.    Administrative Exemption

Next, under the Administrative Exemption, the FLSA exempts a person employed "in a bona fide . . . administrative . . . capacity."  29 U.S.C. § 213(a)(1).   Under the Department of Labor regulations, an employee qualifies for the Administrative Exemption if the employee:  (1) meets a specific weekly salary threshold; (2) has a primary duty of office or non-manual work directly related to management or general business operations; (3) whose primary duty includes the exercise of discretion with respect to matters of significance.  29 C.F.R. § 541.200(a)(1)-(3).   Here, the second and third criteria are at issue.  [*See*, *e.g.*, ##223 at 49-51; 244 at 3-10]  Again, "the term 'primary duty' means the principal, main, major or most important duty that the employee performs," to be determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).

### B.    ANALYSIS

As discussed above, this matter has previously been conditionally certified to proceed as a collective action on Mr. Levine's FLSA claim.  [#41]  Now, at the close of discovery, Defendant has filed its Motion to Decertify arguing that Plaintiff cannot meet his burden to establish that he and the opt-ins are similarly situated such that the action can proceed on a collective basis.  [#223]   In order to determine whether Plaintiff has

met his burden to proceed collectively, the Court will consider the *Thiessen* factors as applied to this matter.[6]

> ### i.  The Disparate Factual and Employment Settings of the Individual Plaintiffs

Citing extensively to the opt-ins' individual discovery responses and depositions, Defendant argues that the opt-ins' day-to-day experiences as ASMs varied significantly based primarily on the store that they were in and the store manager that they worked under. [*See generally* #223] Plaintiff contests this representation, arguing that the record establishes a consistent profile of an ASM's expected duties and responsibilities. [#243 at 4-12] Plaintiff also points to various forms of evidence that is common to all opt-ins, such as Defendant's uniform ASM job description, uniform ASM training programs, and Defendant's uniform exemption decision. [*Id.* at 12-16]

In considering whether the factual and employment settings of the individual plaintiffs weighs in favor or against certification, a court's analysis must be guided by the alleged FLSA violation. Here, Plaintiff alleges that Defendant violated the FLSA by misclassifying ASMs and denying them overtime. [#17 at ¶¶ 1, 74] As discussed above, the applicability of both the executive and administrative exemptions relies in large part on "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Accordingly, courts have recognized that determining the right of opt-in plaintiffs to proceed collectively in a misclassification case requires "a fact-intensive inquiry into the daily activities of each

---

[6] A Court considering a motion to decertify may examine the evidence produced during discovery. *See Thiessen*, 267 F.3d at 1102, 1108; *Shockey v. Huhtamaki, Inc.*, 730 F. Supp. 2d 1298, 1303 n.20 (D. Kan. 2010). Accordingly, the Court considers the discovery materials and deposition testimonies attached to the parties' briefing.

individual plaintiff in order to adequately identify the actual scope of Plaintiffs' job duties to determine the extent and consequences of any disparities among them." *Green*, 888 F. Supp. 2d at 1099 (citing *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005)); *see also Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("'[S]imilarly situated' in this [misclassification] case must be analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt."); *Esparsen v. Ridley's Fam. Markets, Inc.*, No. 18-cv-01556-RM-GPG, 2022 WL 1092136, at *3 (D. Colo. Apr. 12, 2022) (explaining that "[g]eneral allegations of an overarching policy are insufficient to establish similar employment settings" and examining the "specific duties and responsibilities" of the opt-in plaintiffs).

With that in mind, the Court is cognizant that it is not making a merits determination on the applicability of any FLSA exemption at this stage. *See Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1003 (D. Kan. 2018); *Heartland Auto. Servs.*, 404 F. Supp. 2d at 1148. Nor must Plaintiff establish that the opt-ins are *identically* situated. *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007) (citing *Heartland Auto. Servs.*, 404 F. Supp. 2d at 1149). Instead, courts have permitted FLSA claims to proceed collectively when disparities among the opt-in plaintiffs are "not material" and are "outweighed by the similarities between those Plaintiffs." *Ruffin v. Avis Budget Car Rental, LLC*, No. 11-1069-SDW, 2014 WL 294675, at *3 (D.N.J. Jan. 27, 2014) (quoting *Garcia v. Freedom Mortgage Corp.*, 790 F.Supp.2d 283, 287 (D.N.J. 2011)).[7]

---

[7] Plaintiff cites *Ruffin* for the proposition that the Court need not undergo "an intensive inquiry into the daily activities of Plaintiff and the Opt-Ins." [#243 at 16] The court in *Ruffin*, however, did exactly that—examining "deposition testimony of Plaintiffs and

Upon careful review of the record, and keeping in mind the types of disparities that are material in this misclassification case, the Court finds that this factor weighs against this matter proceeding collectively. To illustrate why, the Court will briefly summarize discovery responses and deposition testimony relevant to the executive exemption, which the parties focus their briefing on.

The opt-ins' (and named Plaintiff's) discovery responses and testimony reveal material disparities in the extent of management that they engaged in as ASMs. For example, consider the opt-ins' varying experiences in training other employees. One opt-in testified that she did not have "any involvement in training or coaching new employees." [#223-16 at 65 (159:4-6)] Similarly, another opt-in testified that he "never had the occasion to train any employee at all," because "the store manager would delegate [training] to department managers."[8] [#223-3 at 59 (109:4-12)] Meanwhile, another opt-in testified that he was "extensively involved in training . . . because of [his] experience," and that "it was delegated to [him] to facilitate the development and training of new people [in a particular department]." [#223-7 at 32 (37:1-10), 34 (39:2-4)] Yet another opt-in testified that she "train[ed] and supervise[d] crew members to ensure all department tasks and objectives were met as assigned"—that, in fact, she had trained and supervised other employees while occupying multiple positions with Defendant, stating: "[I]f someone needed training, you trained them." [#223-6 at 52-53 (189:24-190:14)]

---

Defendants' witnesses" and concluding that "the record reflects that there were not significant differences with respect to Plaintiffs' factual and employment settings." *Ruffin*, 2014 WL 294675, at *3.

[8] This opt-in later admitted to "train[ing] or coach[ing] an employee on how to log their time." [223-3 at 60 (111:4-6)]

The opt-ins also testified to significant differences in their involvement in scheduling and task assignment. Defendant utilized a Master Schedule, Weekly Schedule, and Daily Schedule for scheduling hours and assigning tasks at a particular store.[9]  One opt-in testified to regularly creating both the Weekly and Daily Schedules at her store, but not the Master.  [#223-15 at 35-36 (42:19-43:5)]  Another testified that he "worked with the store manager to set the master[,] weekly[,] and daily schedules."  [#223-8 at 105 (209:9-16)]  One opt-in only testified to setting the Daily Schedule, but did not discuss any oversight from her store manager in that process [#223-11 at 38 (74:7-12) (describing "a typical opening shift" by stating:  "And the[] daily schedule would either be done or I would fill it out for the day")], while another testified that he "drafted the daily schedule[s]," but that his store manager would "review them before we put them up, [and] he made edits and changes as needed" [#223-3 at 39 (42:8-10)].  Yet another testified that scheduling "was [the store manager's] job," that he had no recollection of a Master Schedule, and that the only time the opt-in was involved at all in scheduling other employees or assigning their tasks was when the store manager was on vacation.  [#223-17 at 50-51 (72:9-73:21)]

Further, there are meaningful disparities among the opt-ins regarding their involvement in managing and reporting store finances and performance.  Defendant utilized a monthly manager report (the "MMR") and a daily sales report (the "DSR") to

---

[9] According to one opt-in, the Master Schedule reflected the hours and shifts available to be filled based on the store and served as a template for the Weekly Schedule.  [#223-15 at 34-36 (41:12-43:21)]  The Weekly Schedule showed the days and times that employees were scheduled to work for the week.  [*Id.*]  The Daily Schedule listed who was working that day and what each employee's job duties or task lists would be for that day.  [*Id.*]

track the financial performance of its stores.  According to an opt-in, the MMR reflected certain metrics from the store, and if any metrics were "down" then it contained "a few sentence[s]" on how those deficiencies would be corrected moving forward.  [#223-16 at 70-71 (169:16-170:3)]  In sum, the MMR acted as "a snapshot of your store," meant to "show . . . what your store is doing and accomplishing," and, "[i]f you were behind in any way, shape, or form" to provide an explanation for that deficiency.  [#223-6 at 28-30 (87:23-89:3)]  The DSR reported the previous day's sales, noting sales and returns, as well as discrepancies in specific cash drawers.  [*Id.* at 45-46 (159:16-160:1)]  All opt-ins stated in written discovery that they were at least occasionally involved in preparing the MMR at their store, but were not involved in preparing the DSR.  [##223-3 at 27, 29; 223-4 at 30, 32; 223-5 at 30, 32; 223-6 at 8, 10; 223-7 at 8, 10; 223-8 at 28, 30; 223-9 at 26, 28; 223-10 at 29, 31; 223-11 at 27, 29; 223-13 at 9-10; 223-14 at 8, 10; 223-15 at 25, 27; 223-16 at 25, 27; 223-17 at 25-26][10]

However, this uniformity disappeared during depositions.  For example, two opt-ins testified that they had no involvement in the MMR as an ASM, but did complete the DSR.  [##223-3 at 66 (126:5-7), 78 (159:21-24); 223-5 at 61 (122:6-9), 65 (149:10-17)]  Another opt-in testified that she received a complaint against her after the DSR was not completed on her day off.  [#223-6 at 44-45 (158:6-159:13), 51 (188:2-9)]  One opt-in, consistent with his written discovery responses, testified to having some degree of involvement in preparing the MMR, but not the DSR.  [#223-8 at 39 (46:13-22), 107 (213:22-24); *see also* #223-16 at 71 (170:19-22) (Ms. Rife testifying that she completed the MMR "a few times"), 75 (192:2-5) (Ms. Rife testifying that she could not recall

---

[10] The named Plaintiff denied involvement in both the MMR and DSR.  [#223-12 at 8, 10]

completing the DSR as an ASM)]  Others testified to varying levels of involvement in both reports.  [*See, e.g.*, ##223-4 at 42-44 (56:25-57:2, 58:12-17) (Ms. Bugge describing the DSR as "an example of some of the emails that [she] would send"), 82 (150:4-11) (Ms. Bugge testifying that she was trained on how to complete the MMR, and that she recalled completing the MMR twice); 223-9 at 80 (113:2-4) (Ms. Garcia testifying that she drafted the MMR about five times), 92 (142:16-25) (Ms. Garcia testifying that she completed the DSR, but could not recall how frequently)]  Finally, one opt-in testified that he had no involvement that he could recall with either the MMR or the DSR.  [#223-17 at 58 (96:8-14), 73 (141:12-15)]

Similarly, despite uniform responses in written discovery that the opt-ins and the named Plaintiff did not have the responsibility of "ensur[ing] store compliance with food safety regulations, including managing safety audits,"[11] deposition testimony complicated these responses.  Multiple opt-ins testified to, in fact, "ensur[ing] store compliance with food safety regulations" while they were ASMs.  [*See*, *e.g.*, ##223-8 at 103 (206:18-22) ("Q: Did you ensure store compliance with food safety regulations? A: Yes."); 223-11 at 78 (203:20-22) (same); 223-15 at 49 (90:7-10) (same)]  Another denied this responsibility, or at least could not recall having it.  [*See, e.g.*, #223-3 at 52 (83:6-21) ("Q: Did you have any involvement in ensuring that your store complied with . . . food safety requirements? . . . A: No. If I had to like give you an exact answer right now, no. . . . [The store manager]

---

[11] Specifically, the written discovery responses all denied "[e]nsuring store compliance with food safety regulations, including managing safety audits," and stated that:  "No one person in the store was responsible for these tasks. Every employee played a part, and the process was overseen by the Store Manager."  [##223-3 at 28; 223-4 at 30; 223-5 at 30; 223-6 at 9; 223-7 at 9; 223-8 at 28; 223-9 at 26; 223-10 at 29; 223-11 at 28; 223-12 at 9; 223-13 at 9; 223-14 at 9; 223-15 at 26; 223-16 at 26; 223-17 at 25]

was the one who would . . . make sure [employees] were following those food and safety things you mentioned.")]  When asked if he managed safety audits, one opt-in affirmed that he "went through a checklist."  [#223-8 at 103 (206:21-22)]  Another testified that she could not recall any participation in food safety audits.  [#223-16 at 76 (198:2-5)]

More disparities existed with respect to the opt-ins' involvement with managing employee complaints and grievances.  Some opt-ins and the named Plaintiff testified that they would independently resolve certain employee complaints.  [*See* ##223-5 at 41 (71:4-24) (opt-in escalated "one or two" complaints to his store manager or HR, but that "every day" there were complaints that did not warrant elevation to the store manager or HR); 223-9 at 45-46 (52:6-53:11) (opt-in was comfortable handling some employee issues on her own, but would elevate more significant complaints to her store manager and HR to be handled together); 223-12 at 39 (179:14-16) (named Plaintiff "occasionally" resolved issues with store employees through email)]  Another testified to resolving complaints only with the help of the store manager and HR.  [##223-11 at 77 (202:22-25)]  Other opt-ins denied or could not recall any involvement in handling employee complaints.  [*See, e.g.*, ##223-17 at 62 (104:3-13) (opt-in could not recall "any involvement investigating employee complaints or grievances," as the store manager was "the only one that would handle that"); 223-15 at 83 (184:18-21) (opt-in could not recall "any involvement in investigating employee complaints [ ]or grievances")]

Opt-ins also testified to having varying degrees of ability to direct the work of other employees.  As discussed above, some opt-ins created the Daily Schedule, which delegated task lists to employees for the day, while others did not.  The named Plaintiff testified to "directing and monitoring" employees in all departments by "communicat[ing]

what tasks needed to be done." [#223-12 at 27-28 (58:22-59:5)] Another confirmed his supervisor's evaluation of him that he was "comfortable directing the staff and making sure everyone stays busy and is working to their capabilities." [#223-14 at 38-39 (200:21-202:6)] In contrast, another testified to assigning individuals to certain tasks when he drafted the Daily Schedule, but that his store manager would otherwise "give the team direction," even on the store manager's days off. [#223-3 at 44-45 (53:23-54:6), 48 (69:3-8), 61-62 (114:17-115:5)]

Finally, the opt-ins and the named Plaintiff testified to varying levels of involvement in the hiring and firing of employees. As for hiring, some opt-ins responded in written discovery that they were directed to "interview and hire candidates." [##223-4 at 7; 223-8 at 7; 223-14 at 12-13; 223-16 at 7] Others responded that they had no involvement or participation in the hiring process. [##223-10 at 7; 223-15 at 7] Many acknowledged involvement in the hiring process, stating that they "could offer suggestions regarding whether to hire a potential candidate" but that "those suggestions did not amount to recommendations." [*See*, *e.g.*, ##223-3 at 9; 223-5 at 7; 223-9 at 7] Elsewhere in written discovery, all opt-ins and the named Plaintiff—in apparent contradiction to some of the opt-ins' and named Plaintiff's earlier written responses admitting to participating in the interviewing and hiring process—explicitly denied "[i]dentifying, interviewing, and hiring new Crew Member candidates, and/or providing input in such processes that is accorded weight by other managers." [#223-3 at 27; 223-4 at 30; 223-5 at 30; 223-6 at 8; 223-7 at

8; 223-8 at 28; 223-9 at 26; 223-10 at 29; 223-11 at 27; 223-12 at 8; 223-13 at 8; 223-14 at 8; 223-15 at 25; 223-16 at 25; 223-17 at 25][12]

Deposition testimony revealed further disparities.  One opt-in testified that he would generally review online applications together with his store manager, participated in between twenty and thirty interviews, asked questions "here and there throughout [these] interviews," and always gave input to his store manager following the interviews.[13] [#223-8 at 54-58 (113:5-17, 116:1-117:18); *see also id.* at 56 (117:19-21) ("Q: And did you feel that [your store manager] respected your thoughts? A: Yes.")]  Another opt-in reviewed online applications, selected and called candidates, and scheduled interviews on her own, without input from her store manager.  [#223-15 at 50-51 (91:6-92:14)]  She would then participate in the interviews with the candidates she had selected, and conferred with her store manager before each of the store's eleven hires during the opt-in's four-and-a-half-month tenure at the store.  [*Id.* at 51 (92:15-17), 55-56 (99:12-100:15)]  One opt-in testified that his involvement in the hiring process changed based on his store manager.  With one store manager, the opt-in did not participate in interviews; with two other store managers, he did.  [#223-3 at 56-57 (97:13-98:4)]  Of the two store managers who allowed that opt-in to participate in the interview process, one made hiring decisions without "a whole lot of back-and-forth or any sort of conversation" with the opt-in following the interview, while the other store manager would discuss candidates with the opt-in after

---

[12] Four responses include a note that:  "On limited occasions Plaintiff sat in on interviews with job candidates. [Plaintiff] did not formally interview them nor make the decision to hire them, and [Plaintiff's] input was not given any weight."  [##223-6 at 8; 223-7 at 8; 223-12 at 8; 223-13 at 8]

[13] Once again, in his written discovery, this opt-in stated that he was not involved in "[i]dentifying, interviewing, and hiring new Crew Member candidates, and/or providing input in such processes that is accorded weight by other managers."  [#223-8 at 28]

17

interviews, at least for training purposes.  [*Id.* at 57-58 (98:19-99:11)]  Another opt-in testified that he would review, but not select candidates, and that he participated in a handful of interviews with his store manager, but never asked questions and never gave input following the interview.  [#223-17 at 44-46 (58:4-18, 60:1-61:10)]  Finally, one opt-in testified that she "sat in on interviews," but denied interviewing any candidates and denied assisting the store manager in the hiring process in any way.  [#223-13 at 21 (38:6-11), 33 (75:1-10)]

Plaintiffs argue that the disparities in responsibilities that the opt-ins testified to, as illustrated by the above non-exhaustive summary, amount to "minor non-material differences."  [#243 at 9]  The Court disagrees, particularly in the context of a misclassification case.  As discussed above, determining the exemption status of any given individual depends "on all the facts in a particular case" and demands an examination of "the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  Regulations provide that management activities may include "interviewing, selecting, and training of employees," "directing the work of employees," "handling employee complaints," and "monitoring or implementing legal compliance measures"—the precise types of activities that the opt-ins and the named Plaintiff testified to varying degrees of involvement in, depending on their store, store manager, and level of experience.  *Id.* at § 541.102.

Similarly, Plaintiff cannot avoid the opt-ins' job duty differences by pointing out that "ASMs spen[t] the majority of their time" on non-exempt tasks.  [#243 at 10]  Again, "the amount of time spent performing exempt work . . . is not the sole test" of whether an employee is exempt.  29 C.F.R. § 541.700(b).  For this reason, Courts have decertified

actions at this stage despite "general showing[s] of similarity with respect to . . . the time spent on allegedly [non-exempt tasks]." *Green*, 888 F. Supp. 2d at 1104; *Heartland Auto. Servs.*, 404 F. Supp. 2d at 1152 (decertifying a misclassification action because "[the plaintiffs] rest too heavily on the similarity within the class regarding the time spent on non-exempt duties"); *see also Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274-75 (M.D. Ala. 2004) (denying conditional certification in a misclassification case where plaintiffs presented uniform testimony that they spent the majority of their time on non-managerial tasks, but other evidence indicated that the court would need to inquire as to the "daily tasks of each putative collective action member to determine whether they are similarly situated").   And while Plaintiff points out uniformity in some respects of the opt-ins' testimonies and discovery responses,[14] some degree of uniformity, even if material, does not discount the material differences established via the opt-ins' testimonies and discovery responses. *See Heartland Auto. Servs.*, 404 F. Supp. 2d at 1154 ("[W]hile the Court recognizes that Plaintiffs have made a showing of similarity with respect to some aspects of their positions as Store Managers, given the fact intensive nature of the exemption analysis, Plaintiffs have not satisfied the Court that they are similarly situated to the extent necessary to make collective treatment of their claims proper.").

Plaintiff next relies on categories of generalized evidence relating to Defendant's uniform treatment of ASMs to show that the opt-ins were similarly situated.  [*See*, *e.g.*,

---

[14] Plaintiff notes, for example, that the opt-ins were uniformly denied the authority to decide, among other things, "the dress code," "the music to play or temperature to set," or "where to place the signs in the store."  [#243 at 11]

#243 at 12-16]  Plaintiff specifically points to Defendant's uniform ASM job description[15] and uniform employment policies. However, "courts have rejected similar arguments and made clear that the decertification analysis must turn on whether the class members were actually performing similar duties."   *Guanzon v. Vixxo Corp.*, No. CV-17-01157-PHX-DWL, 2019 WL 1586873, at *6 (D. Ariz. Apr. 12, 2019) (collecting cases). This is especially true when multiple opt-ins disavowed these cited job descriptions and policies. [*See, e.g.*, ##255-1 at 4 (245:4-11) ("Q: In reality, did you do the things listed on the job description? . . . A: Not all of them, no."); 255-3 at 3-4 (23:19-24:2) (describing the job description as "what is put out when we apply for the job, but it was not what [the opt-in's] job was"); 255-6 at 3-4 (26:18-27:1) (describing the job description and policies as "the expectation of the company," but providing that, at least as an ASM at one store, "those weren't the things I was doing")]  This case is therefore analogous to the situation in *Green*, where the court held that the opt-ins "may not rely on the job description itself as generalized evidence of the scope and similarity of their daily activities" because the opt-ins "effectively disavow[ed] the job description" as not reflective of their day-to-day responsibilities.  888 F. Supp. 2d at 1098-99; *see also Esparsen*, 2022 WL 1092136, at *3 (decertifying a collective action brought by assistant managers alleging misclassification because "[t]he evidence suggests that although the assistant managers had the same title and were subject to the same expectations and policies, their specific duties and responsibilities were far from uniform"); *Heartland Auto. Servs.*, 404 F. Supp. 2d at 1151 (not considering a job description that the employees largely disavowed).

---

[15] Plaintiffs cite to "Ex. R" when referencing this job description.  [*See* #243 at 5 n.7, 12] However, no Exhibit R was included with Plaintiff's Response.  [*See* ##243-13 ("Exhibit P"); 243-14 ("Exhibit T")]

Finally, and for similar reasons, Plaintiffs may not rely on Defendant's uniform policy of classifying ASMs as non-exempt.  This argument has again been directly considered and rejected by *Green* and *Esparsen*.  *Green*, 888 F. Supp. 2d at 1099 ("[M]erely classifying a group of employees as exempt does not automatically qualify them as similarly situated, nor eliminate the need to make a factual determination as to whether class members are actually performing similar duties." (collecting cases)); *Esparsen*, 2022 WL 1092136, at *3 ("General allegations of an overarching policy [of misclassification] are insufficient to establish similar employment settings, however, and the Court is not persuaded that the assistant managers experiences were similar enough to say that they shared factual nexus regarding that status." (citing *Blair*, 309 F. Supp. 3d at 1001-02)).

Indeed, Plaintiffs themselves appear to recognize that ASM duties differed among Defendant's stores.  For example, Plaintiffs argue that Federal Department of Labor audit results finding that ASMs are properly classified at certain particular stores is "of no moment," citing testimony from Defendant's expert for the proposition that "it would be nothing but sheer luck to find evidence [from a small survey of stores] that was truly representative of the job duties of Defendant's ASMs."  [#243 at 14 & n.19 (quotation omitted)]  Plaintiffs next cite deposition testimony from a former Regional Store Manager, Paula Watts, who received a complaint from Mr. Levine regarding the amount of non-exempt work he was doing.  [*Id.* at 15; *see* #243-31 at 4-5 (90:24-91:18)]  Ms. Watts testified that she discussed the issue with Mr. Levine's store manager and determined that "the store was understaffed at the time," and took no further action.  [#243-31 at 5 (91:19-23)]  If anything, this testimony further supports the notion that Mr. Levine's

complaints, meritorious or not, stemmed from the specific conditions at Mr. Levine's store during the specific time in question as opposed to a uniformly applicable state of affairs across all stores.[16]   [*Cf.* #223-8 at 38 (38:5-14) (opt-in testifying that he "absolutely" observed differences between two stores that he worked in, based on the fact that one of the stores "was extremely shorthanded at the time")]

Ultimately, based on the Court's review of the opt-ins' discovery responses and deposition testimony, the Court finds that the disparate factual and employment settings of the individual ASMs who have opted into this matter weighs in favor of decertification.

### ii.    Individual Defenses

The Court next considers "the various defenses available to defendant which appear to be individual to each plaintiff." *Thiessen*, 267 F.3d at 1103.  For the same reasons as discussed above, the Court finds that this factor weighs in favor of decertification.  *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008) (referring to the disparate setting factor and the individualized defenses factor as "two sides of the same coin" in a misclassification case).  With respect to each individual opt-in's overtime clam in the FLSA collective action, Defendant intends to assert exemption defenses.  [#223]  The application of these defenses depend on each Plaintiff's specific job duties and, as discussed above, "Plaintiffs have not shown that they are similarly situated on many of the fact-specific issues that must be addressed at a trial on

---

[16] Plaintiff further asserts that Ms. Watts testified that "ASMs performed largely the same type of work as Mr. Levine," citing pages 91 and 92 of Ms. Watts' deposition transcript. [#243 at 15]  However, the cited exhibit does not contain page 92 of Ms. Watts' deposition transcript, and page 91 contains no such testimony.  [*See* #243-31 at 5-6]

the merits of their misclassification claim." *Green*, 888 F. Supp. 2d at 1104.  As the court in *Esparsen* explained:

> Whether these assistant managers meet the requirements for an exemption will require presenting evidence of their unique circumstances. Based on those circumstances, all, some, or none of them may qualify for FLSA exemptions. But the Court cannot say they are similarly situated merely because Defendant asserts that they all qualify. In other words, depending on their specific situations, there may be different reasons why they do or do not qualify for the asserted exemptions.

2022 WL 1092136, at *3 (citing *Nez v. Sw. Glass & Glazing, Inc.*, No. 1:15-CV-01041-RJ, 2016 WL 10516171, at *4 (D.N.M. Dec. 22, 2016)).

Moreover, the Court notes the inconsistencies within the individual opt-ins' respective discovery responses and deposition testimonies, illustrated above.  Such internal inconsistencies, combined with the disparities between the opt-ins, would even further "necessitate[ ] individual inquires" into the merits of each opt-in's claims and make the use of "'representative proof [ ] problematic'" considering the contrary responses. *Green*, 888 F. Supp. 2d at 1104 (first citing then quoting *Johnson*, 561 F. Supp. 2d at 574); *see also Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 965 (W.D. Mich. 2009) (denying FLSA certification of a misclassification action based on, in part, "concern[s] about the contradictions between Plaintiffs' affidavits and their deposition testimony, because they show the importance of cross-examination of each plaintiff and suggest the need for separate mini-trials to resolve each individual's claim." (quotations omitted)).

Accordingly, the Court finds that the availability of individualized defenses as to each opt-in weighs in favor of decertifying this action.

### iii.    Fairness and Procedural Considerations

Finally, the Court considers fairness and procedural considerations.  *Thiessen*, 267 F.3d at 1103.  "The FLSA's collective action has an important remedial purpose: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity."  *Brayman*, 595 F. Supp. 3d at 995 (quotation omitted).  This purpose erodes, however, when the collective action would "devolve into numerous mini-trials, causing the jury to evaluate testimony from countless witnesses and other evidence that is unique to particular Plaintiffs."  *Green*, 888 F. Supp. 2d. at 1104 (quotation omitted).

Based on the material disparities within and among the opt-in's discovery responses and deposition testimonies, representative evidence would be of extremely limited value.  Thus, the individualized defenses and credibility concerns would result in at least dozens of the type of "mini-trials" that undercut the efficacy and fairness of a collective action.  *See id.*; *Esparsen*, 2022 WL 1092136, at *3 (noting the "impracticalities of having, essentially, twenty separate 'mini-trials' to establish whether an FLSA exemption applies as to each assistant manager").  Thus, the Court finds that in this case the fairness and procedural considerations weigh against proceeding collectively.

### C.    CONCLUSION

In sum, the Court finds that the three primary factors relevant to a decertification analysis weigh in favor of decertifying the collective action.  The parties do not point the Court to any other relevant factors for consideration, and the Court finds none.  Accordingly, Defendant's Motion to Decertify is GRANTED, and the claims of all opt-in

Plaintiffs are DISMISSED WITHOUT PREJUDICE.  *See Green*, 888 F. Supp. 2d at 1094 ("'If the claimants are not similarly situated, the district court decertifies the class, [and] the opt-in plaintiffs are dismissed without prejudice.'" (quoting *Mooney v. Aramco Servs. Co.*, 54 F. 3d 1207, 1214 (5th Cir.1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 90-91 (2003)).

## III.  THE MOTION TO CERTIFY

### A.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 23 sets forth the requirements for the certification of a class action.  "As the party seeking to certify a class, Plaintiff bears the strict burden of proving the requirements of Rule 23."  *Torres-Vallejo v. Creativexteriors, Inc.*, 220 F. Supp. 3d 1074, 1079-80 (D. Colo. 2016) (citing *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006)).  "In determining the propriety of a class action, the question is not whether a plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *Id.* at 1080 (citing *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982)).

To obtain class certification, the plaintiff must satisfy all four prerequisites of Rule 23(a).  *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014).  These four prerequisites are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "When deciding whether the proposed class meets the requirements of Rule 23, the Court accepts the plaintiff's substantive allegations as true, though it need not blindly rely on conclusory allegations and may consider the legal and factual issues which the complaint presents." *Torres-Vallejo*, 220 F. Supp. 3d at 1080 (citing *Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004)). That is, "Rule 23 does not set forth a mere pleading standard," but "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 350-51 (quotation omitted). "Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351.

Regarding the commonality requirement, "[a] plaintiff seeking class certification satisfies Rule 23(a)(2)'s commonality requirement by demonstrating that 'there are questions of law or fact common to the class.'" *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 788 (10th Cir. 2019) (quoting Fed. R. Civ. P. 23(a)(2)). This requires identifying a "'common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* at 789 (quoting *Dukes*, 564 U.S. at 350). "In other words, the focus of Rule 23(a)(2)'s commonality requirement is not so much on whether there exist common *questions*, but rather on 'the capacity of a class[-]wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Dukes*, 564 U.S. at 350).

"If [the plaintiff] establishes that he has met [Rule 23(a)'s] threshold requirements, he must then demonstrate that the action falls within one of the three categories set forth in Rule 23(b)." *Torres-Vallejo*, 220 F. Supp. 3d at 1080 (citing *Shook*, 386 F.3d at 971). Here, Plaintiff seeks certification pursuant to Rule 23(b)(3).  [#261 at 10]  Rule 23(b)(3) requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"For efficiency, the issue of commonality under Rule 23(a) is often considered together with [the] requirement of predominance under Rule 23(b)(3)." *Brayman*, 595 F. Supp. 3d at 997 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)); *see also Torres-Vallejo*, 220 F. Supp. 3d at 1081 ("The distinction between the commonality requirement in Rule 23(a)(2) and the requirement in Rule 23(b)(3) that common issues predominate over individual ones has become somewhat hazy since the Supreme Court announced that the search for common questions under Rule 23(a)(2) really means the search for questions that can generate class[-]wide answers." (citing *Dukes*, 564 U.S. at 350)).  "A plaintiff satisfies Rule 23(b)(3)'s related predominance requirement by showing that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Naylor Farms, Inc.*, 923 F.3d at 788-89 (quoting Fed. R. Civ. P. 23(b)(3)).  Under this Rule 23(b)(3) analysis, "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to

generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted).

Rule 23(b)(3) does not require a plaintiff to "show 'that all of the elements of the claim entail questions of fact and law that are common to the class' or 'that the answers to those common questions [are] dispositive' of the claim." *Naylor Farms, Inc.*, 923 F.3d at 789 (quoting *CGC Holding Co.*, 773 F.3d at 1087).  It does, however, require a determination that "'common, aggregation-enabling[ ] issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (quoting *CGC Holding Co.*, 773 F.3d at 1087).  Doing so requires a court to consider the particular facts of a case in light of the underlying claims in order to determine which operative issues are "susceptible to generalized proof" and "whether those that are so susceptible predominate over those that are not." *CGC Holding Co.*, 773 F.3d at 1087.

**B.    ANALYSIS**

Here, Plaintiff seeks to certify a class for his unpaid overtime claim under the Colorado Wage Claim Act ("CWCA"), Colo. Rev. Stat. § 8-4-101, *et seq.*  [#261 at 2]  As with Plaintiff's FLSA claim, Defendant primarily contends that certification is inappropriate because the putative class members had highly individualized experiences as ASMs.[17] [#266 at 4-15]   The Court focuses its discussion on whether Plaintiff has satisfied his burden under Rule 23 to establish commonality and predominance.

---

[17] Defendant raises other arguments, including that Plaintiff's Motion to Certify was untimely and that Plaintiff has not demonstrated the adequacy of his attorneys as class counsel.  [*See* #261 at 1]  Because the Court finds that Plaintiff has failed to establish that common issues of fact or law predominate over individualized issues, the Court declines to consider Defendant's remaining arguments.

Plaintiff alleges that the putative class members are uniformly misclassified as exempt from overtime pay under Colorado law, and are therefore entitled to receive overtime compensation.  [*See* #17 at ¶¶ 79-86]   Under state regulations, a salaried employee is exempt from state overtime requirements under the administrative exemption if that employee:  (1) meets a particular salary threshold; (2) directly serves an executive; (3) regularly performs duties important to the decision-making process of the executive; (4) regularly exercises independent judgment and discretion in matters of significance; and (5) has a primary duty that is non-manual in nature and directly related to management policies or general business operations.  Colorado Overtime and Minimum Pay Standards Order #38 ("COMPS #38"), 7 CCR § 1103-1:2.2.1.  A salaried employee is exempt from state overtime requirements under the executive exemption if that employee:  (1) meets a particular salary threshold; (2) supervises the work of at least two full-time employees; (3) has the authority to hire and fire, or to effectively recommend such action; and (4) spends a minimum of 50% of the workweek in duties directly related to supervision.  COMPS #38, 7 CCR § 1103-1:2.2.2.

In order to establish commonality, Plaintiff asserts that the following "common questions" are present in this action:

(1)     Whether Defendant employed Plaintiff and the members of the class within the meaning of Colorado Wage and Hour Law;

(2)     Whether Defendant failed and/or refused to pay Plaintiff and the class overtime pay for hours worked in excess of 40 hours per workweek within the meaning of the Colorado Wage and Hour Laws;

(3)     Whether Plaintiff and the members of the class are exempt executive and/or administrative employees;

(4)     Whether Defendant has a policy of misclassifying workers as exempt from coverage of the overtime provisions of Colorado Wage and Hour Law;

(5)     Whether Defendant's policy of misclassifying workers was done willfully or with reckless disregard of Colorado Wage and Hour Law; and

(6)     Whether Defendant is entitled to its alleged "good faith" affirmative defense.

[#261 at 16]   Plaintiff's analysis, however, ends here—ignoring the Supreme Court's guidance that simply "reciting [common] questions is not sufficient to obtain class certification."   *Dukes*, 564 U.S. at 349 (citing the following "common questions" as insufficient:   "Do all of us plaintiffs indeed work for [Defendant]? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?").   Again, the critical issue for certification purposes is whether Plaintiff has both identified common contentions capable of classwide resolution, and established that these common contentions predominate over questions requiring individual, member-by-member resolution.  *See Naylor Farms, Inc.*, 923 F.3d at 788-89.

Plaintiff primarily asserts that he has met his Rule 23 burden by pointing out that "[Defendant] applies a uniform policy to all ASMs that denies them overtime compensation"—*i.e.* Defendant classifies all of its ASMs as exempt.  [#261 at 11]  Plaintiff asserts that this uniform classification "is the type of 'unifying thread' Rule 23(a)(2) requires."  [*Id.* at 15]  A uniform exemption policy does assist Plaintiff, as it "suggests that Defendant[ ] considered the employees to be similar at least to some degree."  *Rodriguez v. Peak Pressure Control, L.L.C.*, No. 17-CV-00576, 2020 WL 3000415, at *16 (D.N.M. June 4, 2020) (citing *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009)).  But, as was true in considering the FLSA collective action, in the context of a misclassification claim "a blanket exemption policy 'does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties.'"  *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir.

2011) (quoting *In re Wells Fargo*, 571 F.3d at 959).  Defendant does not dispute this exemption policy.  Because Defendant's policy "may have accurately classified some employees and misclassified others," *id.*, asking the undisputed question of whether Defendant had a uniform exemption policy for its ASMs is not the type of "common contention" that will "generate common answers apt to drive resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotation omitted) (emphasis omitted).

With that in mind, the Court turns to the following "common questions" proffered by Plaintiff, both of which go to the heart of this matter:  (1) "Whether Plaintiff and the members of the class are exempt executive and/or administrative employees;" and (2) "Whether Defendant has a policy of misclassifying workers as exempt from coverage of the overtime provisions of Colorado Wage and Hour Law." [#261 at 16]  But again, simply reciting common questions does not suffice—Plaintiff must meet his burden to show that these common questions will generate common answers throughout the class.  *See Naylor Farms, Inc.*, 923 F.3d at 788-89.  Relying primarily on the briefing and exhibits associated with the Motion to Decertify, Plaintiff argues that these questions are susceptible to class-wide proof because ASMs at Defendant's stores perform substantially the same duties and are subject to the same corporate policies and procedures. [#261 at 8-9, 19]  The Court must conduct a "rigorous analysis" to determine if this is so.  *Dukes*, 564 U.S. at 350-351 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

The relevant state exemptions are similar (but not identical) to the FLSA exemptions discussed above in the context of the Motion to Decertify and once again require a fact intensive inquiry into the daily activities of an employee.  *See supra* pp. 5-

8; *see also Ott v. Chacha in Art LLC*, 506 F. Supp. 3d 1133, 1141 (D. Colo. 2020) ("Courts are to read exemptions under the FLSA and Colorado law harmoniously because many of the [state-law] provisions are patterned largely after the FLSA." (quotation and citations omitted)).  Moreover, the putative class overlaps (but is not coextensive with) the FLSA collective.[18]  For reasons similar to those discussed above with respect to the Motion to Decertify, *see supra* pp. 8-25, the Court finds that Plaintiff has failed to establish that the facts material to a Colorado exemption analysis are subject to common answers or generalized proof.

As discussed above, written discovery and deposition testimony reflects that the specific duties and responsibilities of ASMs varied based on their store, store manager, and experience.  Again, the Court focuses on the executive exemption for the purpose of illustration.   Regarding their supervisory duties, one putative class member denied supervising subordinate employees in written discovery [#266-7 at 9], and testified that she "didn't supervise" and "never coached" other employees beyond offering "tips and tricks of what [she] knew" [*id.* at 24 (62:13-18), 29 (94:19-20)].  Another putative class member similarly denied supervising subordinate employees in written discovery [#266-4 at 9], and testified that he did not have any involvement in coaching other employees, and that there was never a time that an employee came to him with a concern but that employees would hold their concerns until the store manager was available [*id.* at 27 (132:5-20)].  The named Plaintiff denied supervising subordinate employees in written discovery [#266-6 at 6], but then testified that ASMs "oversee all departments" and stated

---

[18] For example, the FLSA collective extended to ASMs who are not subject to the CWCA. Conversely, the putative class extends to ASMs who did not affirmatively opt into the FLSA collective.

that he "would communicate what tasks needed to be done" for all departments [#223-12 at 27-28 (58:22-59:5)].  Another putative class member represented that when he was on the floor he "was always directing employees," and noted that he had "100%" responsibility for "supervising subordinate Crew Members."  [#266-25 at ¶¶ 15, 48]  This degree of responsibility for supervising was echoed by other putative class members, who represented that they, for example, "[continuously] engaged in macro-level oversight as to what was going on in the store" while on the floor [#266-26 at ¶ 43], spent "45 [hours per] week" (out of 45 to 50 hours worked per week) engaged in the task of supervising subordinate employees [#266-27 at ¶¶ 8, 10, 14], and were "always engaged in a management related task because [the ASM] was always overseeing [their] Crew Members" [#266-22 at ¶ 34].

Similar disparities exist within the class regarding putative class members' authority to hire or fire, or effectively recommend such action.  *See* COMPS #38, 7 CCR § 1103-1:2.2.2.  One putative class member represented that he "was neither involved in, nor responsible for, the hiring process in the store" [#266-8 at 5], and testified that the extent of his involvement was asking one applicant questions provided by the store manager, who had needed to take off that day, and writing down the applicant's answers so that the store manager could decide whether to hire the applicant [*id.* at 18-19 (136:15-137:22)].  Multiple putative class members described being involved "in a limited capacity" in the hiring process with the ability to "offer suggestions," but later denied "identifying interviewing, and hiring new Crew Member candidates, and/or providing input in such processes that is accorded weight by other managers."  [##266-4 at 5, 10; 266-7 at 5, 10; 266-12 at 5, 10]  One of these members later testified to varying degrees of involvement

depending on the store manager, sitting in on interviews with two store managers, but not with a third, and discussing candidates after interviews with one store manager but not with the second.  [#266-4 at 24-26 (97:13-99:11)]  Another member represented that she would participate in interviews and always gave a recommendation, which the Store Manager adopted each time.  [#266-22 at ¶¶ 25-26; *see also* ##266-23 at ¶¶ 26-32 (describing participating in approximately 90% of the interviews and engaging in substantive discussion with the store manager following each interview); 266-25 at ¶¶ 30-36 (noting that his store experienced "low turnover" and therefore participated in less hiring in comparison to other locations, but that he nevertheless was "intimately involved" with the hiring process when the store did hire, participating in interviews and providing input on each candidate)]   Other putative class members described being "heavily involved in hiring," representing that they, for example:  "typically hired all entry-level [employees] . . . [and] extended hundreds of job offers" [#266-20 at ¶¶ 51-56]; "handled most of the store's interviews and hiring . . . [including] hir[ing] about six people without input from [the] Store Manager" [#266-21 at ¶¶ 45-48]; and were "sometimes responsible for making final hiring decisions" [#266-26 at ¶ 38].

Turning to the final executive exemption element, the Court notes an important difference between the Colorado executive exemption and the FLSA executive exemption—one that is not pressed by Plaintiff.  Whereas time spent performing exempt duties is not a dispositive element under the FLSA executive exemption, the Colorado executive exemption expressly requires that employees "spend[] a minimum of 50% of the workweek in duties directly related to supervision" in order to qualify as exempt. COMPS #38, 7 CCR § 1103-1: 2.2.2.  Plaintiff cites to uniform deposition testimony from

ASMs who had opted into the FLSA collective action[19] that, as ASMs, they spent a majority of their time performing non-exempt tasks such as moving freight, stocking shelves, and collecting shopping carts, and perceived these non-exempt tasks to be their primary duties.  [#261 at 7-8; *see also*, *e.g.*, ##243-14 at 53 (206:20-208:17); 243-15 at 44 (170:9-172:10); 243-16 at 23 (83:4-84:14); 243-19 at 3 (222:13-223:20); 243-20 at 4 (221:15-223:2)]   And some ASMs testified that they were not engaged in any form of supervision while completing these tasks.  [*See*, *e.g.* ##243-20 at 4 (223:8-15); 243-25 at 4 (229:9-24)]

However, other class members (who did not opt in to the FLSA collective action) represented that their experience differed significantly.  For example, one class member estimated that while she "spent approximately 50% of [her] time as an ASM on the floor," this time was spent "supervising Crew Members' work and overseeing store operations," as well as "engaging in informal coaching and training" and "inspect[ing] the departments in detail."  [#266-24 at ¶¶ 21, 39-44]  The remainder of her time was spent completing "HR and administrative tasks" such as MMRs and performance reviews for both individuals and the store.  [*Id.* at ¶¶ 30, 39, 45-47]  Another class member similarly stated that she spent approximately 50% to 65% of her time as ASM "on the floor . . . engag[ing] in macro-level oversight as to what was going on in the store and what needed to be fixed."  [#266-26 at ¶ 43]  Even when "it may have appeared as though [the class member] was merely stocking inventory . . . , in reality [she] was critiquing inventory placement, making sure labels were used correctly, managing other Crew Members who were also

---

[19] Again, not all of these FLSA opt-ins are putative class members.  *See supra* n.18. However, both parties cite to discovery responses and testimony from ASMs who appear to be outside of the putative class.  [##261 at 7-8; 266 at 13 & nn.27-28]

stocking, and much more."  [*Id.* at ¶ 45]  Based on her perception, this class member estimated that "approximately 75% of [her] time as an ASM was spent engaged in performing management-related job duties."  [*Id.* at ¶ 47]  A third class member stated that he "spen[t] approximately 90% of [his] time out in the departments" but nevertheless "estimate[d] that [he] spen[t] approximately 100% of [his] time on [supervision- and management-related activities]," comparing the ASM position to that of a vice-principal who is "on the ground tackling the difficult issues associated with day-to-day . . . administration"   [#266-20 at ¶¶ 23-25, 43]   Another represented that she "spent approximately 50% of [her] time as an ASM on the floor, supervising Crew Members' work and overseeing store operations."  [#266-24 at ¶ 21]  While Colorado law does not define the phrase "duties directly related to supervision,"[20] there are plainly material disparities

---

[20] The Colorado Department of Labor has provided guidance on this point through Interpretive Notice & Formal Opinion #1A ("INFO #1A"), *available at* https://cdle.colorado.gov/infos (last accessed May 25, 2023).  According to this guidance: "'A minimum of 50% of the workweek' means that executive/supervisory employees spend at least half their work time performing qualifying duties directly related to supervision, *or perform such duties at the same time they perform their own labor* (*e.g.*, supervising while they also cook)."  INFO #1A at 2 (emphasis added) .  It lists the following examples of exempt duties:  "training employees," "answering subordinates' questions," "directing the work of employees," and "overseeing operations."  *Id.*  INFO #1A provides the following example:

> A restaurant "head chef" qualifies as an exempt supervisor when they, in addition to cooking, also assure good kitchen operations, monitor food quality, and supervise two or more other full-time kitchen employees. However, if the chef's duties varied, and in some weeks they just cooked, with little interaction with subordinate employees doing their own cooking, then the head chef would not qualify as an exempt supervisor in those weeks. Each week's status would depend on how much time was spent on supervision of other exempt duties. If during one week the chef trained new employees for the first hour of each shift and created the work schedule during the last hour of each shift, but spent the remaining 6 hours of each

among the class members regarding the degree to which their day-to-day duties as ASMs

(particularly their tasks "on the floor") involved supervisory or management-related

objectives.

Finally, and for the same reasons discussed with respect to the Motion to Decertify,

Plaintiff does not meet his Rule 23 burden by relying on Defendant's common policies

and procedures or uniform job description for ASMs.   Again, this Court's "rigorous

analysis" has revealed significant factual disparities among class members regarding

their duties and responsibilities as ASMs.   Multiple class members have disavowed

Defendant's job description and policies.   [##255-5 at 3-4 (25:25-26:5) ("You know,

there's a lot of stuff on [Defendant's policy sheet] that, really, you would never do."); 255-

6 at 3-4 (26:18-27:1) (stating that the items listed on the policy or job description were

"the expectation of the company," but not "the things [the class member] was doing" as

an ASM, at least at one store);   255-7 at 3 (21:5-22) (describing a job description as

"[Defendant's] expectation, but that is not what we did").   Moreover, the job description

and policies at issue, to the extent that they applied, plainly allowed for such factual

variations between ASMs as to hold little weight in an exemption analysis.   *See Pedroza

v. PetSmart, Inc.*, No. ED CV 11-298-GHK, 2013 WL 1490667, at *12 (C.D. Cal. Jan. 28,

2013) ("[A]bsent manuals that appear to strictly dictate the [plaintiff's] performance and

evidence that [the plaintiffs] complied with any such manuals, we cannot [conduct an

exemption analysis] on a classwide basis."); *see also id.* at *10 (distinguishing *Tierno v.

Rite Aid Corp.*, 2006 WL 2535056 (N. D. Cal. Aug.31, 2006); *Alba v. Papa John's USA,*

---

shift cooking on the grill without interacting with other employees, the chef
would not be exempt that week.

*Id.*

*Inc.*, 2007 WL 953849 (C. D. Cal. Feb.7, 2007); and *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008)—all of which are relied on by Plaintiff in this case—because "in all three cases, the plaintiffs sufficiently established that the company policies at issue tightly controlled the universe of duties performed by the employees"); *id.* at *12 ("That [employees] must exercise their discretion within certain parameters does not mean that they are stripped of all or nearly all discretion." (citing *Tetsuo Akaosugi v. Benihana Nat'l Corp.*, 2012 WL 3999855, at *5 (N. D. Cal. Sept. 7, 2012)).

Ultimately, the Court again finds that there are material discrepancies that go to the heart of liability in this matter[21]—whether the class members were classified properly.

---

[21] For this reason, this case is easily distinguishable from the cases cited by Plaintiff which hold that individualized questions that relate to damages, as opposed to liability, will not defeat commonality or predominance. [*See* #269 at 5-6]; *see also Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 184 (S.D. Ohio 2012) (finding that certification was appropriate when the individualized differences "go to the damages that each employee is owed, not to the common question of Defendant's liability [because] [u]ltimately, it is unlikely that [the] differences in the factual background of each claim will affect the outcome of the legal issue" (quotations and citations omitted)); *Morris v. Alle Processing Corp.*, No. 08CV-4874 JMA, 2013 WL 1880919, at *4, 10, 13 & n.7 (E.D.N.Y. May 6, 2013) (finding that, in a time-shaving and improper recording case where defendant did not assert individualized defenses, differences among the plaintiffs did not defeat certification because they related to damages, and explicitly noting that "[t]his is not an exemption issue" and that "defendants fail to make any arguments regarding plaintiffs' time-shaving claims, overtime wages claims, and spread of hours compensation claims in their predominance discussion"); *Chado v. Nat'l Auto Inspections, LLC*, No. CV JKB-17-2945, 2019 WL 1981042, at *5 (D. Md. May 3, 2019) (holding, in a case alleging improper time-keeping, that individualized differences in hours did not defeat certification, because "[t]he common contention of the class members in the instant case is that they were not properly compensated for overtime hours because Defendants computed overtime according to scheduled hours rather than actual hours. *If that is true, then every member of the class is entitled to a recomputation of compensation based upon actual hours worked*," and determining damages based on individualized hour differences "becomes ministerial" (emphasis added)).  The Court agrees that *Rodriguez v. Peak Pressure Control, L.L.C.* dealt with a similar issue as that facing this Court, but notes that in *Rodriguez* the court found, after an extensive review of the record, that the class members' job duties were "largely consistent."  2:17-cv-00576-JLH-JFR, 2020 WL 3000415, at *14-16 (D.N.M. June 4, 2020).

For that reason, the question of exemption is not capable of class-wide resolution. Because of the centrality of this question in the context of this case, the Court further finds that, to the extent that other issues in this matter may be capable of producing class-wide answers, those issues do not predominate over the individualized question of whether each ASM was properly classified under Colorado law. *See Myers v. Hertz Corp.*, 624 F.3d 537, 550-51 (2d Cir. 2010) (affirming the denial of class certification in a misclassification case on predominance grounds where issues subject to common proof, "such as whether [employees] worked overtime, whether they were paid overtime, and whether [Defendant] classified them as exempt pursuant to a common policy, [were] clearly less substantial . . . when compared to the ultimate (contested) question the district court would have to decide in any potential class action—whether plaintiffs were legally entitled to the overtime they were not paid" (emphasis omitted)); *Sinohui v. CEC Ent., Inc.*, No. EDCV 14-25-16JLS, 2016 WL 3475321, at *8 (C.D. Cal. Mar. 16, 2016) (denying class certification in a misclassification case on predominance grounds because "'the record before the court suggests that determining whether [an employee] is primarily engaged in activities meeting the tests for an exemption is an individual question, not one that can be easily resolved through common proof,'" and therefore "individual inquiries would overwhelm common questions of law and fact" (quoting *Zackaria v. Wal-Mart Stores, Inc.*, No. EDCV 12-15-20FMO, 2015 WL 2412103, at *16 (C.D. Cal. May 18, 2015).

## C.    CONCLUSION

Accordingly, the Court finds that Plaintiff has not met his burden to establish that "questions of law or fact common to class members predominate over any questions

affecting only individual members."  Fed. R. Civ. P. 23(b).  Plaintiff's Motion to Certify is therefore **DENIED**.

IV.    **CONCLUSION**

For the reasons set forth above, the Court **ORDERS** that:

1.  The Motion to Decertify [#223] is **GRANTED** and the and the claims of all opt-in Plaintiffs are **DISMISSED WITHOUT PREJUDICE**;

2.  The Motion to Certify [#261] is **DENIED;** and

3.  A status conference is set for May 31, 2023 at 2:30 PM in Courtroom A 402 before Magistrate Judge Scott T. Varholak.  The parties may appear telephonically at that status conference and should be prepared to discuss the effect of this Order on the remaining pending motions.


DATED:  May 25, 2023                              BY THE COURT:


                                                   s/Scott T. Varholak
                                                  United States Magistrate Judge