**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00261-STV

MICHAEL LEVINE,

      Plaintiff,

v.

VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.,

      Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Defendant's Motion for Summary Judgment ("Defendant's Motion") [#286] and Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") [#308] (collectively, the "Motions").  The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment.  [##15, 16]  This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions.  For the following reasons, the Motions are both **DENIED**.

## I.    BACKGROUND[1]

      Defendant is a Colorado corporation that owns and operates more than 150 grocery stores in twenty states.  [#317-1, PSOF42]  Defendant employs more than 3,000

---

[1] The undisputed facts are drawn, where possible, from the Separate Statement of Facts filed with Defendants' Motion for Summary Judgment [#307-1] and Plaintiffs' Motion for

people across the United States, including dozens of Assistant Store Managers ("ASMs") at its retail stores. [#20 at ¶ 16]   Plaintiff was one such ASM, working in the position between March 2018 and April 2019 at one of Defendant's stores located in Highlands Ranch, Colorado.  [#307-1, DSOF2]   As an ASM, Plaintiff earned an annual salary of $47,500.  [*Id.*, DSOF101]   Defendant's job description describes the role of an ASM as "the second person in charge of the store and . . . responsible for the successful operation and profitability of the store."  [*Id.*, DSOF59; #286-6 at 60]  Plaintiff's resumé description for his time as an ASM listed the following tasks:  assisting in the overall successful operation and profitability of his store; interviewing and hiring; and training staff on how to give exemplary customer service.  [#307-1, DSOF60]  Plaintiff testified that these items represented "a very small part" of what he did as an ASM but consisted of some of the "higher priority tasks" that he was involved with as an ASM.  [*Id.*, DSOF60-61; *see also* #295-1 at 50 (190:10-192:16)]

During his approximately 13-month employment as an ASM, Plaintiff had some degree of involvement in various responsibilities related to running the store.  [*See, e.g.*, #307-1, DSOF113-14]    The parties focus on the following general categories: interviewing and hiring, scheduling and adjusting/approving payroll, directing the work of other employees, training and on-boarding other employees, monitoring and evaluating other employees' work performance, managing store finances and inventory, handling

_____

Partial Summary Judgment [#317-1].  The Court refers to the sequentially numbered facts set forth in the Separate Statement of Facts associated with Defendants' Motion as "DSOF#" and those associated with Plaintiffs' motion as "PSOF#."  Due to the purportedly disputed nature of many facts underlying this matter [*see, e.g.*, #307-1 (disputing 72 of Defendant's 122 Statements of Fact)], the Court also cites directly to the exhibits cited by the parties, noting the source of the asserted fact when it does so.

employee and customer complaints, disciplining and terminating employees, and general management and supervision.[2]  [##286 at 4-7; 294 at 9-13]

## A.    Interviewing and Hiring

Plaintiff was involved in interviewing applicants, sitting in with his store manager on approximately 10-12 interviews and asking questions to the applicants.  [#307-1, DSOF3]  After each interview, Plaintiff provided his store manager with his opinion regarding whether or not the candidate was a good person to hire.  [*Id.*, DSOF4] According to Plaintiff's store manager, Plaintiff's opinions were "always g[iven] . . . weight in deciding whether to hire someone."[3]  [*Id.*, DSOF6]  The store manager, however, was "free to leave or take [Plaintiff's] opinion," as Plaintiff was not responsible for the final hiring decision.  [*Id.*, DSOF6; *see also* #295-1 at 62 (237:7-20)]

## B.    Scheduling and Payroll

Plaintiff received training on how to prepare employee schedules.  [#307-1, DSOF7]  Plaintiff's store manager was generally responsible for preparing schedules, although Plaintiff created one Weekly Schedule as an ASM.  [*Id.*, DSOF8; *see also* #295-1 at 40-41 (152:8-153:7)]  Plaintiff also resolved employee scheduling issues when his store manager was out of the store.  [#307-1, DSOF9]  And while Plaintiff did not

---

[2] Each party repeatedly accuses the other of "misrepresenting," "mischaracterizing," or otherwise "distorting" the facts of this case.  [*See, e.g.*, ##294 at 10; 307 at 1]  Such assertions are not particularly helpful as motions for summary judgment are decided based on the material facts themselves, not the parties' alternative characterizations of those facts.  *See Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, No. 2:06-cv-97, 2006 WL 2623935, at *2 (D. Utah Sept. 13, 2006), *aff'd*, 528 F.3d 1258 (10th Cir. 2008).
[3] In briefing, Plaintiff asserts that he "ultimately knew that his opinion did not matter." [#307-1, DSOF4 (Plaintiff's response)]  This assertion is not supported by the record, in which Plaintiff testified only that he "d[id] not know one way or the other if [his] opinion was taken into consideration or not."  [*Id.*, DSOF5; *see also* #295-1 at 12 (39:11-13)]

"supervise when [employees] came in and write it down and supervise when they left and write it down and supervise when they went to lunch and write it down," Plaintiff did at times record when employees were late and had some degree of involvement in reviewing employee time entries. [*Id.*, DSOF53-54; #286-5 at 69; #286-7 at ¶ 15; #295-1 at 62 (239:21-240:7)] Plaintiff also authorized payroll for a week or a pay period "a few times." [#307-1, DSOF55; #295-1 at 46 (174:13-16)]

### C. Directing Other Employees

The store where Plaintiff worked as an ASM had approximately 15 to 20 employees. [#307-1, DSOF10] Plaintiff supervised employees as an ASM.[4] [*Id.*, DSOF11; #295-1 at 46 (174:17-19) ("Q: Did you supervise other employees when you were an ASM? A: Sure, yes, I supervised.")] This supervision involved making sure employees showed up for scheduled shifts on time and adequately performed their jobs, and "training, coaching, and developing store personnel."[5] [#307-1, DSOF12] More specifically, Plaintiff testified that he would "assign[] certain [employees] to help in certain

---

[4] Plaintiff notes that this fact is disputed. [#307-1, DSOF11 (Plaintiff's response)] But Plaintiff's testimony that he supervised other employees is clear, and Plaintiff's citations only establish that employees were also supervised by other individuals and that Plaintiff did not "*micro*manage" employees. [*Id.*; *see also* #295-1 at 46 (174:17-19); *id.* at 62-63 (240:16-242:3)] The Court considers the fact that Plaintiff supervised employees, as he stated in his testimony and as explained in more detail below, to be undisputed. As this footnote and other footnotes in this opinion indicate, Plaintiff consistently attempts to avoid undisputed facts by shifting the focus from the asserted fact to a different fact that Plaintiff seeks to dispute. This approach is inconsistent with the Court's practice standards which are designed to streamline summary judgment motions by focusing on the facts that are truly undisputed.

[5] Plaintiff notes that this fact is disputed, but only argues that other store employees were also responsible for training, directing, and monitoring store staff. [#307-1, DSOF12 (Plaintiff's response)] Thus, the Court considers the fact as stated above—which is only focused on Plaintiff's responsibilities as opposed to the responsibilities of others—to be undisputed.

departments when needed."  [*See id.*, DSOF13-14; #295-1 at 34 (126:9-127:22)]  This involved, in Plaintiff's words, being "given [ ] task[s] from [his] store manager . . . [and] delegat[ing] assignments from her."  [#295-1 at 14 (46:8-11)]  Plaintiff testified that these tasks related to all departments in the store.  [*Id.* at 17 (58:22-59:5)]  Plaintiff also performed daily huddles to convey company goals, and set daily priorities for employees with a daily operations checklist.[6]  [#307-1, DSOF15]

### D.    Training and On-Boarding Other Employees

Plaintiff trained employees on customer service and company policies, and assisted in the orientation and on-boarding of new employees.  [*Id.*, DSOF16-17, 22; #295-1 at 12 (40:13-24) ("Q:  And you trained staff on how to give exemplary customer service; is that true?  A:  I was involved in some training, yes. . . . I explained to [employees] . . . company policies and procedures and how [Defendant] wants things done.  Q:  As an [ASM], a part of your job involved training staff on company policies; is that correct?  A:  That's correct.")]  Plaintiff also trained employees on where to find answers to customer questions by utilizing store resources, as well as how to comply with changes in company policies.  [#307-1, DSOF18-19]  Some of this training, or "shadowing," involved Plaintiff demonstrating "the proper way to do a task by doing that task, and [the employee] would watch."  [*Id.*, DSOF20; #295-1 at 17 (58:11-16)]  Plaintiff would then switch the observation roles, with "[t]he trainee . . . tak[ing] over and do[ing] the task" while Plaintiff observed.  [#295-1 at 34 (128:10-13)]  This type of training was

---

[6] Plaintiff notes that this fact is disputed, but only cites to:  (1) a prior dispute that is irrelevant to the stated fact, and (2)  Plaintiff's discovery responses, which acknowledge that Plaintiff performed daily huddles to convey company goals.  [#307-1, DSOF15 (Plaintiff's response)]  There is therefore no genuine dispute of this fact.

performed "[a]s needed," including "[w]hen anyone new came on board" and "[w]hen somebody switched roles." [#307-1, DSOF20; #295-1 at 34 (128:14-20)] There was no material difference between what the store manager did in terms of training other employees and what Plaintiff did. [#307-1, DSOF21]

### E.    Monitoring and Evaluating Other Employees' Work Performance

Plaintiff assessed employees' strengths and weaknesses. [#307-1, DSOF23] Plaintiff was also involved in providing feedback to Department Managers regarding each department's performance.[7] [*Id.*, DSOF24] Plaintiff coached (or, in Plaintiff's preferred phrasing, "pass[ed] on advice" to) nonexempt department managers by reviewing shrink reports with them to ensure they were stocking inventory efficiently, and inspecting and providing feedback on their displays to ensure the inventory was well-presented. [*Id.*, DSOF25-26] Plaintiff further performed periodic inspections of each store department, and was assigned mandated daily checklists—which were not necessarily completed every day in light of the manual tasks requiring Plaintiff's attention. [*Id.*, DSOF48]

### F.    Managing Store Finances and Inventory

As an ASM, Plaintiff was paid a bonus based on the store's sales volume, and Defendant evaluated the performance of its ASMs based, in part, on the sales/financial performance of their stores. [*Id.*, DSOF30, 74-75] Plaintiff listened-in on weekly "regional calls" and monthly "all-company calls," during which the company's policies, procedures,

---

[7] Plaintiff marked this fact as disputed but provides no citation to contrary evidence and simply states that: "[Defendant] expects store employees to be involved in inventory management and to provide 'World Class customer service.'" [#307-1, DSOF24 (Plaintiff's response)] This uncited generality is entirely unresponsive to the specific fact at issue—that Plaintiff provided feedback to Department Managers. The Court therefore considers the fact undisputed.

initiatives, and priorities were discussed.  [*Id.*, DSOF31-32]  Plaintiff's required attendance on these manager's calls was considered essential for store operations, and the only other employee from Plaintiff's store who regularly attended these calls was Plaintiff's store manager.  [*Id.*, DSOF33-34]  Plaintiff was also involved in evaluating store inventory. [*Id.*, DSOF45]  Indeed, Plaintiff believed that he was a good candidate for the ASM role based, in part, on his knowledge of the company's inventory management system.  [*Id.*, DSOF46]  Plaintiff was involved in preparing and performing monthly and annual site inventories though he maintains that all employees were involved in this process, and that he did not exercise a management role.  [*Id.*, DSOF47]  Plaintiff had minimal involvement in the store reporting process, testifying that he "may have" prepared "one or two" SAP[8] manager reports, but that he was not otherwise responsible for creating any reports as an ASM.  [*Id.*, DSOF35; #295-1 at 48 (181:9-24)]

### G.    Handling Employee and Customer Complaints

Plaintiff would, at times, resolve employee complaints.[9]   [#307-1, DSOF38] Plaintiff was also responsible for responding to department manager calls when on duty. [*Id.*, DSOF39]  Plaintiff similarly resolved customer complaints or issues, sometimes brought to him by other employees, without input from his store manager.  [*Id.*, DSOF56; #295-1 at 39 (147:16-20)]  Plaintiff, however, was not the only employee who could

---

[8] Elsewhere, Plaintiff testified that the store's "inventory management system" was known as "SAP."  [#295-1 at 20 (71:13-14)]

[9] Plaintiff notes that this fact is disputed, but only cites to:  (1) testimony indicating that other employees would also handle *customer* complaints (which has no bearing on whether *Plaintiff* handled *employee* complaints); and (2) Plaintiff's testimony admitting that he would "occasionally" resolve issues with store employees through email (which affirms the fact that part of Plaintiff's job involved resolving employee complaints).  [#307-1, DSOF28 (Plaintiff's response)]  Accordingly, the Court considers the above stated fact to be undisputed.

resolve customer complaints and he would follow company guidelines the same as other employees in doing so.  [#307-1, DSOF56, 58]

### H.    Disciplining and Terminating Employees

Plaintiff was involved in disciplining employees, serving once as a witness as part of a disciplinary process with respect to an employee.  [*Id.*, DSOF40; #295-1 at 46 (175:14-24)]    In addition, Plaintiff identified disciplinary issues with employees in accordance with store policy and his manager's direction, administering write-ups on at least one or two occasions at his store manager's direction.  [#307-1, DSOF41; #286-5 at 73-74]   Plaintiff was also involved in the termination process.  [#307-1, DSOF42] Plaintiff would give his opinion regarding termination decisions, and, on one occasion, assisted in investigating the facts surrounding a termination and participated in the meeting in which the employee was terminated.  [*Id.*, DSOF43]  In both disciplinary and termination matters, Plaintiff's store manager always listened to Plaintiff and gave his recommendations substantial weight.[10]  [*Id.*, DSOF44]

### I.    General Management and Supervision

Plaintiff's in-store schedule overlapped with that of his store manager approximately 50 percent of the time.  [#307-1, DSOF91, 93]  Plaintiff was the highest-

---

[10] Plaintiff disputes every fact related to his involvement in termination with the same response and citations.  [#307-1 at DSOF42-44 (Plaintiff's responses)]  Plaintiff, however, only cites to evidence indicating that Plaintiff did not have the authority to make the final decision as to whether to fire another employee, and that he did not consider terminating other employees to be one of his "primary" job duties.  [*Id.* (citing #295-1 at 62 (238:8-11) ("Q:  Did you have the authority to fire an employee?  A:  No.") and #295-3 at ¶ 17 ("My primary duties did not include . . . firing . . . other employees . . . . My Store Managers always had the final say over . . . firing . . . employees."))]  Such evidence does not create a genuine dispute as to the facts set forth above regarding the level of Plaintiff's involvement in termination decisions.

ranking manager in the store when his store manager was not present.  [*Id.*, DSOF92]

According to Plaintiff's store manager, during these times Plaintiff "was in charge and was

expected to manage all aspects of the [store]."   [#286-7 at ¶ 11]   Plaintiff, in contrast,

testified that he did not have the powers of the store manager when she was not present,

and that "[u]ltimately, the store manager is in charge of the store, whether she is there or

not."[11]   [#295-1 at 63 (241:10-19)]   Plaintiff would call his store manager with questions

---

[11] Defendant argues that this testimony, as well as with much of the evidence relied on by Plaintiff in both Motions, is not appropriate for consideration at the summary judgment stage because it lacks foundations and came in response to leading questions by Plaintiff's counsel.  [##307 at 1-3; 310 at 14]  As for foundation, the Court is satisfied at this stage that Plaintiff's testimony is adequately based on Plaintiff's personal knowledge from his experience as an ASM as opposed to mere speculation about the tasks completed and responsibilities held by ASMs.  Regarding the leading questions, the Court agrees with Defendant that many of Plaintiff's counsel's questions to his own client and other non-adverse witnesses were plainly leading.   Under Federal Rule of Evidence 611(c), "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."   "But there is no absolute prohibition on leading questions," and Rule 611(c) ultimately vests "broad discretion in trial courts" to allow such questions.  *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 643-44 (N.D. Cal. 2020) (quotation omitted).   Moreover, while the Court may consider only admissible evidence for the purposes of summary judgment, *see Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial.  *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016); *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 963 n.7 (9th Cir. 2011) (Kozinski, C.J., dissenting) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial.").  Courts have frequently determined that objections on the basis of improper leading questions go to the form, as opposed to the substance, of the evidence and consider the responses for the purposes of summary judgment.  *See, e.g.*, *Allen v. Sherman Operating Co., LLC*, No. 4:20-CV-290-SDJ-KPJ, 2021 WL 5154221, at *3 (E.D. Tex. July 9, 2021) (considering testimony in response to leading questions because the testimony could be solicited in an admissible form at trial), *report and recommendation adopted*, No. 4:20-CV-290-SDJ, 2021 WL 5710566 (E.D. Tex. Dec. 2, 2021), *aff'd*, No. 21-40913, 2022 WL 3359273 (5th Cir. Aug. 15, 2022); *Huynh*, 508 F. Supp. 3d at 644 ("Exercising its discretion, this Court will consider Plaintiff's deposition testimony [in response to leading questions] for the purpose of this early Motion [for summary judgment]."); *Anderson v. SeaWorld Parks and Entm't, Inc.*, No. 15-

every week when she was out of the store, and Plaintiff testified that he was not "ultimately responsible" for overall store operations or overall sales volume. [*See* #307-1, DSOF104; #295-1 at 41-42 (156:21-157:9), 44 (167:1-168:18)]

While Plaintiff engaged in the various tasks described above, Plaintiff spent about 85 percent of his time performing the same "floor tasks" as hourly employees. [#307-1, DSOF60] Such floor tasks included, for example, working the cash register, moving freight, stocking and organizing shelves, unloading trucks, and cleaning the store. [#295-1 at 60 (232:6-24)] Plaintiff exercised some degree of concurrent management while he was engaged in these manual floor tasks. [*See* #307-1, DSOF83] Plaintiff testified that he did not "t[ake] off [his] manager hat when [he was] busy doing [floor] tasks." [#295-1 at 45 (170:11-17)] For example, if an employee came to him with a question while he was busy on the floor, Plaintiff would stop what he was doing and answer the question. [*Id*. at 45 (169:12-170:17)] That is, Plaintiff testified that he would "stop[] one specific task to attend to another one." [*Id.* at 45 (169:18-24)]

Each ASM's performance is formally evaluated on an annual basis. [#307-1, DSOF62] ASMs are evaluated using a manager evaluation form or "grid" that measures their performance based on, in part, the financial metrics of their store. [*Id.*, DSOF63-67] This evaluation also considers the ASM's ability to effectively manage customer experiences, train employees, and set efficient schedules, as well as whether existing

---

cv-02172-JSW, 2018 WL 1981396, at *4 n.3 (N.D. Cal. Feb. 20, 2018) ("The facts elicited by the leading question are evidence that would be admissible at trial, and the Court shall consider those facts."). The Court agrees with this reasoning, and will therefore consider testimony from non-adverse witnesses elicited by leading questions for the purposes of these Motions. The Court cautions the parties, however, that such questioning will not be tolerated at trial except within the confines contemplated by Federal Rule of Evidence 611(a) and (c).

employees are being promoted to new roles in the store.  [*Id.*, DSOF68-72]  The management evaluation form does not contain metrics related to nonmanagement work. [*Id.*, DSOF73]  Plaintiff was paid a bonus based on the sales volume at his store.  [*Id.*, DSOF75]  Plaintiff and his store manager were the only two in-store employees paid a bonus based on sales volume.  [*Id.*, DSOF76]

## J.   Training Program

Plaintiff attended a several-week management training course in Golden, Colorado.[12]  [#317-1, PSOF3]  Plaintiff was classified as exempt during this training and received his ASM salary.  [*Id.*, PSOF37]  Plaintiff's training was the same as that received by store managers.  [#307-1, DSOF80]  No other in-store employees attended the training in Golden.  [*Id.*, DSOF82]  This training covered various management duties and critical aspects of store operations.  [*Id.*, DSOF78]  Specifically, Plaintiff received training on safety, ADA guidelines, workers' compensation and drug testing, employment law, and preventing workplace harassment.  [*Id.*, DSOF51, 79]

Plaintiff and other ASMs testified that they did not perform management duties or tasks during Defendant's training program. [#317-1, PSOF4, 8, 11, 19, 23, 26, 29] According to Defendant, however, its training program involved significant application of management skills—with ASMs handling various "back-end" management tasks of their assigned store (such as scheduling, inventory evaluation, and staffing) as well as in-store management tasks during assigned days at training stores.  [*See id.*, PSOF4]

---

[12] The exact timing of Plaintiff's training is unclear.  [*See* #317-1, PSOF3]  The Court considers as undisputed that Plaintiff's training occurred sometime during or after March 2018, which is when Plaintiff was promoted to the position of ASM, became classified as exempt, and began to receive the ASM salary.  [*See* ##286-6 at 4-6; 307-1, DSOF100; 317-1, PSOF37-38]

### K.     This Lawsuit

Plaintiff filed this lawsuit on January 31, 2020 and, in accordance with the Fair Labor Standards Act ("FLSA"), consented to join this action on the same date.  [##1; 317-1, PSOF2]  The operative Complaint alleges that Natural Grocers violated the FLSA and the Colorado Wage Claim Act ("CWCA") by improperly classifying Plaintiff and other ASMs as exempt employees and denying them overtime.[13] [*See generally* #17]

On November 6, 2020, the Court granted Plaintiff's Motion for Conditional Certification [#41], and conditionally certified the following collective for the purposes of Plaintiff's FLSA claims:

> All current and former "Assistant Store Managers" who worked for Natural Grocers in the United States at any time on or after January 31, 2017 to the present, and who were classified as exempt from overtime compensation.

[*Id.* at 11]  On December 7, 2023, after the close of discovery, Defendant filed a Motion to Decertify, arguing that discovery established that the members of the collective and the named Plaintiff are not similarly situated.  [#223]  On February 22, 2023, Plaintiff filed a Motion to Certify, seeking to certify a class of ASMs under Federal Rule of Civil Procedure 23 for the purposes of Plaintiff's CWCA claims.  [#261]  On May 25, 2023, the Court granted Defendant's Motion to Decertify and denied Plaintiff's Motion to Certify, concluding that the ASMs who had opted into the collective action were not "similarly situated" for the purposes of the FLSA claims and that the requirements of Rule 23 were not met for the purposes of certifying a class action on Plaintiff's CWCA claims.  [#280]

---

[13] The Complaint also asserts a claim under the Colorado Minimum Wage Act (the "CMWA").  [#17 at ¶¶ 87-94]  The Court dismissed Plaintiff's CMWA claim on September 19, 2022, holding that Plaintiff failed to plausibly allege a violation of the CMWA for which relief is available.  [#209]

Accordingly, the claims of all ASMs who had opted into the collective action were dismissed.  [*Id.* at 40]

On June 30, 2023, Defendant filed Defendant's Motion for Summary Judgment. [#286]  Plaintiff has responded [#294] and Defendant has replied  [#307].  On August 18, 2023, Plaintiff filed Plaintiff's Motion for Partial Summary Judgment.  [#308]  Defendant has responded [#315] and Plaintiff has replied [#317].

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994).  "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."  *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citations  omitted).   When  reviewing  a  cross-motion,  the  Court  must  "construe  all inferences in favor of the party against whom the motion under consideration is made." *Pirkheim v. First Unum Life Insurance*, 229 F.3d 1008, 1010 (10th Cir. 2000) (quoting *Andersen v. Chrysler Corp.*, 99 F.3d 846, 856 (7th Cir. 1996)).

When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed

verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.* When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v.*

14

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### III.    ANALYSIS

In Defendant's Motion, Defendant argues that the undisputed facts establish that: (1) Plaintiff was correctly classified as exempt under both state and federal law [#286 at 3-24]; (2) Defendant did not willfully violate the FLSA [*id.* at 24-28]; and (3) Defendant acted in good faith and reasonably believed that its conduct was lawful [*id.* at 28-30].  In Plaintiff's Motion, Plaintiff argues that the undisputed facts establish that Defendant willfully misclassified Plaintiff during the time that he spent in the training program in Golden, Colorado.  [#308]  The Court considers each issue in turn.

### A.    Plaintiff's Exemption Status—Federal Law

Under the FLSA, an employer must pay an employee overtime compensation at a rate not less than one and one-half times the regular rate at which the employee is employed for all hours that the employee works in a given week above 40 hours.  29 U.S.C. § 207(a)(1).  There are, however, exemptions.  *See* 29 U.S.C. § 213.  Two specific exemptions are at issue in this case—the "executive exemption" and the "administrative exemption."  [*See* #286 at 3]  "An employer who asserts that [an] employee is exempt because he falls within the executive or administrative exception bears the burden of establishing that such category applies."  *Kelley v. Unisys Corp.*, No. 19-CV-03237-PAB-MEH, 2021 WL 1192932, at *6 (D. Colo. Mar. 29, 2021) (citing *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008)).  Per recent instruction from the United States Supreme Court, FLSA exemptions are to be given a "fair," rather than their

traditional "narrow," interpretation. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

### 1.    Executive Exemption

First, Defendants argues that the undisputed facts establish that Plaintiff qualified for the executive exemption during his time as an ASM.   [#286 at 3-16]   Under the executive exemption, the FLSA exempts a person employed "in a bona fide executive . . . capacity."  29 U.S.C. § 213(a)(1).  Department of Labor ("DOL") regulations clarify that an employee qualifies for the executive exemption if the employee:  (1) meets a specific weekly salary threshold; (2) has a primary duty of management; (3) customarily and regularly directs two or more employees; and (4) has authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a)(1)-(4).

Thus, in order to qualify for the executive exemption, Plaintiff must have had the "primary duty of management" while working as an ASM.  *Id.*  A DOL regulation provides the following illustrative list of management activities:

> [I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  An employee's primary duty "is 'the principal, main, major or most important duty that the employee performs.'"  *Ott v. Chacha in Art LLC*, 506 F. Supp. 3d 1133, 1137 (D. Colo. 2020) (quoting 29 C.F.R. § 541.700(a)).  This is a factual determination that "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a); *see also Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012) ("[T]he primary duty determination is a factual one."). "Because the primary duty determination is a factual one, summary judgment is appropriate only if all reasonable factfinders would conclude that the managerial portions of plaintiffs' jobs are their 'primary duties.'" *Maestas*, 664 F.3d at 829.

"Time spent performing each duty is a 'useful guide' in examining which duty is primary, but there is no requirement that an exempt executive employee spend more than half her time on managerial tasks."  *Id.* at 827 (citing 29 C.F.R. § 541.700(b)).  "The regulations also require consideration of 'the relative importance of the exempt duties as compared with other types of duties; . . . the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* (quoting 29 C.F.R. § 541.700(a)).  Considering "all the facts in [this] particular case [and] the character of the employee's job as a whole," with an emphasis on the factors set forth at 29 C.F.R. § 541.700(a), the Court finds that factual issues regarding Plaintiff's primary duties preclude summary judgment on the executive exemption.

The Court begins with the time that Plaintiff spent on managerial tasks.  As set forth above, Plaintiff performed various management duties as an ASM.  These duties

included sitting in on interviews, training or "coaching" employees, sitting in on management conference calls, assisting with employee complaints, and resolving occasional scheduling issues.  Such clearly delineated management tasks, however, only occupied about 15 percent of Plaintiff's workday. [*See* ##307-1, DSOF60; 295-1 at 43 (163:11-24), 61 (233:6-16)] The remaining 85 percent was spent completing the same floor tasks as non-exempt employees, a fact Defendant does not appear to dispute. [*See* #307-1, DSOF60 ("It is undisputed that Plaintiff spent 85% of his time performing tasks other hourly employees performed.")]  These floor tasks included assisting customers, operating cash registers, stocking shelves, unloading trucks, and cleaning the store. [*See* #295-1 at 60-61 (232:2-233:16)]

As discussed, "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee."  29 C.F.R. § 541.700(b).  "Time alone, however, is not the sole test," and "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."  *Id.* Similarly, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met."  29 C.F.R. § 541.106(a).  Thus, courts have granted summary judgment to retail employers when seemingly nonmanagerial tasks occupied the majority of an employee's time, but that employee nevertheless remained sufficiently responsible for managing the store at all times.  *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 514-18 (4th Cir. 2011) (affirming grant of summary judgment to the employer when the employee spent most of her time on non-managerial tasks but "during 100% of the time, even while doing

[non-managerial] jobs, she was also the person responsible for running the store[—][i]ndeed, there was no one else to do so"); *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 504-09 (6th Cir. 2007) (affirming grant of summary judgment to the employer when the employee spent most of her time on non-managerial tasks but the remaining "primary duty" factors weighed in favor of the exemption).  Thus, the Court will consider the remaining "primary duty" factors to determine whether the undisputed facts conclusively establish that Plaintiff's management duties, including those exercised concurrently with his non-exempt duties, were primary.

The next factor to consider is the relative importance of Plaintiff's exempt duties relative to his other tasks.  29 C.F.R. § 541.700(a).  Here, the Court determines that a reasonable factfinder could conclude that Plaintiff's hourly floor tasks were more important to Defendant than his management tasks as an ASM.  Plaintiff testified that his store was understaffed and overtime for hourly employees was not approved.  [#295-1 at 63-64 (244:25-245:14), 68-69 (264:24-265:23), 71 (273:19-274:9)]  Under Defendant's policy, Plaintiff was required to perform hourly tasks in order to remain under the store's labor budget, which was set by Defendant's corporate offices.  [##295-1 at 63-64 (244:25-245:14), 68-69 (264:24-265:9); 307-1, DSOF35; *see also* #307-1, DSOF48 (indicating that Plaintiff often could not perform his daily checklists but was instead required to help perform manual tasks in the store)]  Such evidence supports a conclusion that Plaintiff's hourly floor tasks were more important to Defendant than his managerial tasks due to the labor budget restrictions and staffing level imposed by Defendant.  *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1270 (11th Cir. 2008) (upholding a jury's finding that store managers were not exempt when those managers performed "[a] large amount of

manual labor . . . given each store's limited payroll budget and the large amount of manual labor that had to be performed"); *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 916 (E.D. La. 2009) (finding a salaried employee's "completion of [non-managerial] tasks was essential to the functioning of the store" when the employer set a strict labor budget for the store that resulted in excess non-managerial tasks routinely falling on that employee).

Evidence also reflects that the management duties that Plaintiff did perform were often redundant with those of his store manager, or were exercised under the supervision of his store manager. [*See, e.g.*, #307-1, DSOF8, 9, 11, 13, 35, 40] Moreover, many of Plaintiff's managerial tasks could be performed by non-exempt department managers. For example, certain hourly department managers were required by company policy to serve as the "Manager on Duty" on a scheduled basis, and were tasked with similar "managerial" tasks as Plaintiff. [#307-1, DSOF104; #296-1 at 6-7 (listing as responsibilities for an hourly "Receiving Manager" position: "Training and monitoring department personnel including assigning and following up on tasks;" "Working with other department managers to cross-train staff to accomplish all needed tasks;" "Assisting in interviewing and hiring for department needs;" "Working with the store manager to address performance and/or disciplinary issues within the department;" "Opening and closing of store;" "Maintaining the safety and security of customers and employees;" "Answering customer questions per company standards and policies;" and "[R]unning and analyzing reports")] This is especially true of any "concurrent" supervision that Plaintiff was responsible for while completing non-exempt tasks, as evidence reflects that all employees—hourly or exempt—"coached" each other [#286-5 at 71], resolved customer

complaints [#307-1, DSOF56], maintained inventory [*id.*, DSOF47], performed quality assurance [*id.*, DSOF87], and minimized inventory "shrink" to increase the store's profitability [*id.*, DSOF88].  [*See* #307-1, DSOF85, 87 (listing "supervising [employees]," "[p]erforming quality assurance on inventory," "[r]esponding to customer complaints," and "coaching [employees]" as some of Plaintiff's concurrent management responsibilities)]  Indeed, one store manager ran one of Defendant's stores without any ASM—relying instead on only hourly department managers to "manage" the store.  [*Id.*, DOSF104]  This evidence, viewed in the light most favorable to Plaintiff, indicates that "[i]f [Plaintiff] failed to perform his managerial duties, [Defendant] would still function in much the same manner because the Store Manager, and even non-salaried managers . . ., could and did perform many of these tasks."  *Johnson*, 604 F. Supp. 2d at 917; *cf. Thomas*, 506 F.3d at 505 (finding that an employee's managerial duties were of primary importance to the success of her store because "[i]f [the manager] failed to perform her managerial duties, her [store] would not function at all because no one else would perform these essential tasks"); *In re Family Dollar*, 637 F.3d at 515-17 (finding that an employee's primary duty was management when that employee "had the ultimate responsibility for operating the store profitably" because "there was no one else to do so").  A factfinder could therefore reason that "the redundant ability of [Plaintiff's store manager and] even hourly-wage supervisors to perform so-called essential management tasks meant that [P]laintiff['s] absence would prove no great impediment to the continued success of [the store]." *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 291 (E.D.N.Y. 2010) (citing *Johnson*, 604 F. Supp. 2d at 916-17).

Defendant relies primarily on Plaintiff's job description, performance review criteria, bonus plan, and training to argue that his management duties were more important than his hourly tasks. [#286 at 7-9]  The Court agrees that these factors, drawn from *Cort v. Kum & Go, L.C.*, 923 F. Supp. 2d 1173, 1178 (W.D. Mo. 2013), largely support an exemption.  This evidence, however, is to be considered "[i]n addition" to "whether the company's goals could be accomplished if the manager failed to perform either his managerial or non-managerial duties."  *Id.* (citing *Thomas*, 506 F.3d at 505); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) ("[T]he regulations make clear that [the primary duty] question[] should be resolved by examining the employees' *actual* job characteristics and duties." (emphasis added)).  Here, evidence supports the conclusion that, in practice, Plaintiff's non-managerial duties contributed more to the overall success of the store.  Moreover, Plaintiff's job description notes that ASMs "are expected to be 'hands on' and do whatever it takes to get the job done and make the company thrive," and must "[r]emain[] flexible to changing work demands." [#286-6 at 61] This stated job duty aligns with the evidence that, in light of the store's understaffing, "do[ing] whatever it takes to get the job done" in Plaintiff's scenario meant prioritizing hourly tasks because they were more important to the success of the store.

Any concurrent exercise of managerial duties while performing nonexempt tasks does not change this conclusion.  Defendant argues that "the overall quality of [Plaintiff's] work was managerial," relying on evidence indicating that Plaintiff was always engaged in "[t]he concurrent performance of management and non-management tasks." [#286 at 10]  Defendant cites to evidence such as Plaintiff's testimony that he did not "believe that [he] took off [his] manager hat" when he was performing non-exempt tasks [#295-1 at 45

(170:11-17)], and Plaintiff's store manager's statement that Plaintiff was "still engaging with the store as a manager and looking for opportunities to improve store operations" while he was performing "what may appear to be a menial task" [#286-7 at ¶ 27].  [#307-1, DSOF83-84]  But the evidence is not so one-sided as to compel a rational factfinder to determine that any concurrent supervision that Plaintiff exercised, even as the highest-ranking employee in the store, was more valuable to Defendant than the non-exempt tasks that he was performing.   Again, evidence reflects that nonexempt employees exercised similar concurrent oversight of the store while performing manual tasks.  And Plaintiff's testimony, read in the light most favorable to Plaintiff, reflects that his "concurrent" managerial tasks consisted of occasionally "stopp[ing] one specific task to attend to another one," when necessary.  [#295-1 at 45 (169:4-24)]  That is, Plaintiff would "take breaks" from his hourly tasks to attend to occasional, specific issues brought to him by store employees.  [*Id.*] Otherwise, Plaintiff testified that employees largely knew what they needed to do each day, and for the most part, he acted simply as a "middleman" who "relayed [his store manager's] assignments."   [#295-1 at 14 (46:20-47:8), 62-63 (240:24-241:9); *see also id.* at 46 (173:8-18) (Plaintiff testifying that employee tasks "generally stayed the same" on freight delivery days and that Plaintiff would only assign employees to assist "[o]n occasion")]  Thus, although Plaintiff may have always been wearing his "manager hat," there is a dispute of fact as to the extent that Plaintiff's "managerial" label impacted his day-to-day experience or his value to the store—beyond his ability to work extra hours exempt from overtime.  *See Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 691 (6th Cir. 2001) ("The words 'in charge' are not a magical incantation that render an employee a *bona fide* executive regardless of his actual duties.").

The Court next considers Plaintiff's relative freedom from direct supervision.   29 C.F.R. § 541.700(a).   Defendant argues that Plaintiff was "responsible for 'running the store' approximately 50 to 60 percent of the time without any direct supervision or guidance from his [store manager]," and that Plaintiff operated with "significant freedom from direct supervision" even when Plaintiff's store manager was present.   [#286 at 13-14]  The Court finds, however, that these factual assertions are disputed.

Regarding Plaintiff's responsibilities when his store manager was away from the store, it is undisputed that Plaintiff spent 50 to 60 percent of his workweek as the highest-ranking manager in the store.   [#307-1, DSOF93]   But the undisputed facts do not establish that Plaintiff was necessarily responsible for "running the store" during this time. Instead, viewing the evidence in the record in the light most favorable to Plaintiff, Plaintiff's store manager structured her time to primarily control the store-management tasks.   For example, Plaintiff's store manager set schedules ahead of time, leaving only minor schedule adjustments for Plaintiff's approval [#295-1 at 41 (156:5-8); *see also id.* at 40-41 (152:8-11, 153:1-16) (Plaintiff testifying that he only completed one schedule during his time as an ASM)]; completed nearly all of the store's required reports [#307-1, DSOF35]; regularly attended the management conference calls [*id.*, DSOF34]; conducted all interviews, with Plaintiff also involved to some degree [*id.*, DSOF3]; and delegated tasks for the day, with Plaintiff simply acting as a "middleman" who "relayed [his store manager's] assignments."   [#295-1 at 14 (46:20-47:17)]  Thus, while Plaintiff held the title of highest-ranking manager for much of his time in the store, there is evidence indicating that Plaintiff nevertheless lacked the ability to exercise any significant degree of discretionary power free from supervision during this time.   *See Morgan*, 551 F.3d at

1270 n.57 (11th Cir. 2008) ("Having discretionary power is one aspect of freedom from supervision.").

Relatedly, during the time that Plaintiff and his store manager did overlap, there is evidence that Plaintiff did not operate with significant freedom from supervision.  Again, Plaintiff testified that his store manager controlled most of the features of store management, with Plaintiff only exercising occasional involvement (often at his store manager's direction).  [*See, e.g.*, #286-5 at 70 ("On one occasion Plaintiff was directed by [his store manager] to prepare [a schedule]."), 74 ("[O]n at least one or two occasions, Plaintiff was directed by his [store manager] to write an employee up.")]  And Plaintiff agreed that employees largely knew what they needed to do each day, and for the most part, he acted as a "middleman" who "relayed [his store manager's] assignments."  [#295-1 at 14 (46:20-47:8), 62-63 (240:24-241:9)]

Ultimately, viewing the evidence in the light most favorable to Plaintiff, this is not a case where Plaintiff indisputably exercised the degree of freedom from supervision necessary to sustain summary judgment.  *Compare Thomas*, 506 F.3d at 507 (affirming summary judgment to a defendant when a store manager had a district manager who merely "visited [the] store approximately once or twice a week, communicated with [the store manager] frequently via phone and email, and remained constantly available to address her concerns"); *and In re Family Dollar*, 637 F.3d at 511, 517 (affirming summary judgment to a defendant when a store manager was "subject to company policies," "provided . . . with a quarterly budget," and subject only to the supervision of a district manager with 17 stores to supervise and who would visit "once every two to three weeks"), *with Morgan*, 551 F.3d at 1271 (affirming a jury's verdict in favor of plaintiff store

managers where they were subject to the supervision of district managers who supervised 10 to 30 stores and "closely monitored" or "closely supervised" aspects of store management such as payroll, hourly rates, prices, and inventory orders); *and Smith v. Heartland Auto. Servs., Inc.*, 418 F. Supp. 2d 1129, 1137 (D. Minn. 2006) (denying the defendant's motion for summary judgment in a case where "an overarching theme" for most of the plaintiff store managers was "the close involvement of their District Managers with the daily operations of the stores").  Instead, the evidence read in the light most favorable to Plaintiff reflects that Plaintiff's store manager directly oversaw and remained responsible for the store's effective operation, even during times that Plaintiff was the highest ranking manager in the store.  *See Ale*, 269 F.3d at 691-92 (holding that shift supervisors' primary duty was not management even though they were "in charge of their shifts" because of their limited control over the employees they supervised).  Accordingly, the Court determines that a reasonable factfinder could find that Plaintiff did not experience a relative degree of freedom from direct supervision as an ASM.

Finally, the Court considers the relationship between Plaintiff's salary as an ASM and the wages paid to other employees for the kind of nonexempt work performed by the Plaintiff.  29 C.F.R. § 541.700(a).  Plaintiff earned $15.90 per hour as a non-exempt department manager.  [#307-1, DSOF99]  As an ASM, Plaintiff earned an annual salary of $47,500 and estimated working 50-55 hours per week.[14]  [*Id.*, DSOF101]  Assuming a 50-hour workweek, Plaintiff's annual ASM salary equated to approximately $18.27 per

---

[14] Defendant notes an objection to the admissibility of Plaintiff's hourly estimates and states that it intends to address this argument through "a motion in limine at the appropriate time."  [#307 at 10 n.11]  Thus, the Court does not consider any legal or factual dispute regarding the estimated hours that Plaintiff worked before the Court at this time, but will address the issue if Defendant files a motion in limine.

hour; assuming a 55-hour workweek, Plaintiff's annual salary equated to approximately $16.61 per hour.[15]  The Court concludes that such a difference, in light of the other factors, does not necessitate judgment in favor of Defendant—especially where any hours worked as a department manager over forty hours per week would have needed to have been paid at one and one-half times  the regular rate.  *See Morgan*, 551 F.3d 1233, 1271 (11th Cir. 2008); *Heartland Auto. Servs., Inc.*, 418 F. Supp. 2d at 1139-40 (holding that competing salary calculations "must be considered by a jury together with the other evidence relevant to the primary duty analysis").

Thus, having considered the factors relevant to a "primary duty" analysis and Plaintiff's job as a whole, the Court finds that there is a genuine dispute as to whether Plaintiff's primary duty as an ASM was the management of the store.   Accordingly, Defendant has not met its burden of establishing its entitlement to summary judgment on the executive exemption, and Defendant's Motion is DENIED to the extent that it seeks summary judgment on this ground.

### 2.    Administrative Exemption

Next, under the administrative exemption, the FLSA exempts a person employed "in a bona fide . . . administrative . . . capacity."   29 U.S.C. § 213(a)(1).   Under DOL regulations, an employee qualifies for the administrative exemption if the employee:  (1)

---

[15]  The parties offer competing calculation methods for determining the proper comparison.   [#307-1, DSOF101]   Neither party offers caselaw in support of their preferred method.  For the purposes of deciding this Motion, the Court adopts the method used in *Morgan v. Family Dollar Stores*, where the court compared the hourly rates of the next-lowest, non-exempt employee with the hourly rates of the salaried employees— scaled for the average hours worked in a workweek by the salaried employees. *See* 551 F.3d at 1271; *see also Heartland Auto. Servs., Inc.*, 418 F. Supp. 2d at 1139-40 (declining to rule on the proper calculation method on a motion for summary judgment).  The Court will, of course, consider more fully briefed arguments related to this dispute brought through appropriate motions or pretrial filings.

meets a specific weekly salary threshold; (2) has a primary duty of office or non-manual work directly related to management or general business operations; and (3) has a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance.   29 C.F.R. § 541.200(a)(1)-(3).   Again, "the term 'primary duty' means the principal, main, major or most important duty that the employee performs," to be determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."   *Id.* § 541.700(a). Defendant argues that the undisputed evidence establishes that "[Plaintiff's] primary duty was managing day-to-day operations at his store."   [#286 at 17]   For the reasons discussed above, the Court disagrees.   While the evidence establishes that Plaintiff had some degree of involvement in managing store operations, there is a factual issue as to whether this involvement was Plaintiff's "primary duty" as opposed to his non-exempt manual tasks.   Accordingly, Defendant has not met its burden of establishing its entitlement to summary judgment on the administrative exemption, and Defendant's Motion is DENIED to the extent that it seeks summary judgment on this ground.

### B.     Plaintiff's Exemption Status—State Law

Defendant also argues that Plaintiff was properly classified as an exempt executive or supervisor for the purposes of the CWCA.   [#286 at 18-24] Under state regulations, a salaried employee is exempt from state overtime requirements under the executive exemption if that employee:   (1) meets a particular salary threshold; (2) supervises the work of at least two full-time employees; (3) has the authority to hire and fire, or to effectively recommend such action; and (4) spends a minimum of 50% of the workweek in duties directly related to supervision.   COMPS #35, 7 C.C.R. § 1103-1, Rule 5(b)

(2019).  Under the fourth element, Defendant asserts that, just as under the FLSA, "the relevant inquiry" under Colorado Law is "a determination of the employee's 'primary duty.'"  [#286 at 21]   Without specifically deciding the extent to which the "50% of the workweek" requirement of the CWCA and its implementing regulations parallels or diverges from the "primary duty" requirement of the FLSA, the Court agrees that, for the purposes of Defendant's Motion, the exemptions "rise and fall together."  [#286 at 21 n.17]; *Ott*, 506 F. Supp. 3d at 1141 ("Courts are to read exemptions under the FLSA and Colorado law harmoniously because many of the [state-law] provisions are patterned largely after the FLSA." (quotation and citations omitted)).  Thus, the same fact issues that precluded summary judgment under the FLSA exemptions similarly preclude summary judgment on Plaintiff's CWCA law claim.  Accordingly, Defendant has not met its burden of establishing its entitlement to summary judgment on Plaintiff's CWCA claim, and Defendant's Motion is DENIED to the extent that it seeks a summary judgment on this ground.

### C.   Willfulness

Defendant next moves for summary judgment on the issue of whether its alleged violation of the FLSA was willful.  [#286 at 24-28]  The FLSA imposes a two-year statute of limitations unless the defendant's violations are shown to be willful, in which case a three-year period applies.  *See* 29 U.S.C. § 255(a).  Neither party points the Court to any other legal impact of a willfulness finding in this FLSA action, and the Court is aware of none.

The Court finds that Defendant's request for summary judgment on the question of willfulness is moot.  "A federal court has no power to give opinions upon moot questions

or declare principles of law which cannot affect the matter in issue in the case before it."

*S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (citing *Church of Scientology of Calif. v. United States*, 506 U.S. 9, 12 (1992)).  Here, the undisputed facts establish that the entirety of Plaintiff's claims fall within the lesser two-year statute of limitations.  Plaintiff only asserts claims based on his experience as an ASM.  [##1; 17] Plaintiff began as an ASM in March 2018.  [#307-1, DSOF2]  Plaintiff filed this lawsuit in which he was "specifically named as a party plaintiff" less than two years later on January 31, 2020, and filed his written consent to become a party that same day.  [##1; 317-1, PSOF2]  Thus, the entirety of Plaintiff's FLSA claim falls within two years from the date that Plaintiff's action commenced.[16]  29 U.S.C. § 256(a); *Coldwell v. Ritecorp Env't Prop. Sol.*, No. 16-cv-01998-NYW, 2017 WL 1737715 at *11 (D. Colo. May 4, 2017).  Whether any misclassification of Plaintiff occurring between March 2018 and April 2019 was willful is therefore a "question[] . . . which cannot affect the matter in issue" in this case and is thus moot.[17]  *S. Utah Wilderness All.*, 110 F.3d at 727.

---

[16] While the briefing focuses on willfulness under the FLSA, the Court notes that a finding of willfulness similarly extends the statute of limitations under the CWCA from two to three years.  *See Hernandez v. Ray Domenico Farms, Inc.*, 414 P.3d 700, 701 (Colo. 2018); Colo. Rev. Stat. § 8-4-122 (2016).  While Plaintiff did not assert a CWCA claim until his Amended Complaint, filed on April 1, 2020 [#17], this amendment plainly relates back to the date of Plaintiff's original Complaint as it "asserts a claim or defense that arose out of the conduct . . . set out . . . in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

[17] To be sure, the question of willfulness and its resulting impact on the statute of limitations at one point held import in this matter.  This case was brought as a collective action under the FLSA, and the collective included individuals who worked as ASMs "at any time on or after January 31, 2017"—that is, within three years of the filing of this lawsuit.  [*See* #41 at 11]  Thus, applying a two year statute of limitations would extinguish the ability of any opt-in plaintiffs who worked as ASMs to recover damages for violations that occurred between two and three years prior to the date that their action was deemed to commence.  *See Coldwell*, 2017 WL 1737715 at *11 ("In a collective action, an individual claimant whose name does not appear on the initial complaint commences an action when he or she files written consent." (citing 29 U.S.C. § 256(b)).  However, on

Accordingly, Defendant's Motion is DENIED to the extent that it seeks summary judgment on the issue of whether Defendant acted willfully.

### D.      Good faith/reasonableness

"Generally, an employer in violation of the FLSA is liable for both compensatory damages as well as 'an additional equal amount as liquidated damages,' essentially doubling the plaintiffs' damage award." *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1272 (10th Cir. 2011) (quoting 29 U.S.C. § 216(b)). "However, if the employer can establish that his conduct was both in good faith and based on a reasonable belief that his conduct was not in violation of the FLSA, the court may, in its discretion, award less or no liquidated damages." *Id.* (quoting 29 U.S.C. § 260). "[T]he employer bears the burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness." *Koellhoffer v. Plotke-Giordani*, 858 F. Supp. 2d 1181, 1192 (D. Colo. 2012) (quoting *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2nd Cir.1997)). "The burden . . . is a difficult one to meet." *Id.* (quoting *Reich*, 121 F.3d at 71).

Defendant seeks a determination that it acted in good faith and reasonably believed that its conduct was lawful in classifying Plaintiff as exempt.  [#286 at 28-30]

---

May 25, 2023, the Court granted Defendant's Motion to Decertify and dismissed the claims of all opt-in plaintiffs, leaving only Mr. Levine's claims against Defendant.  [#280] Thus, while the question of willfulness had legal import in this matter while it proceeded on a collective basis, it no longer does.  And "[t]he rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quotation omitted); *see also Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (quotation omitted)).

The Court declines to make such a determination at this stage of the proceedings. Defendant first relies on five DOL audits completed between 2006 and 2021, each of which concluded that the audited store's ASMs were properly classified as exempt or that the store's exemptions were "not an issue."  [*Id.* at 28; #286-6 at 31, 36-37, 43, 48, 54] None of these audits, however, took place at the store where Plaintiff was employed as an ASM.  [*See* #307-1, DSOF107-111]  While perhaps an insignificant detail in other cases, in this case the Court has already found that "ASM duties differed among Defendant's stores," creating "disparate . . . employment settings" from store-to-store. [#280 at 21-22]  The Court finds that the significance of DOL audits at separate stores weakens in light of a store management structure that, by Defendant's own argument, permits such a degree of work variety as to "make it impossible . . . to adduce representative evidence of [an ASM's] exemption status."  [#223 at 12]

Moreover, Plaintiff has pointed to evidence that Defendant was not entirely forthcoming to the DOL in at least one of these audits.  [#307-1, DSOF111]  On August 18, 2021, a DOL investigator held a phone conference with Defendant's Vice President Human Resources Manager Heidi Hayward and "was . . . informed that there were no private action lawsuits against [Defendant] at the present time."  [#286-6 at 57]  At the time of that conference, this lawsuit had been pending for over a year and a half, suggesting Defendant misrepresented a fact to the DOL investigator.  [*See* #1]; *see also Koellhoffer*, 858 F. Supp. 2d at 1193 (denying summary judgment on the issues of good faith and reasonableness when "[a] reasonable jury could find from the evidence that Defendants were not completely honest to the USDOL investigator").   And while Defendant points to Ms. Hayward's testimony that she did provide the DOL with

information regarding this lawsuit in connection with the audit [#307-9 at 5-6 (28:21-29:7)], this testimony merely creates a disputed fact that is not proper for resolution at the summary judgment stage.[18]

Nor does Plaintiff's resumé, listing primarily managerial duties, establish Defendant's good faith and reasonableness.  First, it is unclear when Plaintiff submitted his resumé, and there is no evidence that it was ever reviewed by anyone associated with Defendant prior to this litigation.  [*See* #295-1 at 15 (50:1-12) (Plaintiff's testimony that he did not recall when he prepared this resumé, but affirming that it was "[s]ometime after [he] had already been a Natural Grocers [ASM]")]  Moreover, Plaintiff raised specific concerns with his regional manager regarding the amount of nonexempt work he was completing.  [#295-2 at 25 (90:24-91:18)]  Plaintiff's regional manager "discussed it with [Plaintiff's] store manager [but] the store was understaffed at the time[,] [s]o [they] didn't really do anything about it." [*Id.* (91:19-23)]  Thus, there is some evidence that Defendant had knowledge of Plaintiff's alleged misclassification due to the store's high manual labor needs but took no action to either adjust his tasks or otherwise reevaluate his classification.  *See Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*, 246 F. Supp. 2d 886, 906 (S.D. Ohio 2003) (denying summary judgment when, despite findings by the DOL that a particular employee was properly classified as exempt at one office location, the employer "may have had knowledge" that an employee holding the

---

[18] Defendant also argues that Plaintiff is citing the DOL audit report "out of context," because further up on the same page the report contains a heading titled "Family Medical Leave Act." [#307 at 16-17]  The Court finds Plaintiff's reading to be reasonable, as the remainder of the page addresses subjects not related to the Family Medical Leave Act, indicating that the report had changed topics (albeit without a new heading).  [#286-6 at 57-58]

same position at a separate office location was working under different conditions which impacted the exemption at issue).

Defendant also points out that it periodically reviewed and revisited its exemption classification for ASMs.  [#286 at 29-30]  Ms. Hayward testified that, as of January 12, 2022, the most recent evaluation took place in 2017 and consisted of a "quick check" that included "a quick discussion" between Ms. Hayward and Defendant's executive vice president.  [#295-8 at 32-33 (31:17-32:25), 37 (36:6-9)]  Ms. Hayward based the decision, in part, on her perception that "[ASMs] perform a managerial duty on a regular basis," including "hiring people," "firing people," "putting together performance evaluations," and "scheduling."  [#295-8 at 42-43 (41:8-42:9)]  But, as discussed above, there is a factual issue as to whether Plaintiff was actually engaged in these managerial duties on a regular basis such that the exemption applied or whether, pursuant to Defendant's labor budget and manual labor needs, Plaintiff performed primarily non-exempt tasks.  Putting aside any questions of Defendant's good faith in conducting its reviews, this factual dispute inhibits the Court's ability to make a finding as to the reasonableness of Defendant's classification of Plaintiff as exempt at this stage.

Indeed, multiple courts have determined that a ruling on the issue of good faith and reasonableness at the summary judgment stage is premature when the underlying claims of violation remain outstanding.  *Warren v. MBI Energy Servs., Inc.*, No. 19-CV-00800-RM-STV, 2022 WL 1211584, at *4 (D. Colo. Apr. 25, 2022) ("Having made no determination as to Defendants ultimate liability in this case, however, the Court cannot say that there are no genuine issues as to Defendants' good faith defense at this stage."); *McClain v. Ultimate Towing of Gainesville, Inc.*, No. 1:17CV14-MW/GRJ, 2017 WL

4932933, at *3 (N.D. Fla. Sept. 15, 2017) ("Defendants' [good faith] argument is premature; [o]nly after a finding of liability has been reached does the Court reach the issue of liquidated damages." (quotation omitted)); *Prickett v. DeKalb Cnty.*, 276 F. Supp. 2d 1265, 1271 (N.D. Ga. Feb. 4, 2003) ("Defendant's Motion for Summary Judgment on [good faith and reasonableness] is premature. Only after a finding of liability has been reached does the Court reach the issue of liquidated damages."), *vacated in part on other grounds*, 349 F.3d 1294 (11th Cir. 2003); *see also Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 714-15 (S.D. Tex. 2012) ("den[ying] as premature" summary judgment on the issue of good faith and reasonableness when "some of [the employer's] decisions were correct" but "the [c]ourt has rejected others"), *aff'd*, 755 F.3d 279 (5th Cir. 2014). The Court agrees that a summary judgment determination on this matter is premature considering the outstanding factual disputes regarding Plaintiff's actual job duties as an ASM.

Accordingly, Defendant's Motion is DENIED to the extent that it seeks a determination that it acted reasonably and in good faith in classifying Plaintiff as exempt.

### E.    Exemption Status During the Training Program

Turning to Plaintiff's Motion, Plaintiff seeks partial summary judgment on both his FLSA and CWCA claims, asserting that the undisputed facts establish that Plaintiff was entitled to overtime compensation for hours worked above 40 in a workweek during the several-week training program that Plaintiff attended in Golden, Colorado.   [#309] Defendant argues that: (1) as a matter of law, the FLSA does not recognize the "training-in-isolation" theory advanced by Plaintiff [#310 at 2-7]; and (2) the undisputed facts do not

establish that Plaintiff was improperly classified as exempt during the training period or that Plaintiff is entitled to any damages [*id.* at 7-20].

The Court begins with Defendant's legal argument.  As the Court has previously noted, "determining the exemption status of any given individual depends 'on all the facts in a particular case' and demands an examination of 'the character of the employee's job as a whole.'"   [#280 at 18 (quoting 29 C.F.R. § 541.700(a))].   From this principle, Defendant argues that it is improper to "bifurcate" an employee's time in a training program vs. the remainder of that employee's work for the purposes of an exemption analysis. [#310 at 2-7]

The Court disagrees that it is categorically barred from considering Plaintiff's training period separate from the remainder of his employment as an ASM.  In fact, DOL regulations specifically recognize that employees training for exempt positions are not necessarily exempt during the course of their training.  According to 29 C.F.R. § 541.705: "The executive [and] administrative . . . employee exemptions do not apply to employees training for employment in an executive [or] administrative . . . employee capacity who are not actually performing the duties of an executive [or] administrative . . . employee." In response to comments on this regulation, the DOL maintained that "it is not appropriate to adopt a blanket exemption for all 'trainees'" in management training programs because "[e]mployees, including trainees, who do not 'actually perform' the duties of an exempt [employee] cannot be considered exempt."  *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg.  22122, 22189 (Apr. 23, 2004).  Whether the employer created a separate "trainee" title is not dispositive for applying the trainee regulation.  *See* 29 C.F.R. § 541.2.

Courts applying this principle have separately considered training periods apart from the post-training position itself for the purposes of an exemption analysis. *See Reichert v. Hoover Foods, Inc.*, No. 1:16-CV-4575-SCJ, 2019 WL 13275198, at *7 (N.D. Ga. Feb. 22, 2019) (denying an employer's motion for summary judgment on assistant store manager's exemption status because "[the] [p]laintiffs submit evidence from which a reasonable jury could find that [they] were misclassified as exempt from overtime pay during their training," meaning that "a reasonable jury could conclude that [the] [d]efendant misclassified employees while they were in training"); *Espinosa v. Stevens Tanker Div., LLC*, No. SA-15-CV-879-XR, 2017 WL 6021861, at *6 (W.D. Tex. Dec. 5, 2017) (separately considering a "two-week training period" and holding that an overtime exemption did not apply during it "[b]ecause [the] [d]efendant presents no evidence that [the] [p]laintiffs engaged in any activity other than training" during that period); *Bullard v. Babcock & Wilcox Tech. Servs. Pantex, L.L.C.*, No. CIV.A. 2:07-CV-049-J, 2009 WL 1704251, at *6 & n.1 (N.D. Tex. June 17, 2009) (holding that the trainee regulation applied to an employee in training because "[w]hile a trainee he was not in an exempt position"), *vacated sub nom. on other grounds*, *Stokes v. BWXT Pantex, L.L.C.*, 424 F. App'x 324 (5th Cir. 2011).

To be sure, not every training period automatically qualifies for overtime compensation. Some training may involve "actually performing the duties of an [exempt] employee." 29 C.F.R. § 541.705. Moreover, as Defendant points out, courts have recognized that temporary periods of non-exempt work do not necessarily alter the overall status of an otherwise exempt employee. *See Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003) (holding that otherwise exempt employees at a nuclear station

were not entitled to overtime pay for nonexempt work performed in connection with periods of routine maintenance because during the "natural business cycle" of eighteen months "the performance of nonexempt work for five or six weeks out of every eighteen months could not alter the plaintiffs' exempt status"); *see also Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 517 (6th Cir. 2004) (holding that employees were not "preclude[d] from otherwise meeting the [administrative] exemption" by virtue of completing a one or two month "ice removal project" involving nonexempt manual labor during the course of their employment); *Wingerd v. Kaabooworks Servs., LLC*, No. 18-CV-2024-JAR-KGG, 2019 WL 1171700, at *16 (D. Kan. Mar. 13, 2019) (holding that a seventeen day "demotion" which did not alter an employee's salary or job title "d[id] not destroy [the employee's] classification as an exempt employee"); *but see Dixon v. Zabka*, No. 3:11-CV-982 MPS, 2014 WL 6084351, at *16 (D. Conn. Nov. 13, 2014) (distinguishing *Counts* and similar cases because "these cases do not consider new hires who are training for a position, nor do they consider the training exception at all").  The DOL has provided an opinion letter that applies this concept in the context of executive training, concluding that already-exempt employees would not lose their exemption status by completing a training program for a different exempt position that featured some weeks of primarily nonexempt work mixed with exempt tasks.  DOL Wage & Hour Div., Opinion Letter FLSA2008-19 (December 19, 2008).  This was because "the primary duty test for executives need not be met each and every workweek in all cases."  *Id.* at 2.  Accordingly, a "temporar[y] reassign[ment] to training" would not result in the loss of a long-held exemption when the employees' "primary duty continues to be that of an exempt [employee]."  *Id.* at 2-3.

Thus, Plaintiff *may* be entitled to overtime compensation under the FLSA for hours worked during Defendant's training program—even if the position that he was training for qualified as exempt.  However, turning to Defendant's factual argument, the Court agrees with Defendant that the undisputed facts do not compel this conclusion.  Indeed, the record before the Court contains very little information about Plaintiff's training.  The only direct evidence that Plaintiff musters regarding Plaintiff's duties during training is Plaintiff's statement that "I was not performing duties in my training.  It was a learning process."[19] [#295-1 at 60 (230:7-25)]   To the extent that any legitimate factual assertions in Plaintiff's favor may be drawn from Plaintiff's sparse description of his training (or similar statements of other ASMs[20]), such assertions are disputed.  [*See* #317-1, PSOF4, 8]  Defendant points to evidence that while ASMs completing the training program were not "completely proficient" and were "still learning," they came into training with some experience at their assigned store and were actively "applying [the] knowledge that they're learning to that store" throughout training.  [#310-4 at 9-10 (20:13-21:18)]  There is evidence that ASMs were involved in making promotion and termination decisions, creating schedules, assessing inventory, analyzing store performance, and planning store improvements

---

[19] And this statement was made in response to the undeniably leading question from Plaintiff's counsel: "You weren't performing the role of the [ASM] while you were in training; correct?"  [#295-1 at 60 (230:7-25)]

[20] *See, e.g.*, #309-3 at 5 (169:3-7) ("Q:  Were you performing any management tasks while you were completing training in Golden, Colorado? . . . A:  No."); #309-4 at 7 (226:5-8) ("Q:  Were you performing any management tasks while you were completing training in Golden, Colorado?  A:  No."); #309-5 at 7 (221:5-7) ("Q:  Were you performing any management tasks while you were completing training?  A:  No."); #309-6 at 5 (154:8-10) ("Q:  Were you performing any management tasks while you were completing training in Golden?  A:  No.").

while they were completing the training program.[21]  [*See* #317-1, PSOF4, 36]  The training

also included in-store days, and there is evidence that the ASMs were expected to apply

the management training that they were receiving and supervise the employees at the

store.  [*Id.*; *see also* #310-4 at 17-18 (30:9-31:25)]  Further disputes exist regarding when

Plaintiff began training—and therefore how long Plaintiff had worked in the ASM position

prior to training—and the number of hours that Plaintiff worked during training.[22]  [*See*

#317-1, PSOF3, 40]   These facts are material to determining Plaintiff's ability to recover

overtime compensation while completing Defendant's training program.

Thus, the Court concludes that Plaintiff's primary duties during training and the

amount of overtime worked by Plaintiff during this period (if any) are questions to be

resolved by a jury.  Accordingly, Plaintiff's Motion is DENIED.[23]

---

[21]  Plaintiff argues that because the evidence that Defendant relies on came from Defendant's corporate representative the Court should ignore it.  [*See* #317 at 6; 317-1, PSOF4, 36]  Plaintiff cites no authority for this proposition, and the Court is satisfied that Ms. Valdez exhibited sufficient familiarity with the ASM training program to reliably testify as to its contents.  [*See generally* #295-6; *see also id.* at 8-9 (19:23-20:1) (discussing Ms. Valdez's ongoing experience teaching a leadership class during training)]

[22]  To support Plaintiff's assertion that "Plaintiff completed mandatory ASM training between March and April 2018," Plaintiff cites only to Plaintiff's deposition testimony establishing that he signed a human resources training acknowledgement on April 12, 2018.  [#317-1, PSOF3; *see also* #309-1 at 6 (144:5-17)]  The testimony does not necessarily establish that the human resources training referenced in the acknowledgement was part of mandatory training program. [#309-1 at 6-7 (144:5-146:5)] Thus, Plaintiff's chart purporting to show the hours that Plaintiff worked for seven specific weeks during his time as an ASM fails to establish that Plaintiff worked those hours during training, as the dates of Plaintiff's training period are uncertain.  [*See* #319-1]  Moreover, Plaintiff specifically testified that he worked "approximately 40 [hours] a week" during his training and did not recall working over 40 hours in any week during training.  [#295-1 at 60 (231:5-14)]

[23]  Plaintiff's Motion also seeks a summary judgment finding that Defendant's violation was willful.  [#308 at 16-18]  Because a fact dispute precludes a finding that Defendant committed a violation in the first place, a finding that any violation was willful would be inappropriate.  Moreover, as discussed above, the question of willfulness is moot as to Plaintiff's claims, as the undisputed facts establish that the entirety of Plaintiff's

III.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment [#286] and

Plaintiff's Motion for Partial Summary Judgment [#308] are **DENIED**.


DATED:  October 19, 2023                    BY THE COURT:

                                            s/Scott T. Varholak_____
                                            United States Magistrate Judge

---

employment as an ASM (including training) took place within the lesser two-year statute
of limitations.